**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

STAN LABER,

               Plaintiff,

    v.

LLOYD J. AUSTIN, *in his official capacity as Secretary, United States Department of Defense*,

            Defendant.

No. 1:22-cv-145 (MSN/TCB)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
<u>MOTION TO DISMISS AND FOR SUMMARY JUDGMENT</u>**

Defendant, Lloyd J. Austin, in his official capacity as Secretary, United States Department of Defense, by counsel, hereby submits the following memorandum in support of his motion to dismiss and for summary judgment.

## INTRODUCTION

Plaintiff Stan Laber, now retired, started working at the National Geospatial Intelligence Agency ("NGA") in October 2006 as a Defense Acquisition Workforce Improvement Act ("DAWIA") contract specialist.  First Am. Compl. ("FAC") ¶ 2, Dkt. No. 11.  In the summer of 2013, Plaintiff—who is Jewish, male, and was then 68 years old—applied for a promotion to a vacant supervisory position.  *Id.* ¶ 3.  NGA referred Plaintiff for further consideration, but ultimately did not select him for an interview or grant him the promotion.  *Id.* ¶ 5.  Plaintiff alleges that NGA did not select him for the job "because of his age, gender, religion, and [as] reprisal" for his prior protected activity.  *Id.* ¶ 1.  Plaintiff now brings claims of discrimination based on sex, age, religion, and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C.§ 633a.

Plaintiff's claims of age discrimination, sex discrimination, and reprisal merit dismissal under Federal Rule of Civil Procedure 12(b)(6).[1]  Plaintiff's First Amended Complaint is completely devoid of factual allegations supporting those claims, with the result that he fails to raise a plausible inference of discrimination on these bases.  Regardless, all of Plaintiff's claims warrant summary judgment.  The testimony of the selection panel members—and Plaintiff's own sworn testimony—clearly establish that Plaintiff was not discriminated against.  Rather, the

---

[1] Because this Court must "accept as true the facts alleged" by Plaintiff for the purposes of a motion to dismiss, *see Bing v. Brivo Systems, LLC*, 959 F.3d 605, 608 (4th Cir. 2020), Defendant does not move to dismiss Plaintiff's claim of religious discrimination.  Defendant only seeks summary judgment on this claim.

selection panel members individually rated other candidates (including the selectee) as more qualified than Plaintiff, based on the position's required criteria. Not only do the demographics of the applicant pool and the selection panel bear this out, but so does Plaintiff's inability to articulate any evidence of discrimination.

## BACKGROUND

As alleged, Plaintiff is a Jewish male, who at the time of the events at issue in this case, was 68 years old. FAC ¶ 3. Plaintiff began working at the NGA in 2006 as a DAWIA contract specialist. *Id.* ¶ 2. In 2013, Plaintiff applied for a promotion to a vacant supervisory contract specialist position. *Id.* ¶ 3. On September 6, 2013, Plaintiff was informed that another individual was selected for the position; Plaintiff had not been granted an interview. *Id.* ¶ 5. Allegedly, every member of the selection panel knew Plaintiff was male, Jewish, and "had participated in prior protected activity" at the time he was not selected. *Id.* ¶¶ 31–34. Plaintiff alleges that he was "not evaluated using the same criteria as his comparators," *id.* ¶ 24, and his non-selection was due to his age, "gender, religion, or protected activity." *Id.* ¶ 60; *see also id.* ¶ 1.

As evidence of unlawful discrimination, Plaintiff alleges that: (1) he was the oldest applicant; (2) he was the only Jewish applicant; (3) the NGA "preferred females over males and disproportionally hired females over males"; (4) "[s]ix of the nine female applicants were selected for interview and two females selected" as top choices for the position; and (5) a member of the selection panel told him that "the panel decided that Plaintiff would never be selected because of his religiously motivated dress and grooming, specifically his skullcap and untrimmed beard." *Id.* ¶¶ 33, 38, 73, 84, 111. Plaintiff retired from the NGA in 2015, allegedly because "he was unable to achieve a promotion." *Id.* ¶ 116.

In March 2014, Plaintiff filed a formal complaint alleging discrimination and retaliation for his non-selection. *Id.* ¶ 6. After several years of administrative proceedings and appeals, the Equal Employment Opportunity Commission ("EEOC") affirmed NGA's determination that no unlawful discrimination had occurred in August 2021. *Id.* ¶¶ 7–12.

This case followed. Plaintiff filed his original *pro se* complaint in the Eastern District of Missouri on November 8, 2021. Dkt. No. 1. On January 26, 2022, Plaintiff—still proceeding *pro se*—filed an amended complaint. *See* FAC. In February 2022, after Defendant filed a motion to dismiss or in the alternative, to transfer, the case was transferred to this District. *See* Dkt. Nos. 12–14.

## STATEMENT OF UNDISPUTED MATERIAL FACTS.

### A. Plaintiff's Employment at NGA and Application to the Vacant Position

1. Plaintiff started working at the NGA in October 2006 as a DAWIA contract specialist in Reston, Virginia. Ex. 1 at 1.

2. Before working with the NGA, Plaintiff had filed between 50 and 100 EEO complaints. Ex. 2 at 3. Most of his complaints alleged religious discrimination for his non-selection or promotion to various positions. *Id.*

3. Plaintiff is Jewish and wears a skull cap in the office. *Id*. at 9.

4. From 2006 to 2013, Plaintiff worked in various positions at the NGA, including as a DAWIA supervisory contract specialist. Ex. 1 at 1. In 2011, Plaintiff's job location moved to Springfield, Virginia. *Id.* He remained at the same pay grade throughout—Band 4.[2] *Id.*

---

[2] The NGA's pay scale goes from Band 1 to Band 5, with multiple steps per band, similar to the GS scale used widely by the federal government. *See* NGA FAQs, *Can you explain NGA's salary structure*, available at *https://www.intelligencecareers.gov/nga/ngafaq.html* (last visited Mar. 7, 2022).

5.      On June 24, 2013, the NGA posted a job opening for a DAWIA supervisory contract specialist at a pay scale of Band 5 in Springfield, Virginia.  *See* Ex. 3.  The position asked for, *inter alia*, "applicants with extensive hands-on contracting experience including major systems, base operations or complex programs and strong supervisory skills to provide creative leadership in fulfilling NGA's mission."  *Id.* at 1.

6.      Plaintiff submitted his resume, along with a cover letter, in consideration for the position.  Ex. 1; Ex. 4.  At the time of his application, Plaintiff was 68 years old.  *See* Ex. 5 at 2.

7.      On July 5, 2013, the vacancy closed to applicants.  *See* Ex. 3.  Ms. Natasha Grant, the recruiter for the vacancy, reviewed the applicants' resumes to determine if the applicant was qualified based on the mandatory criteria set by senior leadership.  Ex. 6 at 3; Ex. 7 at 4; *see* Ex. 3 (listing mandatory qualification criteria).  Sixteen applicants, including Plaintiff, qualified for further consideration.  *See* Ex. 4.  Ms. Grant sent the qualified list of applicants, along with their resumes, to the selection panel.  Ex. 6 at 3; Ex. 7 at 4; Ex. 4.

8.      The selection panel for this vacancy was comprised of four individuals:  Daniel Hinchberger (male, aged 48), Richard Unis (male, aged 51), Tamara Verdon (female, aged 52), and Johnetta Williams (female, aged 54).  Ex. 8.  Mr. Hinchberger also served as the chair of the selection panel.  Ex. 7 at 4.  The composition of the selection panel satisfied the NGA's policy for diverse selection panel membership.  *See* Ex. 9; Ex. 6 at 5; Ex. 10 at 3.

9.      At that time, Mr. Hinchberger was Plaintiff's second-level supervisor.  Ex. 2 at 2.  Ms. Verdon and Ms. Williams had both served as Plaintiff's supervisor in the past.  *Id.*

10.      The selection panel did not receive any demographic information for the sixteen applicants (i.e., nothing regarding the applicants' age, race, sex, disability, religion, or EEO activity).  Ex. 6 at 4–5; Ex. 7 at 5.

11.     Upon receiving the resumes of the 16 applicants, each member of the selection panel individually rated and ranked the resumes on a scale of 1 (lowest) to 9 (highest) based on how well the applicant met the position's criteria, as outlined in the vacancy announcement.  Ex. 7 at 4–5; Ex. 11 at 3; Ex. 12 at 3; Ex. 13 at 3; Ex. 14 at 3; Ex. 15 at 2; Ex. 16 at 2–3; Ex. 17 at 1–3; *see also* Ex. 18.

12.     Mr. Hinchberger then consolidated the panel's rankings and the panel met together to discuss their ratings, average out the scoring, and come up with a final ranking of the applicants.  Ex. 7 at 4; Ex. 11 at 4; Ex. 12 at 3; Ex. 14 at 3.

13.     Next, the panel looked for a "logical cut point" in the scoring to determine who should be granted an interview.  Ex. 12 at 5; Ex. 11 at 4.  Based on a natural break in the scores, the panel decided to interview all applicants who rated a "7" or above.  Ex. 7 at 4.  Accordingly, the panel interviewed seven applicants for the position.  Ex. 4.

14.     Each member of the selection panel independently gave Plaintiff a score of "5" based on his resume.  Ex. 7 at 5; *see also* Ex. 12 at 4; Ex. 11 at 3.  Because Plaintiff's score fell below the cut-off point, he and eight other people were not selected for an interview.  Ex. 14 at 4; Ex. 4; *see also* Ex. 7 at 5 ("It was not a personal decision against [Plaintiff].").

15.     The selection panel rated Plaintiff a 5 out of 9 primarily due to his lack of supervisory experience, strategic thinking, and breadth in contracting experience.  Each panel member articulated the reason for his or her score of Plaintiff as follows:

- ***Mr. Hinchberger***:  "My biggest concern was his apparent lack of supervisory experience. Mr. Laber had decent contracting experience, but it did not strike me as being the same depth or breadth as other candidates.  That, combined with what I perceived as relatively limited supervisory experience in the operational role were the biggest factors."  Ex. 7 at 5–6.

- ***Mr. Unis***:  "The biggest issue was his lack of broad experience across NGA contracts.  This position had been identified as one of the most senior within the office of contracts.  We

6

were looking for someone with significant breadth and depth of contract experience, particularly within multiple buying divisions of NGA.  I noticed that Mr. Laber had a lot of experience, duties, and assignments that were outside the normal buying realm." Ex. 11 at 3.

- ***Ms. Verdon***:  "But the part of his resume that was the weakest was his demonstrated leadership experience; leading medium to large teams.  Although he had some supervisory experience, to my knowledge while at NGA, he only supervised one person at a time, and most recently it was not in contracting.  His weakest area was leadership and strategic involvement.  He had no experience leading medium or large teams.  Strategic thinking/agility and managing multiple people were not clear in his resume.  He did not have the experience of setting up a larger operation and implementing it.  He had not been a team lead of more than one person at a time, and he had not managed across organizational lines.  He had not been involved in resolving or implementing strategic visions." Ex. 12 at 4.

- ***Ms. Williams***: "I can't recall the specifics of my rating for him, but I followed the same process with each applicant.  It has been awhile since I did it, and I haven't seen his resume since then.  I would imagine that he was probably close to getting an interview.  I don't think he would have been in the lower part of the group.  But I do remember that he did not make the cutoff for the interview.  A lot of his prior experience was outside of the agency." Ex. 14 at 4.

16.     All four selection panel members knew Plaintiff was Jewish at the time of his application—either by way of personal conversations with Plaintiff or because of Plaintiff's manner of dress (e.g., he wore a skull cap in the office). Ex. 7 at 1–2; Ex. 11 at 1; Ex. 12 at 1–2; Ex. 14  at 4–5.  The religious affiliations and/or practices of NGA employees is not recorded or maintained by the agency. *See* Ex. 19.

17.     All four selection panel members regarded Plaintiff as male at the time of his application. Ex. 7 at 2; Ex. 11 at 1; Ex. 12 at 1–2; Ex. 14 at 5.

18.     At the time of Plaintiff's application, Mr. Hinchberger and Mr. Unis estimated Plaintiff to be close to, or a little over, sixty years old.  Ex. 7 at 1; Ex. 11 at 1.  Ms. Verdon, who was fifty-two years old, was unsure of Plaintiff's age, but was "confident" that he was "a little bit older" than her. Ex. 12 at 1.  Ms. Williams "did not know [Plaintiff's] exact age." Ex. 14 at 4.

19.     Three of the four panel members were positive that they did not know anything about Plaintiff's prior EEO activity at the time of his application.  Ex. 11 at 2; Ex. 12 at 3; Ex. 14 at 5–7.  Mr. Hinchberger thought he may have heard something, but did not know any of the details: "Mr. Laber may have mentioned something to me in the past, but I can't recall the details. It is really foggy, so I'm not sure if I knew something about his EEO activity before this case." Ex. 7 at 3; *see also id.* 7–8 (stating that he did not know Plaintiff's EEO activity at the time of selection).

20.     All four panel members swore under oath that Plaintiff's age, religion, sex, and EEO activity were not factors in their decision to not interview or select Plaintiff for the vacancy. *Id.* at 8–9; Ex. 11 at 6–7; Ex. 12 at 7–8; Ex. 14 at 5–7.

21.     In total, seven applicants were interviewed for the position.  Ex. 4; Ex. 20.  Of the seven interviewed applicants, one was male and six were female.  *See* Ex. 11 at 6–7;  Ex. 12 at 5–6; Ex. 4.

22.     Based on the interviews, the panel recommend Karen Eichelberger for selection, and Danita Ladson as an alternate.  Ex. 20.  Mr. Hinchberger brought the panel's recommendation to the approving official, Tonya Crawford.  Ex. 7 at 4–5.

23.     Ms. Crawford reviewed and then signed-off on the panel's recommendation.  Ex. 10 at 3.  In doing so she "looked at panel composition, how they rated resumes, how they selected interviewees, and how they rated the interviews.  Then [she] made sure that the job was given to the most qualified candidate."  *Id.* at 3.

24.     Ms. Crawford concurred with the selection panel's determination that Plaintiff did "not have the extensive leadership or collaborative networks that Ms. Eichelberger ha[d]" and that

"Ms. Eichelberger ha[d] more extensive supervisory experience than Mr. Laber." *Id.* at 4; *see also* Ex. 21.

25.    Ms. Crawford (female, aged 41) was aware of Plaintiff's sex and religion at the time of the selection, but did not know about his EEO activity.  Ex. 10 at at 4–5; Ex. 8.  She "assume[d] he [wa]s over the age of 40" but did not specifically know his age.  Ex. 10 at 5.

26.    Ms. Crawford did not consider Plaintiff's age, religion, sex, or EEO activity as a factor in deciding to approve Ms. Eichelberger for the position.  *Id.*

27.    The NGA promoted Ms. Eichelberger to the position.  *Id.*

28.    The NGA notified Plaintiff that he had not been selected for the position on September 6, 2013.  Ex. 22.

**B.  Plaintiff's EEO Proceedings**

29.    On October 15, 2013, Plaintiff asked to be put in touch with an EEO counselor because he "believe[d] unfair discrimination may have occurred" when he was "not interviewed or selected" for the position.  Ex. 23.

30.    Plaintiff filed an informal complaint on November 8, 2013.  *See* Ex. 24.  He then elected to pursue Alternative Dispute Resolution ("ADR"), which failed.  Ex. 5.  Plaintiff was issued a Notice of Right to file his formal complaint of discrimination on February 18, 2018.  *Id.* at 3; Ex. 24.

31.    On March 10, 2014, Plaintiff filed his formal EEO Complaint, alleging that he was discriminated against on the basis of sex, religion, age, disability, and reprisal for prior EEO activity.  Exs. 25 & 26.

32.    On April 2, 2014, the NGA accepted Plaintiff's complaint based on sex, religion, and age, but dismissed his claims of disability discrimination and reprisal for failing to state a

9

claim.  Ex. 27.  In particular, Plaintiff refused to disclose what physical or mental condition he claimed as a disability.  *See id.* at 2.

33.     Plaintiff's complaint was investigated from July 3, 2014 through August 8, 2014. Ex. 28 at 1.  The investigator pursued all of Plaintiff's claims despite the NGA's non-acceptance of his claims of disability and reprisal.  *See id.*  The resulting investigative file totaled approximately 350 pages of documents and testimonial materials.  *See* Ex. 29.

34.     In July 2014, Plaintiff signed a declaration under the penalty of perjury in connection with his EEOC complaint.  *See generally* Ex. 2.  Plaintiff stated that he "d[id not] know who applied" for the position or "how many people were interview" but his "claim is that [he] has more experience, training, and knowledge than anyone who was interviewed."  *Id.* at 6.  Plaintiff further stated that he did not know why he was not selected for the interview, but that he "presume[d]" it was because the selection panel "scored [him] in a way that did not match [his] qualifications" and instead "used their opinions about [him] rather than [his] actual experience." *Id.* at 7.  Plaintiff's logic was that, with over 30 years of experience, he "d[id not] believe there is anybody with more experience than [he] h[as], inside or outside of the government."  *Id.* at 6.

35.     In his declaration, Plaintiff testified that no one made any overt comments to him to indicate he was denied the job because of discrimination:

> Where is the smoking gun?  Was it one person?  More than one person?  Ill feelings? My religion, age, or sex?  You'll have to talk to them because I can't cite overt comments made to me.  They have not notified me that I am too old, or too Jewish, to my face. At this time I don't have any witnesses who will say that they made comments about my age, religion, or sex.

*Id.* at 7–8.

36.     Three times in declaration, Plaintiff stated that he never discussed his non-selection with anyone on the selection panel:

- "I did not speak with any agency officials about this selection action; I knew how it turned out so I didn't talk to anyone." *Id.* at 9.

- "I did not have any conversations with agency officials about how my religion played into the selection action because I never discussed the selection with anyone of them." *Id.* at 10.

- "I have had no discussion with agency officials about sex." *Id.* at 11.

37.     On November 21, 2014, the NGA issued a Final Agency Decision ("FAD"), finding that there was "no evidence of unlawful discrimination." Ex. 30 at 20.  After Plaintiff appealed the NGA's decision, the Equal Employment Opportunity Commission ("EEOC") vacated the NGA, finding that the record was not yet sufficiently developed to determine if the NGA's reasons for not hiring Plaintiff was pretextual. *See* Ex. 31 at 5.  Specifically, the EEOC held that the record needed to include the applications of the other candidates who were selected for an interview so it could determine whether they "also lacked supervisory experience in an operational contracting role." *Id.*  The EEOC remanded the case and tasked the NGA with conducting a supplemental investigation. *Id.* at 5–6.

38.     On April 4, 2017, the NGA issued another FAD after supplementing the Record of Investigation ("ROI") with more application materials and demographic information for those who applied to the position. *See* Ex. 32 at 4.  However, the NGA forgot to use agency letterhead, and, as a result, a second copy of the FAD (on the correct letterhead) was issued on September 11, 2017.  *See* Ex. 33.  The NGA again concluded that there was no evidence of unlawful discrimination. *Id.* at 21.

39.     Plaintiff once again appealed. Ex. 34 at 3.  On June 25, 2019, the EEOC reversed and remanded the FAD a second time. *Id.* at 4.  This time the EEOC wanted "an individualized

assessment of the applicants and how they compare to [Plaintiff]," including the ranking criteria and worksheets used to score and rank applicants.  *Id.* at 3–4.  The EEOC ordered the NGA to perform another supplemental investigation to include "all documents used and created by panel members in determining those applicants selected for an interview" as well as "supplemental affidavits" regarding the scoring of those individuals offered an interview.  *Id.* at 4.

40.     On September 5, 2019—after performing the additional investigation ordered by the EEOC, including obtaining more application materials and supplemental affidavits from Mr. Hinchberger, Mr. Unis, Ms. Verdon, and Ms. Williams—the NGA issued its fourth and final FAD. *See* Ex. 35 at 3.  The NGA concluded there was no evidence of unlawful discrimination.  *Id.* at 32.

41.     On August 16, 2021, the EEOC affirmed the NGA's decision, finding that "the responsible Agency officials articulated legitimate, nondiscriminatory reasons for its actions."  Ex. 36 at 6.  The instant case followed three months later.  *See* Pl.'s Comp., Dkt. No. 1.

## I.   PLAINTIFF'S CLAIMS OF AGE DISCRIMINATION SEX DISCRIMINATION, AND REPRISAL WARRANT DISMISSAL.

Three of Plaintiff's claims—for sex and age discrimination and reprisal—merit dismissal for failure to state a claim.  For each, Plaintiff allegations are solely conclusory.  With no factual details, Plaintiff's allegations do not create a plausible inference that he was denied the position on a discriminatory basis.

### A.  Standard of Review Under Federal Rule of Civil Procedure 12(b)(6).

A complaint is subject to dismissal if it fails to allege facts that state a plausible claim for relief rising "above the speculative level."  Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief."  *Iqbal*, 556 U.S. at 678.  Legal conclusions,

"naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are legally insufficient to state a plausible claim. *Id.*; *Twombly*, 550 U.S. at 555. In the employment discrimination context, this means that a plaintiff may not rely on speculative assertions, but rather must plead facts sufficient to support her conclusion of discrimination or retaliation. *Bing*, 959 F.3d at 617–18.

While it is true that the Court must "liberally construe a *pro se* litigant's complaint," the Court "need not attempt 'to discern the unexpressed intent of the plaintiff.'" *Laber v. U.S. Dep't of Defense*, 2021 WL 5893293, at *2 (E.D. Va. Dec. 13, 2021) (quoting *Laber v. Harvey*, 438 F.3d 404, 413, n.3 (4th Cir. 2006)). Nor does the liberal pleading standard "excuse a clear failure in the pleadings to allege a federally cognizable claim." *Id.* (citing *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 390–91 (4th Cir. 1990)).

### B. Plaintiff Fails to State a Plausible Claim of Sex or Age Discrimination, or Reprisal.

The crux of Plaintiff's case is that—by his own estimation—he was the most qualified individual for the job, and as he did not get it, he must have been discriminated against. But Plaintiff has no facts to support his theory, only his own beliefs and suppositions.

Ultimately, Plaintiff believes that the hiring process was not objective, claiming that "no common criteria were applied" in evaluating the various applicants. FAC ¶ 24. To prove his point, Plaintiff dedicates several paragraphs in the Amended Complaint to comparing himself with some of his competitor applicants who were selected for interviews—noting, in one case, the many supposed typographical errors made by an applicant in her cover letter. *See* FAC ¶¶ 41–54. Plaintiff's comparison does no more than split hairs and quibble over minutiae when comparing his training, awards, and certifications to a selected few of his competitor applicants.

Moreover, Plaintiff contradicts himself throughout the Amended Complaint. Plaintiff alleges that he "was the oldest applicant," *id.* ¶ 84, and that "[s]ix of the nine female applicants were selected for interview," *Id.* ¶ 30. But in the same breath, Plaintiff alleges that "Defendant failed to preserve the demographics information of applicants," *id.* ¶ 30 and that "Defendant's investigator did not report demographic data for the selecting officials' selection[s]," *id.* ¶ 89— both of which beg the question of how Plaintiff became aware of the age and sex of the other applicants.

This is not Plaintiff's first set of baseless employment discrimination claims that a jurist in this Court has dismissed for lack of factual support. *See Laber*, 2021 WL 5893293, at *2 (dismissing with prejudice Plaintiff's employment discrimination claims for seventeen different positions he applied for in 2017). Here likewise Plaintiff's bare-bones allegations do not create a plausible inference that Plaintiff was denied the supervisory position because of his sex, age, or as retaliation for previous complaints.

### 1. Plaintiff Has Not Plausibly Alleged Discrimination Based on Sex Under Title VII.

To make out a prima facie case of employment discrimination for failure to hire (in the absence of direct evidence of discrimination), Plaintiff must show that: (1) he "is a member of the protected class"; (2) "the employer had an open position for which he applied or sought to apply"; (3) he "was qualified for the position"; and (4) he "was rejected under circumstances giving rise to an inference of unlawful discrimination." *Laber*, 2021 WL 5893293, at *2 (quoting *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015)). While Plaintiff does not need to plead a prima facie case to overcome a motion to dismiss, his "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* (alteration in

original) (quoting *Coleman v. Md. Ct. App.*, 626 F.3d 187, 190 (4th Cir. 2010)).  Plaintiff's claim

that he was discriminated against on account of his sex fails to meet this standard.

Plaintiff alleges that his sex "was a significant factor" in not being selected for an interview

because "Defendant had a history of hiring or selecting females over males."  FAC ¶ 25; *see also*

*id.* ¶ 111 (alleging that Defendant "disproportionally hired females over males").  As if to prove

this point, Plaintiff alleges that "[s]ix of the nine female applicants were selected for interview and

two females were selected" for the position he applied for.  FAC ¶ 38.  But nowhere does Plaintiff

allege the gender breakdown of the total application pool, those selected to be interviewed, or the

individuals on the selection panel.

Moreover, while Plaintiff concludes that the NGA preferred hiring women over men, he

does not allege that any of the individuals on his selection panel held such a preference.  Nor does

Plaintiff point to any statement, action, or behavior by any selection panel member that indicates

that Plaintiff's sex was a factor in their decision-making.  As pled, Plaintiff allegations do not raise

a plausible inference of discrimination.  Rather, Plaintiff asks the Court to speculate that his sex

was the reason for his non-selection, based only on the fact that a woman was hired for the position,

and Plaintiff's unsupported belief that the NGA prefers female over male employees (even though

Plaintiff—a male—already had a position at the NGA).

Plaintiff concedes that he was not selected for an interview based on a cutoff score granted

to applicants after each member of the selection panel individually reviewed their resumes.  *See*

FAC ¶¶ 26, 35–39.  Plaintiff thus ignores the obvious inference that he was not selected for an

interview (or the position) because the selection panel found other applicants more qualified than

him.  Accordingly, Plaintiff's allegation that he was not chosen because of his sex "is not plausible

in light of the 'obvious alternative explanation' that the decisionmakers simply judged those hired

to be more qualified and better suited for the positions." *McCleary-Evans*, 780 F. 3d at 588 (quoting *Iqbal*, 556 U.S. at 682).

### 2. Plaintiff Has Not Plausibly Alleged Discrimination Based on Age Under the ADEA.

The ADEA grants a cause of action for federal employees over the age of 40 who allege age discrimination. *See* 29 U.S.C. § 633a. To survive a motion to dismiss, Plaintiff "must plausibly allege that he is (1) over the age of 40, and (2) experienced discrimination by a federal employer (3) because of his age." *Song v. Becerra*, 2021 WL 3732961, at *1 (4th Cir. Aug. 24, 2021).

Plaintiff's sole allegation regarding his age discrimination is that he "was the oldest applicant and significantly older than the selectee and all other applicants" who received further consideration for the position. FAC ¶ 84. Here also, Plaintiff fails to allege any supporting facts to make his claim of discrimination plausible. He does not provide the ages of any other applicants, the ages of those on the selection panel, or even specify the age gap between himself and the individual selected for the position. Plaintiff does not even allege that the selection panel members *knew* his age or were aware that he was older than the other applications. Finally, Plaintiff fails to allege any facts indicating that the selection panel was biased against him based on his age.

Instead, Plaintiff rests his entire claim on the fact that he is a member of a protected class and was denied a job in favor of someone who was not. Allowing this claim to proceed "cannot be squared with the Supreme Court's command that a complaint must allege 'more than a sheer possibility that a defendant has acted unlawfully.'" *McCleary-Evans*, 780 F. 3d at (quoting *Iqbal*, 556 U.S. at 682)).

### 3. Plaintiff Has Not Plausibly Alleged Retaliation Discrimination under Title VII.

Plaintiff also alleges that he was not selected for the supervisory position in retaliation for his prior Equal Employment Opportunity ("EEO") complaints.  To survive a motion to dismiss on a Title VII retaliation discrimination claim, Plaintiff must "allege beyond the speculative level that: '(1) []he engaged in a protected activity; (2) the employer acted adversely against [him]; and (3) there was a causal connection between the protected activity and the asserted adverse action.'" *Laber*, 2021 WL 5893293, at *3 (alterations in original) (quoting *Ziskie v. Mineta*, 547 F.3d 220, 229 (4th Cir. 2008)).

Plaintiff fails to allege any facts demonstrating a causal connection between his protected activity and his non-selection.  As a threshold matter, it is pure speculation on Plaintiff's part that anyone on the selection panel was aware of his protected activity.  Plaintiff alleges that "[e]very panelist knew that Plaintiff had participated in prior protected activity at the time of his rejection," FAC ¶ 34, but subsequent allegations reveal that this statement is based purely on conjecture.  He alleges that "hiring officials for contract specialist vacancies are the most frequent users of internet searches regarding applicants" and guesses that "one or more selecting officials vacancy [sic] searched the internet and found Plaintiff's EEO complaint activity"—which "is well documented on the internet."  *Id.* ¶¶ 64, 67–68.  Plaintiff further speculates that "anyone who found Plaintiff's protected activity advised others of Plaintiff's protected activity," including "his colleagues and supervisors."  *Id.* ¶ 78.  Indeed, except for one member of the selection panel—Mr. Hinchberger, *see id.* ¶ 30—Plaintiff does not allege that any specific individuals knew of his protected activity. He merely surmises that they did since the information is available on the internet.

"A prima facie showing of causality requires either: (1) that the retaliation closely followed the protected activity, or (2) that the plaintiff put forth a sufficient explanation for the delay

between the protected activity and the alleged retaliation." *Reardon v. Herring*, 201 F. Supp. 3d 782, 784 (E.D. Va. 2016); *see also Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (finding that even a ten-week delay was insufficient to satisfy prima facie case of causation); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (same for two-month delay). Plaintiff fails to do either. There are no facts suggesting that his non-selection followed closely on the heels of prior protected activity, or any other facts that would compensate for the lack of allegations demonstrating temporal proximity. In short, there is no causal connection alleged at all—except that he has at least once before lodged an EEO complaint and he was denied this position. Because Plaintiff does not plausibly allege causation, his relation claim should be dismissed.

## II.   ALL OF PLAINTIFF'S CLAIMS WARRANT SUMMARY JUDGMENT.

In the alternative, Defendant respectfully submits that summary judgment is warranted on all of Plaintiff's claims. By his own admissions at the administrative stage, Plaintiff has no direct evidence of discrimination against him. Instead, all record evidence indicates that Plaintiff was not selected for the position because he lacked the supervisory experience and breadth of contracting experience it required. Indeed, Plaintiff's own statements, the statements of the selection panel, and the demographics of the applicant pool all make clear that the position was filled based on merit alone. As such, his claims lack merit and judgment should be entered in favor of Defendant.

### A.  Standard of Review Under Federal Rule of Civil Procedure 56.

Although a plaintiff in an employment discrimination case is ordinarily entitled to a *de novo* hearing on claims in district court, he is not entitled to a full trial on the merits if summary judgment is warranted. *Ballinger v. N. C. Agric. Extension Ser.*, 815 F.2d 1001, 1005 (4th Cir.

1987).   Summary judgment procedures are important in winnowing out meritless claims and preventing the "unwarranted consumption of public and private resources."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322–23.   The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact.   *See Celotex*, 477 U.S. at 323.   Once the moving party has met its burden, the non-moving party must demonstrate that such an issue of fact does indeed exist.   *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).   The non-moving party "may not rest upon mere allegations or denials . . . but must set forth specific facts showing that there is a genuine issue for trial."   *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1998).   Moreover, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts."   *Harper v. Lindsay Chevrolet Oldsmobile, LLC*, 212 F. Supp. 2d 582, 586 (E.D. Va. 2002) (quoting *Matsushita*, 475 U.S. at 586).   A "mere existence of a scintilla of evidence in support of a non-moving party's position is insufficient to avoid summary judgment."   *Litman v. George Mason Univ.*, 131 F. Supp. 2d 795, 798 (E.D. Va. 2001), *vacated in part* 92 F. App'x. 41 (4th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).   "Rather, the court must 'determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant.'"   *Litman*, 131 F. Supp. 2d at 798.

**B.   The Evidentiary Burden Governing Discrimination and Retaliation Claims.**

A plaintiff may use direct or circumstantial evidence to make out a case of discrimination or retaliation under Title VII and the ADEA.   *See U.S. Postal Serv. Bd. of Gov'rs v. Aikens*, 460

U.S. 711, 714 n.3 (1983) (Title VII); *Arthur v. Pet Dairy*, 593 Fed. Appx. 211, 216 (4th Cir. 2015) (ADEA); *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (retaliation). Direct evidence is "conduct or statements that both reflect . . . the alleged discriminatory attitude and that bear directly on the contested employment decision." *Rhoads v. FDIC*, 257 F.3d 373, 391-92 (4th Cir. 2001).

Absent direct evidence, a plaintiff may establish discrimination or retaliation through the burden-shifting scheme articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Foster v. University of Maryland-Eastern* Shore, 787 F.3d 243, 250 (4th Cir. 2015) (holding that retaliation claims are likewise governed by the *McDonnell Douglas* burden shifting framework).

As explained below, Plaintiff has no direct evidence suggesting that discriminatory or retaliatory animus motivated his non-selection. As a result, the *McDonnell Douglas* burden-shifting standard applies to Plaintiff's claims. In the failure-to-hire context, a plaintiff must first establish a *prima facie* case of discrimination by establishing by a preponderance of the evidence that: (1) he is a member of a protected group; (2) he applied for the position in question; (3) he was qualified for the position; and (4) he was rejected under circumstances giving rise to an inference of unlawful discrimination. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 268 (4th Cir. 2005) (Title VII); *Brown v. McLean*, 159 F.3d 898, 902 (4th Cir. 1998) (ADEA). For age, sex, and religious discrimination, this fourth element generally requires a plaintiff to show that he was treated less favorably than a member outside of his protected class. *See Arthur*, 593 F. App'x at 217; *Coleman*, 626 F.3d at 190.

To establish a *prima facie* case of retaliation under Title VII or the ADEA, the plaintiff must prove: (1) he engaged in protected activity; (2) adverse action was taken against him; and (3) there was a causal connection between the protected activity and the adverse action. *Laber*, 2021 WL 5893293, at *3; *see also Ziskie*, 547 F.3d at 229.

20

If a plaintiff can make out the prima facie case, "he creates a presumption of discrimination, and the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its adverse employment decision." *Laber*, 438 F.3d at 430.  If the defendant can articulate a legitimate reason, "then the presumption disappears and the plaintiff must show that the articulated reason is a pretext" for discrimination.  *Id.*  "'A plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons' for a discharge." *Dockins v. Benchmark Commc'ns*, 176 F.3d 745, 749 (4th Cir. 1999) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 472, 456 (4th Cir. 1989) (discounting plaintiff's own affidavit in support of his allegations that employer made discriminatory comments about his age).

### C.  Plaintiff Has No Direct Evidence of Discrimination or Retaliation.

The record is devoid of any direct evidence of discrimination or retaliation against Plaintiff. Plaintiff himself declared (under penalty of perjury) that no one had made any "overt comments" to him, or anyone else, about his "age, religion, or sex."[3] Ex. 2 at 7.  Likewise, Plaintiff declared that no one made negative comments to him about his prior EEO complaints, but regardless he was "convinced that it played a decisive role in the non-selection." *Id.* at 11; *see also id.* at 4 ("'Nobody ever said to me "Oh, I heard you filed EEO complaints.'  But I am convinced that they all knew.").

In his First Amended Complaint (filed in 2021), Plaintiff alleges for the first time that he spoke with Ms. Verdon in October 2013 about the reason for his non-selection.  FAC ¶¶ 71–72.

---

[3] Moreover, the five NGA officials who oversaw the selection process all swore under penalty of perjury that age, sex, religion, and protected activity did not play any role in how they selected who to interview for or promote to the position.  Ex. 10 at 5; Ex. 7 at 8–9; Ex. 11 at 6–7; Ex. 12 at 7–8; Ex. 14 at 57.

Plaintiff claims that Ms. Verdon told him that the panel had collectively decided that "Plaintiff would never be selected because of his religiously motivated dress and grooming, specifically his skullcap and untrimmed beard."  FAC ¶¶ 71—73.  Plaintiff's own sworn testimony directly contradicts this allegation.  In July 2014—ten months after Plaintiff alleges this conversation with Ms. Verdon occurred—Plaintiff declared: "I did not have any conversations with agency officials about how my religion played into the selection action because I never discussed the selection with anyone of them."  Ex. 2 at 10.  Here, Plaintiff's allegation is refuted by his own sworn statements, and thus cannot sustain his claims at the summary judgment stage.  *See Chappell v. Sch. Bd. Of City of Va. Beach*, F. Supp. 2d 509, 517–18 (E.D. Va. 1998) (finding that defendants' sworn affidavits refuted plaintiff's allegations in employment discrimination case); *see also Rivanna*, 840 F.2d at 240 (holding that non-moving party "may not rest upon mere allegations" to oppose summary judgment).  Moreover, at summary judgment, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."  *Jessup v. Barnes Grp.*, 23 F.4th 360, 367 (4th Cir. 2022) (alteration in original) (citation omitted).  Thus, even if Plaintiff's allegation had the same evidentiary significance as a sworn declaration—which it does not—Plaintiff's own conflicting story about an overtly discriminatory statement made to him does not create a genuine issue of material fact.

Plaintiff's declaration, in essence, admits that he has no evidence of direct discrimination, only suppositions—his declaration is full of "I presume" and "I imagine" and "I believe."  *See id.* at 4, 5, 6, 7.  At the time, Plaintiff did not even know who was selected or who had applied for the position.  *Id.* at 6 (I don't know who was selected. . . . I am sure that I am better qualified than she is, because I certainly had more experience.  As far as the details of her experience, I don't know

what it is."); *id.* ("I don't know who applied.  I don't know their names or anything about them"). Plaintiff simply believed discrimination *had* to have occurred because he "d[id]n't believe there [wa]s anybody with more experience than [he] ha[d], inside or outside of the government."  *Id.* Such unsupported speculation is plainly insufficient to carry Plaintiff's burden.

### D. Plaintiff Cannot Establish a Prima Facie Case of Discrimination or Retaliation.

Nor can Plaintiff prove his case through circumstantial evidence.  None of his claims meet the standard required for a prima facie case under the *McDonnell Douglas* burden-shifting framework.

#### 1. There is No Circumstantial Evidence of Retaliation.

Plaintiff cannot establish a prima facie case of retaliation for two reasons: (1) the selection panel members were unaware of his prior protected activity; and (2) the seven-year gap between his last complaint and his non-selection makes it implausible that the two were linked.

Ms. Verdon, Ms. Williams, Ms. Crawford, and Mr. Unis all stated definitively that they did not know about Plaintiff's EEO activity before he filed the complaint at issue for his non-selection.  Ex. 10 at 2; Ex. 14 at 2; Ex. 12 at 3; Ex. 11 at 2.  Mr. Hinchberger was unsure whether Plaintiff had "mentioned something to [him] in the past" about other EEO activity but regardless, could not "recall the details."  Ex. 7 at 3.  Plaintiff admits that he does not know how or when anyone on the selection panel learned of his prior protected activity.  Ex. 2 at 4–5.  That anyone at the NGA would know seems unlikely, given that his last EEO complaint (before this one) was filed before he started working for the agency.  *Id.* at 3.  Despite this, Plaintiff is "certain" each individual on the selection panel knew about his prior EEO complaints—because the information is available online.  *Id.* at 5; *see also id.* at 3.

It is axiomatic that the decision-maker must know about the plaintiff's prior protected activity in a retaliation case—otherwise, there is no causation. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("[T]he employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case."); *Chapman v. Geithner*, 2012 WL 1533514, at *21 (E.D. Va. Apr. 30, 2012) ("Without knowledge of [plaintiff's] prior EEO activities, these protected activities could not have influenced or caused the selecting official to non-select her for the position."). Here, at most, one of the selection panel members was vaguely aware or *may have* known that Plaintiff had filed an EEO complaint before. This hardly allows for a reasonable inference of causation.

Even assuming Plaintiff had definitive evidence that *everyone* on the selection panel knew about his prior EEO activity, he cannot establish causation. Plaintiff fails to show "(1) that the retaliation closely followed the protected activity, or (2) that the plaintiff put forth a sufficient explanation for the delay between the protected activity and the alleged retaliation." *Reardon*, 201 F. Supp. at 784. Here, Plaintiff's closest event of prior protected activity was an EEO complaint he filed in 2006—**seven years** before his 2013 non-selection. *See* Ex. 2 at 3. In *Perry v. Kappos*, the Fourth Circuit found that a ten-week delay between an employee filing an informal EEO complaint and his termination was "sufficiently long so as to weaken significantly the inference of causation." 489 F. App'x at 643 (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (three months insufficient to create inference of causation); *Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 173 (4th Cir. 2020) (same for three months); *Horne*, 154 F. App'x at 364 (same for two months).

Plaintiff has no explanation for the seven-year gap between Plaintiff's last prior protected activity and the instant non-selection. Simply put, with no additional evidence, Plaintiff's

24

retaliation claim is implausible given that the selection panel knew little to nothing about his prior protected activity and that his last protected activity occurred seven years before, at a different federal agency.

### 2.  There is No Circumstantial Evidence of Sex Discrimination.

From the start, Plaintiff's claim of sex discrimination has been wholly speculative.  In his July 2014 declaration, Plaintiff admitted that he did not know the sex of any of the applicants.  Ex. 2 at 10 ("For all I know, the applications who were interviewed were all male.").  He further conceded that he made "an allegation of discrimination based on sex because [he] d[id not] want to have an allegation that might be denied because it was not made earlier."  *Id.*

Even now—after a comprehensive EEO investigation—Plaintiff's so-called evidence of discrimination consists solely of: (1) the fact that a woman was selected for the position; (2) the fact that more women than men were selected for interviews; and (3) his belief that "there is a history and pattern of females being selected."  *See id.* at 11.  But these two facts, and Plaintiff's own belief, does not allow for an inference that Plaintiff was denied *this* position because he is male.

The demographics at play in Plaintiff's application clearly rebut any inference of discrimination.  The selection panel was comprised of two men and two women.  Ex. 8.  Of these four, a man (Mr. Hinchberger), was the chair of the selection panel, and responsible for compiling everyone's scores.  Ex. 7 at 4.  As a whole, the selection panel scored and ranked individuals' resumes and picked a cut-off point below which no one would be interviewed.  *Id.*; Ex. 11 at 4; Ex. 12 at 3; Ex. 14 at 3.  Ms. Crawford—a woman—did not play any role in the selection process until the panel had already chosen a selectee and an alternate.  Ex. 10 at 3–4.  Because the individuals responsible for choosing who would be interviewed (and ultimately, recommended for

selection) were evenly split between men and women, it is unlikely that Plaintiff's sex played any role in his non-selection. *See Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008) (affirming district court's common sense inference that decision-maker was unlikely to have discriminated against someone in his own protected class); *Laurent-Workman v. McCarthy*, 2021 WL 2426118, at *8 (E.D. Va. June 11, 2021) (finding that sex discrimination claim was "substantially weakened" by the fact that someone on the selection panel was the same sex as the applicant).

Furthermore, of the 16 total applicants referred for the position, seven were male and nine female.[4]  Ex. 4.  Of these, seven were selected for interviews—one man and six women.  *Id.*; Ex. 11 at 6–7;  Ex. 12 at 5–6.  The demographics of employees in the Office of Contract Services (where Plaintiff was based) similarly skews female: approximately 105 out of 171 employees were female—over 60%—in the 2014 time frame.  *See* Ex. 37.  While Plaintiff complains that the NGA prefers to promote female employees over male, he has no data to support this supposition. Regardless, his belief fails to take into account that the existing employee pool for promotion had more women than men and could be self-selecting.

The NGA did select a woman,  not a man, for the position.  But here, where the majority of applicants were female, one man was interviewed, and the selection panel was evenly split between the sexes, that does not create an inference of sex discrimination.

### 3.   There is No Circumstantial Evidence of Age Discrimination.

Plaintiff's age discrimination claim rests on similarly superficial grounds.  The selection panel was only vaguely aware of Plaintiff's actual age, guessing he was somewhere in his fifties or sixties.  *See*  Ex. 7 at 2 ("early 60's"); Ex. 12 at 1–2 ("a little bit older than I am"); Ex. 11 at 1

---

[4] Based on the identifiable genders of the applicants' names.

("probably close to 60"); Ex14 at 1 ("Mid 60's"); Ex. 10 at 5 ("He talks about the number of great grandchildren he has, so I assume he is older than I."). The selection panel members ranged in age from 48 to 54, and Ms. Crawford was slightly younger (41). *See* Ex. 8. Of the applicants chosen for an interview, all were over 40, ranging from 44 to 56 years old. *See* Ex. 38. The selection panel estimated that the interviewed applicants ranged from mid/late 30s to late 40s/50. *See* Ex. 12 at 5–6; Ex. 11 at 6–7; Ex. 7 at 6. While the panel members had diverse views on the ages of the applicants who were not interviewed, their estimates ranged from early 30s to mid/late 50s (and early 60s). Ex. 12 at 6; Ex. 11 at 7; Ex. 7 at 6.

The evidence suggests that the vast majority of the applicant pool (or the selection panel's perception of it) was well within the class the ADEA protects (over 40)—as were those selected for interview. Ms. Eichelberger, who panel members believed to be mid-40s, 48, or 50, was not substantially younger than Plaintiff. Moreover, each panel member stated that he or she had previously selected applicants who were over the age of 40 for positions. Ex. 12 at 7; Ex. 11 at 6–7; Ex. 7 at 8–9; Ex. 14 at 5–6. Under these circumstances, Plaintiff cannot establish that he was rejected under circumstances giving rise to an inference of unlawful discrimination. *Brown*, 159 F.3d at 902.

**4.  There is No Circumstantial Evidence of Religious Discrimination.**

Finally, Plaintiff cannot establish a prima facie case of religious discrimination. The selection panel was clear that religion was not a factor in Plaintiff's non-selection. Ex. 7 at 8; Ex. 11 at 6; Ex. 12 at 7; Ex. 14 at 5–6; Ex. 10 at 5. Nor are there any circumstances to suggest that it may have been.

As a threshold matter, the religious beliefs of applicants were not disclosed to members of the selection panel. *See e.g.*, Ex. 8; Ex. 19; *see also* Ex. 6 at 4–5; Ex. 7 at 5. To the extent selection

panel members knew any of the applicant's religious beliefs, it was because of personal relationships.  The panel members were all aware that Plaintiff was Jewish—either through personal conversations with him or because of his religious dress in the office.  Ex. 7 at 1–2; Ex. 11 at 1; Ex. 12 at 1–2; Ex. 14 at 4–5; Ex. 10 at 4–5.  But the panel remained largely unaware of the religious beliefs of the other applicants.  *See* Ex. 7 at 6; Ex. 11 at 6–7; Ex. 12 at 5–6.   While one member of the selection panel "presumes" Ms. Eichelberger to be Catholic, there is no other evidence of her religious beliefs.  Moreover, members of the selection panel, and Ms. Crawford, attested that they had promoted, or were aware of, other individual who were Jewish in supervisory roles at the NGA.  *See* Ex. 10 at 8; Ex. 7 at 11; Ex. 17 at 3–4; Ex. 12 at 9.  With no other evidence, Plaintiff cannot establish that an individual outside of his protected class was given more favorable treatment.

### E. Defendant's Reason for Not Selecting Plaintiff Was Legitimate and There Is No Evidence of Pretext.

Assuming Plaintiff were able to establish a prima facie case of discrimination or retaliation (which he cannot), his claims still merit summary judgment because Defendant had a legitimate and non-pretextual reason for selecting Ms. Eichelberger over Plaintiff:  the selection panel viewed Ms. Eichelberger as better qualified for the position.

"[R]elative employee qualifications are widely recognized as valid, non-discriminatory bases for any adverse employment decision."  *Evans v. Techs. Applications & Service Co.*, 80 F.3d 954, 960 (4th Cir. 1996).  In these cases, "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Id.* at 960–61.  The selection panel rated Plaintiff's resume as a 5 out of 9 in terms of fulfilling the position's desired qualifications.  *See* Ex. 7 at 5.  This meant that Plaintiff "me[t] all of the desired skills and competencies and exhibits about the same performance-based potential as most employees."  Ex. 18.  The selection panel

believed that Plaintiff was "a good solid performer, but not necessarily outstanding."   Ex. 7 at 6. Plaintiff did not score higher because he lacked the supervisory experience and breadth of contracting experience needed for the position.  *Id.* at 5–6; Ex. 11 at 3; Ex. 12 at 4; Ex. 10 at 4. Plaintiff's resume supports this view.   While some of his past positions were titled as "supervisory," his resume reflects that he led small teams, if any.  *See* Ex. 1 at 2 ("I am the first line supervisor for one to three contract specialists); *id.* ("I mentored interns and other less experienced team members.").

In contrast, Ms. Eichelberger "received an overall average score of 9,"  Ex. 7 at 5, meaning she "greatly exceed[ed] the desired skills and competencies" for the position.  Ex. 18.  The panel saw Ms. Eichelberger as someone who "has been in a leadership position at least as far back as 2002-2003" and had "been in supervisory roles ever since then, in different divisions and levels." Ex. 12 at 4; *see also* Ex. 7 at 5 ("In Ms. Eichelberger, I saw a person who had supervised larger teams, and supervised at the division level.").  Ms. Eichelberger's resume reflects her greater experience in leading large teams and supervising divisions—she previously served as Deputy Chief for two different units, supervising teams of eight and twenty-two respectively.  Ex. 21.  In short, merit, not discrimination, was the only reason for Ms. Eichelberger's selection.

While Plaintiff may believe he was more qualified for the position because of his many years of government service, "an employee's own testimony about his job performance does not create a genuine issue of material fact as to whether he was meeting his employer's legitimate expectations."  *Howard v. College of the Albemarle*, 262 F. Supp. 3d 322, 332 (E.D.N.C. 2017); *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) (finding that plaintiff's own assessment of her work could prove "only the unremarkable fact that she and [her employer] disagreed about the quality of her work"); *Phillips v. Esper*, 2020 WL 3579796, at *15 (E.D. Va.

June 30, 2020) ("Plaintiff's argument plainly relies on her self-assessment of her superior experience . . . as the basis for her superior qualifications, and this argument plainly fails.").  Even if the selection panel was wrong—i.e., if Mr. Laber *was* more qualified for the position—the selection panel's genuine belief that Ms. Eichelberger was the best qualified candidate is dispositive.  *See e.g.*, *White v. Runyon*, 887 F. Supp. 875, 880 (E.D. Va. 1995) ("Defendant's burden would be met by citing a legitimate, non-discriminatory reason for [plaintiff's] non-selection, regardless of whether that reason is based on a belief mistakenly held at the time of the decision.").

In sum, the panel members had legitimate reasons to not select Plaintiff for an interview and thus the position he was seeking.  Despite extensive administrative proceedings, there is no evidence that the panel's well-founded reasons were pretextual.

## CONCLUSION

For the foregoing reasons, Plaintiff's claims for sex and age discrimination and retaliation should be dismissed for failure to state a claim upon which relief may be granted, or alternatively, this Court should grant summary judgment on all of Plaintiff's claims.


Dated: March 28, 2022                                         Respectfully submitted,

                                                             JESSICA D. ABER
                                                             UNITED STATES ATTORNEY

                                          *By*:   _____/s/_____
                                                             CAROLYN M. WESNOUSKY
                                                             Assistant United States Attorney
                                                             Office of the United States Attorney
                                                             2100 Jamieson Avenue
                                                             Alexandria, Virginia 22314
                                                             Telephone: (703) 299-3996
                                                             Fax:        (703) 299-3983
                                                             Email: Carolyn.Wesnousky@usdoj.gov

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, and caused a copy to be served by first-class mail on the following *pro se* plaintiff:

Stan Laber
321 S. Main Ave.
Albany, NY 12209
703-981-2793
Email: 6133164129463c@gmail.com

_____/s/_____
CAROLYN M. WESNOUSKY
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3996
Fax:        (703) 299-3983
Email: Carolyn.Wesnousky@usdoj.gov

*Counsel for Defendant*