# Exhibit 1

UNCLASSIFIED//NONE//NONE

## National Geospatial-Intelligence Agency

### Internal Resume

**Name:** Laber,Stan P
**Location:** Springfield, VA

**Employee Id:** 1040254
**Current Dept Id:** OCSP

### Job History

| Date | Assignment | DeptId | PayPlan | Bnd/Grd | Location |
|---|---|---|---|---|---|
| 03/10/2013 | Supv Contract Specialist-DAWIA | OCSP | IA | 04 | Springfield |
| 11/20/2011 | Supv Contract Specialist-DAWIA | ACP | IA | 04 | Springfield |
| 04/11/2011 | Contract Specialist-DAWIA | ACC | IA | 04 | Springfield |
| 09/12/2010 | Supv Contract Specialist-DAWIA | ACC | IA | 04 | Reston |
| 02/28/2010 | Supv Contract Specialist-DAWIA | ACA | IA | 04 | Reston |
| 01/04/2009 | Supv Contract Specialist-DAWIA | ACA | IA | 04 | Reston |
| 01/06/2008 | Contract Specialist-DAWIA | ACA | NI | 04 | Reston |
| 10/29/2006 | Contract Specialist-DAWIA | ACA | NI | 04 | Reston |

### Education

| As of Date | Education Level | Major | School |
|---|---|---|---|
| 06/1973 | Post-Sixth Year | Technology | Syracuse Univ |
| 08/1967 | Master's Degree | Communications | Northwestern Univ |
| 06/1966 | Bachelor's Degree | Communications | Univ Of Wisconsin-Milw |

### Licenses and Certifications

| Type | Description | Issue Date | Expiration Date |
|---|---|---|---|
| LIC | EEO Counselor Training Cert | 08/03/2009 | |
| LIC | ICAAP Certification | 05/01/2007 | |
| DAWIA | Production, Quality & Manufact   Level III | 04/21/2008 | |
| DAWIA | Program Management   Level III | 03/24/2010 | |
| DAWIA | Test & Evaluation   Level I | 03/31/2008 | |
| DAWIA | Facilities Engineering   Level II | 03/18/2008 | |
| DAWIA | Information Technology   Level I | 03/18/2008 | |
| DAWIA | Contracting   Level III | 01/07/2002 | |
| JDA | Joint Duty Assignment Credit | 02/20/2008 | |

### Training

| Date | Course |
|---|---|
| 08/04/2010 | HD Policies and Procedures |
| 07/01/2010 | Stepping Up to Supervision |
| 05/10/2010 | Accepting Your Roles as a Supervisor in EEO, ADR, and Diversity Refresher (4 Hours) |
| 04/28/2010 | Supervisory Lab |
| 02/04/2010 | DAWIA PMT 352B Program Management Office Course - Part B |
| 08/11/2009 | DCIPS Performance Management/Performance Pay Supervisor Training |
| 12/12/2008 | DAWIA PMT 203 International Security and Technology Transfer/Control |
| 09/30/2008 | DAWIA SYS 202 Intermediate Systems Planning, Research, Development and Engineering, Part 1 |
| 09/30/2008 | DAWIA PMT 352A Program Management Office Course - Part A |
| 05/01/2008 | DAWIA STM 201 Intermediate Science and Technology Management |
| 02/08/2008 | DAWIA PQM 301 Advanced Production, Quality and Management |
| 09/28/2007 | DAWIA TST 101 Introduction to Acquisition Workforce Test and Evaluation |
| 09/28/2007 | DAWIA SYS 101 Fundamentals of Systems, Planning, Research, Development and Engineering |
| 03/01/2007 | Acquisition Contracts Leadership Journey (ACLJ) Program - Module 1 |
| 06/22/2001 | Management for Contracting Supervisors |
| 05/22/1998 | Intermediate Systems Acquisition (ACQ 201) |

### Honors and Awards

| Date | Type | Justification |
|---|---|---|
| 01/03/2010 | Total Pay Comp Bonus | This Bonus was inserted by the inbound pay pool interface - nihr059.sqr. |
| 07/19/2009 | Individual Cash Award | For outstanding support to multiple complex initiatives and devotedness |
| 08/03/2008 | Group Cash Award | From A: Supporting the successful awarded Cirrus Shield IDIQ Contract. |
| 12/09/2007 | Individual Cash Award | For outstanding support in meeting the ASA office goals and objectives. |

### Performance Ratings

| Review Date | Rating | Description | Organization (Weighted Avg) | Band | Org. Band Average |
|---|---|---|---|---|---|
| 09/30/2012 | 3.5 | Successful | | 04 | |
| 09/30/2011 | 3.7 | Excellent | A | 04 | 3.6 |
| 09/30/2010 | 3.6 | Excellent | A | 04 | 3.5 |

UNCLASSIFIED//NONE//NONE

## National Geospatial-Intelligence Agency

### Internal Resume

**Name:** Laber, Stan P
**Location:** Springfield, VA

**Employee Id:** 1040254
**Current Dept Id:** OCSP

### Resume Narrative

04/08/2011 - Present NGA/OCS/OCSP.  I serve as a Supervisory Contract Specialist for NGA's warrant and the COR/COTR Programs. I ensure proper vetting and record keeping for these programs and administering and improving the related processes. I have led or participated in numerous internal and external working groups to streamline processes for contractor personnel. I am the first line supervisor for one to three contract specialists.

05/01/2010 - 04/7/2011 NGA/SI/SISK KLONDIKE Secretariat, Serving in a voluntary detail as the SME for Acquisition to the Secretariat.  The purpose of the team is to implement the new CAPPCO/ODNI SCI control system for sensitive GEOINT in the IC and NSG. I coordinate with internal and external customers to develop supporting acquisition plans and acquisition strategies for programs approved for protection under the KDK security control system.  I facilitate processes to define design requirements, CONOPS, risks, schedules, performance, and costs.

10/29/06 to 12/31/08 NGA/A/AC/ACA/International Team. Served as a senior warranted contract specialist for systems acquisitions drawing on multiple procurement authorities and employing an extremely wide range of contract vehicles. I mentored interns and other less experienced team members.  I led or assisted in source selections and administered high value IT systems contracts for ASA (International Division).

08/11/2003 to 10/28/2006. Army, DC Area.  GG-1102-13, DCIPS warranted contracting officer and team leader at an Army Field Activity responsible for preaward and postaward functions involving highly sensitive and specialized procurements of significant importance. I independently planned for, led, awarded, and administered a major source selection for technical services.

04/04/2003 to 08/11/2003  NH-1102 -03. PEO EIS Distance Learning System. Newport News, VA 23606, Ms. Sandy Rathmann, 757 369 2914. I was the single contracting expert in the PM office for acquisition strategy, acquisition policies, and planning to ensure compliance with FAR, DFARS, and DoD 5000 series program guidance. I performed preaward and post award for the acquisition of complex automated information systems (AISs) of high priority and visibility. I developed objectives, acquisition plans, SOW and PWS documents with justifications for sole source contracts. I performed analyses of cost in contractual proposals and prepared recommendations for best value and tradeoff decisions. I applied acquisition reform principles and new or innovative contracting approaches. Contract types involved were requirements, ID/IQ, FFP, FP price reimbursable, FFP with incentive award fees, and cost type. I developed estimates, schedules, and contingency plans for AIS development. I defined and approved work tasks, deliverables, system requirements, development of milestones, system integration, project task planning, systems engineering, configuration management, verification, validation, and product integrity. I applied SA CMM tools to control cost and schedule. I coordinated and combined multiple engineering and technical elements into SOWs and PWSs for competition. I monitored contractors, cost and schedule, and coordinated government responsibilities and GFP. I assisted in negotiations and establishing small business set asides. I met with business leaders and DA and DoD officials to resolve issues. I applied FAR, DFARS, AFARS, PM guidance, and DoD 5000.1 to meet program goals and optimize resources. I replied to GAO, AAA, OSD, DA, DODIG audits, proposals, and reports and implemented corrective actions. I issued procurement policy and was lead author on all contract related documents. In one $4M award, I was recognized for assisting the contracting officer in achieving a 45% reduction based on historical data.

10/23/2000 to 04/05/2003  GS-1102 -12. ACA USAREUR USACCE Wiesbaden Contracting Center. Wiesbaden Germany, AE 09096, Ms. Joanne Byrd , I served as a senior contract specialist and principal consultant for large high dollar value, and potentially controversial procurements for services, commodities, communication systems, facility maintenance, and computers. I held meetings with industry and government representatives. I prepared RFP, RFQ, PWS, and SOW documents and evaluated proposals. I conducted negotiations and prepared awards and modifications. I established contracts requiring nonstandard provisions. Types were FFP, requirements, TM, and IDIQ contracts with Government furnished property, and options, including award term options. I prepared complex modifications, led proposal evaluation meetings, and negotiated over 1 million in changes. I prepared the incentive award section for WCC's first PBSA solicitation. I was particularly successful in increasing competition in areas where it had not existed, saving over $2 million for one customer. I prepared the acquisition plan for a $700 Million services contract. I was the designated POC within the Division for PD2 SPS assistance and prepared the division newsletter. I conducted negotiations of basic contracts and modifications in the scope of work to be performed, price escalation and adjustment, and progress payments. I applied my considerable judgment during negotiations in areas where little or no precedent or historical cost data existed. I prepared detailed summary of negotiations including case history, comparison of cost data, conclusions reached, and PNM. I prepared complex modifications, led proposal evaluation meetings, and negotiated one million in changes. I prepared the incentive award section for WCC's first PBSA solicitation.

06/14/1994 to 10/23/2000 Management Analyst, GS-0343 -12. Defense Contract Management Agency ATTN: Technical Assessment Group. Chicago, IL.  At DCMC Israel 1994-1996 as a management analyst and administrative officer managing all administrative areas such as budget, personnel, training, liaison with US Embassy office in Israel performing quality assurance and oversight for personnel transfers, details, PCS, benefits administration, housing, LQA and personnel/workforce management.  I applied my expert knowledge of the DSSR, FTR, JTR, and HR/HD policies and procedures to facilitate smooth transitions and rotations.  From 1996-2000, I ensured that all contract administration services were performed according to established goals and standards. I served as the PIO (Performance Improvement Officer) for the Command performing a variety of audits, surveys, and contract administration improvement projects to improve business processes through the systematic application of management techniques.

09/29/1991 to 06/14/1994 Procurement Analyst, GS-1102 -12. DCMA Chicago. I audited major Defense contractors' purchasing and sub-contracting systems compliance with the FAR and DFARS. As team captain, I coordinated the input of other team members from various technical areas such as quality assurance, small business, DCAA, price/cost analysts, and industrial specialists

01/15/1990 to 09/21/1991  Operations Research Specialist, GS-1515 -12. HQ Fourth Army.  I performed complex statistical analyses of business processes (training) for trends and to research operational hypotheses. The data were derived from my audits in the seven-state area. I briefed the Lieutenant General Commander. Briefings concerned complex highly political issues. I often provided analyses of alternatives on complex and sensitive topics. I designed my own evaluation instruments, surveys, and questionnaires. I served as Branch Chief for 9 months.

12/23/88 to 01/13/90, Program Analyst, GS-0343 -13. HQ DLA Directorate of Information Systems and Technology. Alexandria, VA . I ensured that IT contracts

UNCLASSIFIED//NONE//NONE

# National Geospatial-Intelligence Agency

## Internal Resume

**Name:** Laber,Stan P
**Location:** Springfield, VA

**Employee Id:** 1040254
**Current Dept Id:** OCSP

for all systems (AIS) adhered to contract and DOD standards.  I audited PM's configuration status accounting and prepared milestone charts and performance analyses.

09/87-12/88 GS-0301-12  Supervisory Information Management Officer , US Army Corps of Engineers Chicago District,  Chicago, IL  I supervised 10 logisticians and computer professionals as DOIM (Director of Information Management) and DOL (Director of Logistics). I managed IM assets, budget, security, logistics.

09/01/85 to 09/87. Hrs per week: 40, Computer Specialist, GS-0334-12. HQ US MEPCOM. Directorate of Information Systems and Technology, North Chicago, IL. I was the team lead and COR for ADPE, software, and IT resources for the Command, which included 73 worldwide sites. I was a assistant security officer.

1981 to 1985 DLA, DCMA QA Specialist Intern, Electronics, GS-5/7/9. I completed a two year training program to be a resident Quality Assurance Representative in contractors' manufacturing facilities for electronics, Navy Nuclear Propulsion, and computer software.

1967 to 1977 Assistant Professor Communications, University of Wisconsin, Communications and Journalism Departments. I taught courses in journalism, media, radio-TV production, public speaking, and media relations.

Performance Award, Army, 6/30/2006
Sustained Performance Award, Army, 6/30/05
Quality Step Increase, Army 10/23/04
Performance Award USACCE 01/17/2003
Performance Award USACCE 01/28/2002
On the Spot Award USACCE 09/08/2001
Performance Award DCMA 08/01/1998
Sustained Superior Performance DCMA 11/30/1997
Performance Award DCMA 06/30/1997
Sustained Superior Performance DCMA 06/01/1996
Sustained Superior Performance DCMA 05/01/1995
Special Act Award DCMA 03/01/1995
Sustained Superior Performance Award DLA 04/11/1992
Commander's Award for Civilian Service ARMY 03/15/1991
Sustained Superior Performance Award ARMY 03/15/1991
Exceptional Performance Certificate ARMY 03/10/1991
Certificate of Achievement USACE 07/19/1988
Exceptional Performance Certificate MEPCOM 07/30/1987
Exceptional Performance Certificate MEPCOM 04/30/1986

Acquisition Corps Member, Army, 06/11/2003
Intelligence Community Joint Duty Requirement, ODNI, 01/2008
Intelligence Community Assignment Program, ODNI, 06/2007

Certificate in Contract Management, National Contract Management Association and AFIT, 1987.
Certificate in Logistics Management Information Sys, Data Processing Management Association and ALMC, 1987.
Professional Designation in Contract Management, National Contract Management Association and ALMC, 1987.
Certificate in Maintenance Management, Society of Logistics Engineers and ALMC, 1988.
Certificate in Research, Test, and Evaluation, Association for Systems Management and ALMC, 1989.
Diploma, Logistics Executive Development Program, U. S. Army Logistics Management College, 1989.
Certificate in Management Science, Society of Logistics Engineers and ALMC, 1990.
I completed the following IC related courses:

Intelligence in Combating Terrorism, ITO468, 4 8/10/2005, ATSC
US National Intelligence Structure, ITO427, 4 8/8/2005, ATSC
Use of Intelligence Products, IT0552, 8, 7/21/2005, ATSC
Legal Aspects of COMSEC Monitoring, ITO763, 4, 8/7/2005, ATSC
Counterintelligence Liaison, ITO777, 4, 8/8/2005, ATSC
Personnel Security Program, IT0110, 5, 8/7/2005, ATSC
Intro to Intelligence Analyst, IT0550, 6, 7/22/2005, ATSC
Military Intelligence Law, ITO466, 6, 8/7/2005, ATSC
Strategic Intelligence, IT0583, 10, 8/1/2005, ATSC
Intro to the Intelligence Analyst, IT0583, 6, 7/22/2005, ATSC
Active Defense: An Executive's Guide to Information Assurance, DIA-CMP-2004, 7/7/2010, DIA
Teamwork and Emotional Intelligence, 6/23/10, SKS-COMMO143, 6/23/2010, Skillsoft
Geospatial Skills-NGA;GI and S Support to Intelligence, 6/23/2010, DIA-JBC-2002-D, DIA
DCID 6-3:Protecting SCI with Information Systems, DIA-IST-2001, 6/11/2010, DIA
National Intelligence Course, DIA-INT-2003, 6/11/2010 DIA
WMD Course, 5/24/2010 NRO

UNCLASSIFIED//NONE//NONE

# National Geospatial-Intelligence Agency

## Internal Resume

**Name:** Laber,Stan P
**Location:** Springfield, VA

**Employee Id:** 1040254
**Current Dept Id:** OCSP

## Optional Cover Letter Text

Evaluation Panel

I have over 40 years of hands-on acquisition and industry experience.  Over half of my career has been as a supervisor or team lead, so I am excited about this opportunity to get back into operations.

I see this OCS position as an ideal match of my interests and skillsets with NGA's needs to mentor and develop a competent and agile workforce.   During my years at NGA, I have honed my contracting skills while developing a strong support network within and outside the agency. I have supported nearly every directorate and established continuing personal relationships.

My strengths are in team building, mentoring, and innovative solutions. I'm keenly interested in this and look forward to meeting you

Respectfully,
Stan Laber

UNCLASSIFIED//NONE//NONE

# Exhibit 2

## Declaration under Penalty of Perjury

I, **Stan Laber**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ORGANIZATIONAL INFORMATION

Question (Q): What is your full name?
Response (R): Stan Laber

Q: In your formal complaint, you allege discrimination on the bases of age, religion, and sex. Is that correct?
R: Yes, that is correct. But I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies. The EEO Office dismissed my allegation of reprisal.

Q: Name each of the employee(s) and/or management official(s) you are alleging is responsible for discriminating against you.
R: I don't know who was involved in it, other than the people who were addressed by Mr. Hinchberger. I believe that is Hinchberger, Richard Unis, Tammy Verdon, and Johnetta Williams. I am assuming they were involved because they were the members of the selection panel. I have no idea what those people did, said, or with whom they consulted. I also allege that Tonya Crawford was responsible, as the approving official. The panel is only a recommendation to her. Ms. Crawford made the selection decision. Those are the only people I know about.

Q: What was your position title, pay plan, job series, and grade on September 6, 2013?
R: Supervisory Contract Specialist, IA-1102-04

Q: When did you start that job?

R: November 2006 to present.

Q: On September 6, 2013, what is your organization starting with the lowest level to the highest? **(i.e., Branch, Section, Division, Directorate, location)**
R: At that time, I was a supervisor in Office of Contract Services Policy Branch (OCSP) Office of Contract Services (OCS), Director (DD), National Geospatial Intelligence Agency (NGA), Department of Defense, Springfield, VA

Q: Who was your **first** level supervisor on September 6, 2013?
R: Howard Pierce

Q: Who was your **second** level supervisor on September 6, 2013?
R: Dan Hinchberger

Q: Has your position changed since September 6, 2013?
R: Yes, it has. I am still a Contract Specialist, IA-1102-04, although I am no longer a supervisor.

Q: If so, when did your position change?
R: I don't recall when that happened; I think it was in 2014. There was a change in the span of control throughout the agency. I don't think it had to do with my performance; it was a reorganizational issue.

Q: During the period at issue, what was your organizational relationship to **Daniel Hinchberger**?
R: He was my second level supervisor.

Q: How often did you interact with **Mr. Hinchberger**?
R: Once every few months.

Q: During the period at issue, what was your organizational relationship to **Richard Unis**?
R: None at all.

Q: How often did you interact with **Mr. Unis**?
R: I spoke to him on business-related topics, but that was infrequently.

Q: During the period at issue, what was your organizational relationship to **Tammy Verdon**?
R: She was a supervisor of mine for some period of time, but I don't recall when that was. When she supervised me, I had daily contact with her. That was a few years ago.

Q: How often did you interact with **Ms. Verdon**?
R: It was daily when she was my supervisor. After she was no longer my supervisor we had much less contact.

Q: During the period at issue, what was your organizational relationship to **Johnetta Williams**?
R: She was also my supervisor about three years ago.

Q: How often did you interact with **Ms. Williams**?

R: I had daily contact with her while she was my supervisor, and then we had much less frequent contact after she was no longer my supervisor.

Q: What are you seeking as relief for this complaint? What kind of outcome are you seeking?
R: It hasn't changed from what I wrote in my formal complaint. The remedies I am seeking in the formal complaint still hold true.

## RETALIATION FOR EEO ACTIVITY
Q: Your claim is based on retaliation for participating in protected EEO activity. What EEO protected activity did you participate in?
R: I have a history of filing EEO complaints, and I guess I am what is called a "frequent-flier." The number of complaints I have filed is so high that when you search for me on the internet, you see a lot of EEO complaints. I filed between 50 and 100 EEO complaints before I came to NGA in 2006. Some of those became court cases, hearings, appeals, etc. That adds more internet hits to my name. This is the first claim I have filed since coming to NGA. My belief is that NGA officials were well aware of my EEO when the selection action happened. I think they were also aware of my activity because I asked to serve as an EEO counselor at NGA. That was in 2009 or 2010. I don't recall who my supervisor was at that time, but it was someone in OCS. There became an issue about whether a person who files EEO complaints should serve as an EEO counselor. I didn't think it was an issue, but the agency did because while attending the class the instructor told me that he was well aware of my history and it had been discussed at NGA. The instructor at the EEO class (I don't remember his name) told me he had been consulted by another agency in regard to the complaints I had filed against that agency. After I was approved to be a counselor, I was never provided any assignment and when I asked to serve a second year, I was advised that my services were not needed.

Q: Are you alleging reprisal because of EEO activity you initiated which led to this formal complaint? In other words, are you alleging reprisal for filing this claim?
R: No, I don't think that happened. I am not making the claim that NGA retaliated against me because I filed this claim, at least not to date for which I am aware.

Q: Are you alleging reprisal for EEO activity you pursued prior to this complaint?
R: Yes

Q: When did you participate in the prior EEO activity?
R: I filed my first claim in 1979. The last time I filed a complaint before coming to NGA in 2006.

Q: In looking at the 50 – 100 complaints you filed prior to coming to NGA, what bases were you alleging discrimination on?
R: Generally my complaints were non-selections, promotions, and training. Most were based on religion. They evolved into many bases, but a lot of them had to do with religion. More than one of my complaints went to federal court, and one of them got as far as a federal court of appeals, and then to the supreme court. That relates to the amount of internet presence my cases have out there. It demonstrates that the agency must have knowledge of how litigious I have been because very few EEO complaints go to the Supreme Court. That one was based on religion and I prevailed on it. The court case was about the remedy that I received after prevailing at the EEOC.

*Page 3 of 12 Pages*
Declarant's Initials
000067

Q: Was **Mr. Hinchberger** aware of the prior EEO activity?
R: I believe everyone was.

Q: How did **Mr. Hinchberger** become aware of your prior EEO activity?
R: I don't know how or when he learned about it, but there are many ways he would learn about it. I believe there was a discussion when I took that EEO course, about approving me as an EEO Counselor.

Q: When did **Mr. Hinchberger** become aware of your prior EEO activity?
R: I don't know when he learned about it.

Q: How do you know that **Mr. Hinchberger** was aware of your EEO activity?  How did you learn that they knew about it?
R: I don't know, but I believe he was aware.

Q: Was **Mr. Unis** aware of the prior EEO activity?
R: Yes

Q: How did **Mr. Unis** become aware of your prior EEO activity?
R: I don't know.

Q: When did **Mr. Unis** become aware of your prior EEO activity?
R: I don't know when he became an employee, and he was never in my supervisory chain. I think he was probably at meetings where it was discussed. I would assume he became aware after he arrived at NGA. Each person who was my supervisor, or who was in management would have known. The only thing I can provide you are ways that they could have learned about it. Nobody ever said to me "Oh, I heard you filed EEO complaints." But I am convinced that they all knew.

Q: How do you know that **Mr. Unis** was aware of your EEO activity?  How did you learn that they knew about it?
R: I don't know, but I believe he was aware.

Q: Was **Ms. Verdon** aware of the prior EEO activity?
R: Yes

Q: How did **Ms. Verdon** become aware of your prior EEO activity?
R: I don't know.

Q: When did **Ms. Verdon** become aware of your prior EEO activity?
R: I don't know.

Q: How do you know that **Ms. Verdon** was aware of your EEO activity?  How did you learn that they knew about it?
R: I don't know, but I believe she was aware.

Q: Was **Ms. Williams** aware of the prior EEO activity?

*Page 4 of 12 Pages*
Declarant's Initials
000068

R: Yes

Q: How did **Ms. Williams** become aware of your prior EEO activity?
R: I don't know.

Q: When did **Ms. Williams** become aware of your prior EEO activity?
R: I don't know.

Q: How do you know that **Ms. Williams** was aware of your EEO activity?  How did you learn that they knew about it?
R: I don't know. She was my supervisor before Ms. Verdon, closer to the time that she would have been present for it to be discussed.

Q: Was **Ms. Crawford** aware of the prior EEO activity?
R: Yes

Q: How did **Ms. Crawford** become aware of your prior EEO activity?
R: I don't know, but she has always been in a management position since I came here. She wasn't the director she was now, but she was always in a management position. She was never my supervisor, but she was my reviewing official.

Q: When did **Ms. Crawford** become aware of your prior EEO activity?
R: I don't know.

Q: How do you know that **Ms. Crawford** was aware of your EEO activity?  How did you learn that they knew about it?
R: I don't know, but I am certain she knew about it.

Q: What do you believe NGA agency officials did to retaliate against you for your EEO activity?  How and when did they retaliate against you, and what form did that take?
R: Every time I file a complaint, the lawyers look me up in Lexis-Nexis and they find the long list of claims I have. And my name comes up when you do internet searches. There have been no accusations by NGA agency officials or lawyers that any of my complaints were frivolous. They haven't even made that allegation. However, I believe that NGA officials believe that my EEO complaints have been frivolous because it is so unusual. In regard to this selection, NGA officials acted on their belief that I am a frequent-flier, and that my complaints were frivolous. They didn't want me to complain about not being selected, so they purposely ensured that I would not get an interview. In their minds, I think they think that it would be easier just to tell me I didn't make the cut for an interview rather than telling me that I was interviewed but not selected. I think they chose not to interview me because they thought it would be easier to explain that I was not interviewed. And their opinion of me was that I could not do a supervisory job because of my history of EEO activity. I think they think that my EEO history would project an overwhelmingly negative managerial style and ability. I just think they had a negative opinion of me. When I was on the list of counselors, they did not give me any EEO-related work to do. I think they decided to let me complete the training but then never use me for EEO work.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013

Q: You allege that you were discriminated against based on your age, religion, and sex when you were not interviewed or selected for the position of Contract Specialist, Pay Band 05 in September 2013.  Explain why you believe you should have been selected for the position.
R: Because of my eminent qualifications. I really can't tell you every reason why I should have been selected in this interview. The summary is that I have over 30 years of acquisition experience, most of which was supervisory. That is it in a nutshell. If we go through my experience, my jobs, my grades, etc., that is all in the resume. But that information doesn't really provide a succinct argument of my qualifications. I don't see any point for me to explain why I should be selected for the position. And even if I told you why I was qualified, it would just be reiterating what I have in my resume.

Q: Did you believe that you were as equally qualified as the candidate selected?
R: I don't know who was selected. I believe I did know, but I don't recall. I think it was a female, but I don't know her name. I am sure that I am better qualified than she is, because I certainly had more experience. As far as the details of her experience, I don't know what it is.

Q: Did you believe that you were more qualified as the candidate selected?
R: Yes, I do.

Q: If you believe that you were more qualified, explain how.
R: I can only explain how I was more qualified in one aspect; I have over 30 years of experience, and because I am the oldest person who applied for the vacancy, I don't believe there is anybody with more experience than I have, inside or outside of the government.

Q: Did you see the application materials of the other people who applied for the position?
R: No, I did not. I don't know who applied. I don't know their names or anything about them. I don't have the referral list. I don't know how many people were on it. As far as I know, only one person was selected. The same statement I just made goes to the issue of my superiority over those who were interviewed. I don't know how many people were interviewed, and how many were not interviewed. But my claim is that I have more experience, training, and knowledge than anyone who was interviewed. I believe I am far superior to the selectee and to anyone who passed the threshold for being interviewed. If I don't know anything about these applicants, I can't say for a fact that I have more experience than anyone who was interviewed or selected. But I believe that is the case because of my 30 years of experience and my eminent qualifications. I don't think anyone, including the selectee, has over 30 years of acquisition experience as I do. But it is not just experience; it is also knowledge and training.

Q: Do you know who applied for the position?
R: No, I do not.

Q: If you have not seen the application materials of the other applicants, how do you know that you were as qualified, or more qualified than the person who was selected?
R: I don't know for a fact, but I believe I am more qualified and experienced than the person who was selected. I don't think anyone who applied or was selected has the DAWIA certifications that I have. I don't believe that any of the applicants or the selectee has completed more related training than I have. No one who applied or was selected could have a higher level of education than I have; bachelor's, Masters, and all but dissertation toward a PhD. I have six certificates from various societies. I completed more than one Acquisition Leadership Program. I supervised

*Page 6 of 12 Pages*
Declarant's Initials _____

000070

Acquisition in industry and government. My acquisition experience is extremely robust because I have worked in acquisition positions that support 1102 work, such as: (1910) Quality Assurance Representative, (1515) Operations Research Analyst, (1150) Industrial Specialist, (0334) Computer Specialist, (0343) Program Analyst. At one time or another I was in all of those positions, all of which are allied to Acquisition. The grades I have been in range from 11 to 13. The training that I completed is over 330 Acquisition courses in residence, online, and in correspondence. I don't think anybody else who applied for the job completed over 300 courses as I have. I think that is probably true for DoD-wide. I have the training, experience, industry experience, and government experience. I think it is important that I have worked in approximately five contracting offices; CONUS and OCONUS, which provided me insights into the best way to do acquisition. That is as opposed to other applicants whom I believe only had experience in one or two organizations. The breadth and depth of my experience is extensive.

Q: How did agency officials discriminate against you in the selection process? What did they do to discriminate against you?
R: They did not interview me or select me. I imagine they entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected. I don't have the scores, so I can't say that in category X they scored me incorrectly. All I can do is make a generalized claim. When we do the discovery and go through the details of who was scored for an interview and who was not, with their measures based on the criteria for interviews, then we will know. I presume that they supported a scoring system that kept me from being selected for an interview, and from being selected for the position. When I get all the scores in the investigative file I guess I will know what they did. I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview. If I see the scores and the comments, maybe I will drop my complaint. I just don't think that is going to happen. I think there will be a number of people selected for interviews who were strikingly less qualified in their applications than I was. Where is the smoking gun? Was it one person? More than one person? Ill feelings? My religion, age, or sex? You'll have to talk to them because I can't cite overt comments made to me. They have not notified me that I am too old, or too Jewish, to my face. At this time I don't have any witnesses who will say that they made comments about my age, religion, or sex. I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization. Even as a supervisor, I put someone in for an award who had filed a complaint, and I was told that management wasn't ready to approve an award for that person because the complaint was too fresh in their minds. I know how they are, how they talk, how they behave. So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory. I haven't seen any of the scoring materials, but I am very confident that they would have had to do that. There is no other way that I would not have been interviewed with my experience. I don't know how many people applied, were interviewed, or were selected. I think

that when the scores are revealed, there will be some categories where my objective record does not support the lower rating that I received. The raw data will speak for themselves. It is not just the raw data; it is also the communications between the panel members, when they tried to reconcile the scoring. The leader or instigator, who wants to throw somebody under the bus, will send an email to the panel members to build consensus about who they want interviewed. I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me. I don't know how many people were not selected for interviews.

Q: How were you harmed by not being selected for the position?
R: I did not receive the benefits of the position; I was not selected. I suffered pecuniary and non-pecuniary losses. I lost the salary that would have come from being selected and future earnings related to that. There is also the emotional upset of being discriminated against; having my age and religion play a role in the non-selection. That is very upsetting. There is also my time. A great deal of my time is occupied pursuing the discrimination complaint. It takes a huge emotional toll. Although I have filed complaints in the past, I have never filed a complaint at NGA. It is especially difficult because I come from a history of being a frequent-flier outside this agency. I have been determined not to file a complaint unless it is absolutely necessary. In the past, I filed valid complaints, but I could just as well have decided not to file them. When I came to NGA, I tried to take a different perspective and view of the criteria under which I would go ahead and file a complaint. This particular complaint has a greater significance to me, and a greater amount of emotional, physical, and mental, time component because of the constraints I have placed on myself when I came to NGA. It makes it harder for me to file this complaint now. It is difficult to pursue, to discuss. It is more emotional upsetting and draining. I am really not looking forward to the time that will occupy me from doing other things in my life; lack of enjoyment of my other activities because there are deadlines for discovery and other associated activities.

Q: With respect to the selection action, do you believe you were treated differently (or less favorably) than a person who was not of your **AGE**?
R: Yes

Q: If so, who was treated differently based on **AGE**?
R: The people who were selected for the interview: I don't know their names or their ages. But I believe they were younger than I am. I believe they were younger than I am because of my age. I presume that none of the applicants were older than I was.

Q: How were they treated differently based on **AGE** with respect to the selection action?
R: They were interviewed and selected. The OCS leadership prefers to have younger employees and leaders.

Q: Who treated them differently based on **AGE**?
R: The selection panel and selecting officials; Tonya Crawford, her deputies (whoever they are).

Q: Have agency officials explained why they treated those individuals differently based on **AGE** with respect to the selection action?

R: No, they don't talk to me about their selections. I had discussions with co-workers, not about this particular non-selection, but about another one. There was a consensus among our group that they wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski. That particular case was so egregious that I am my colleagues discussed the blatant age discrimination that has occurred.. I did not speak with any agency officials about this selection action; I knew how it turned out so I didn't talk to anyone. It was not appropriate for me, for my religion, or for my person to go and question them about how the selection turned out. I would not accuse anyone of Title VII discrimination to their face. I think that would be inappropriate.

Q: Why do you believe the non-selection was motivated by discrimination based on your **AGE**?
R: The leadership of OCS has a long history of shoving older employees into dead end positions, and not promoting them.

Q: How can you prove that you were discriminated against based on your **AGE**? What evidence can you point to that proves age discrimination?
R: The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions. For this selection action specifically, I believe there is proof. I don't have an email from anyone who said that I didn't get the interview because I was too old. I don't recall any comments that anybody made to me personally that said I was too old for the position. But I see it in their actions. For example, the position that I was in at the time was formerly occupied by someone who was about to retire from the military. The person who ran the program before that person was a Band 02 or 03. It was quite clear to me, just in my assignments, that management did not want me in a responsible position in the agency. Since I consider myself a responsible, well-qualified employee, being moved into such a low-impact and low-visibility position was because of my age and religion. In that regard it is difficult to point to facts, but it was indicative of their opinion of me. That, I believe, was motivated by all of these discriminatory factors.

Q: Do you know the **AGE** of the other applicants for the position?
R: No

Q: If you do not know the age of the other applicants, what is the basis for your allegation that the selection was discriminatory based on **AGE**?
R: My belief that they were younger.

Q: With respect to the selection action, do you believe you were treated differently (or less favorably) than a person who was not of your **RELIGION**?
R: Yes

Q: If so, who was treated differently based on **RELIGION**?
R: The applicants for the position. I don't know who they are, I don't know what their religions are. But I believe I have seen everyone who works within OCS, and none of them exhibits the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the

**61**

agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do. I do my utmost to tell the truth, and not do anything inappropriate in my professional position. If there is something that I don't think is proper or according to regulation/law, I refuse to do it based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times.

Q: How were they treated differently based on **RELIGION** with respect to the selection action?
R: I don't know their religions, so I can't answer that. The only thing I can say is that based on my religion, I was treated negatively.

Q: Have agency officials explained why they treated those individuals differently based on **RELIGION**?
R: I did not have any conversations with agency officials about how my religion played into the selection action because I never discussed the selection with anyone of them.

Q: With respect to the selection action, do you believe you were treated differently (or less favorably) than a person who was not of your **SEX**?
R: Yes

Q: If so, who was treated differently based on **SEX**?
R: I don't have the name of anyone who was treated more favorably than I was. For all I know, the applicants who were interviewed were all male. I don't know the sex of the applicants. I am making an allegation of discrimination based on sex because I don't want to have an allegation that might be denied because it was not made earlier.

Q: How were they treated differently based on **SEX** with respect to the selection action?
R: I believe that a female was selected, but I don't recall the person's name. It is possible that I got that wrong, but I believe a female was selected. Most selectees in OCS are female, particularly those with female experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females.

Q: Who treated them differently based on **SEX**?
R: Tonya Crawford. Even though the panel does the selection, Ms. Crawford tells the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. OCS leadership acts with impunity.

Q: Have agency officials explained why they treated those individuals differently based on **SEX**?
R: No. I have had no discussions with agency officials about sex.

Q: Why do you believe the non-selection was motivated by discrimination based on your **SEX**?
R: Because there is a history and pattern of females being selected at OCS.

Q: How can you prove that you were discriminated against based on your **SEX**? What evidence can you point to that proves sex discrimination?
R: Only through the observed history of females being interviewed and selected for positions.

Q: If you do not know the sex of the other applicants, what is the basis for your allegation that the selection was discriminatory based on **SEX**?
R: Just the observable pattern of females being interviewed and selected in OCS.

## RETALIATION
Q: How were you harmed by the reprisal you allege took place?
R: I did not get the position I applied for. The negative attitude that agency officials had about me being a complainer, particularly EEO, because it is an important part of being a supervisor.

Q: Explain how the act of reprisal was harmful.
R: I was not interviewed, and I did not get the job. They didn't taunt me about being a frequent-flier, but I am convinced that it played a decisive role in the non-selection.

Q: Why do you believe the harmful action was motivated by your EEO activity?
R: In their minds, they believe that EEO claims play a role in my ability to carry out supervisory responsibilities.

Q: Do you have anything to add that is relevant to the accepted claim?
R: I am alleging discrimination based on reprisal and disability, but the EEO office dismissed those two. I did not, and still do not want to disclose information about my disability for privacy reasons. I have a condition that is a disabling condition, but I do not want to enter any information about it into the record. However, I do maintain that I was discriminated against based on my disability. I don't believe that anybody in the agency was aware of my disability, but that does not mean that the condition did not affect the selection action. I have a disability, but I don't want to disclose the details of it. Because I will not disclose the details of the disability, I can't explain how or why I was discriminated against based on that disability. No one ever said anything to me about my having a disability but I think they perceived some part of my behavior as being a disability.

END OF STATEMENT

I, **Stan Laber,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct. The interview questions were first presented to me verbally on July 3, 2014. The answers I provided were without the aid of any notes or records.

_____          _____
Complainant's  Signature                           7/ 7/ 4
                                                                            Date

# Exhibit 3

# NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY

*Visit our home page at www.nga.mil.*
Our Mission:
NGA provides timely, relevant, and accurate
Geospatial Intelligence in support of national security.
Our Vision:
*Know the Earth...Show the Way...Understand the World*

---

## VACANCY ANNOUNCEMENT

Announcement Number: 20130928

Opening Date: June 24, 2013
Closing Date:  July 5, 2013

---

POSITION TITLE & SERIES:  Supv Contract Specialist-DAWIA

PAY BAND & SALARY RANGE:

DUTY STATION:  Springfield, VA

AREA OF CONSIDERATION:  NGA Wide

---

Classification: Unclassified
Source: NGA Wide
Open: 2013-06-24
Closed: 2013-07-05
Recruitment POC: Grant,Natasha A, 571-557-3791
Hire Office POC: Hinchberger,Daniel E, 571-557-2332
Band: 05
Org: OCS
Location: Springfield, VA

Applicants are NOT required to submit a cover letter. The entire cover letter CANNOT exceed the specified limits provided in the Cover Letter field (6,500 characters). Pages exceeding this limit will not be considered. THE COVER LETTER IS RECOMMENDED BUT IS NOT REQUIRED FOR EMPLOYMENT CONSIDERATION WITH THE NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY. Applicants should place their narrative information in the appropriate field on the Job History and Cover Letter Text Page.

ONLY ELECTRONIC SUBMISSIONS WILL BE ACCEPTED.

PERMANENT CHANGE IN STATION: PCS expenses are authorized for NGA employees.

ASSIGNMENT DESCRIPTION: Supervisory positions involve planning, directing, assigning, leading, and monitoring work of the unit, or selecting employees, and managing and appraising employee and organizational performance. Supervisors make decisions that impact the resources (people, budget, material) of the work unit, ensure the technical quality and timeliness of the work produced by employees in the unit, and collaborate with supervisors across the organization in unstructured situations. Supervisors must supervise at least one government employee; they typically supervise between three to fifteen employees. Supv Contract Specialists-DAWIA develop, plan, organize, manage, solicit, negotiate, award, terminate, administer, and close out acquisitions to meet customer needs. They interact with the contractor and the customer to meet customer needs. They may also hold a warrant that would authorize them to obligate the Government subject to limitations expressed on their warrant. They must obtain DAWIA-certification in Contracting, as appropriate for the band, within 24 months of appointment to this work role.

PROMOTION OPPORTUNITY: Promotion opportunities allow both applicants at the next lower Band and applicants at the same Band to apply and be considered. Those expressing interest should familiarize themselves with the Generic Promotion Profile found on the blue bar at the top header of the Announcement Pages on the HD Intranet page (NGANet and SBU).

ADDITIONAL INFORMATION: The Office of Contract Services (OCS) seeks applicants with extensive hands-on contracting experience including major systems, base operations or complex programs and strong supervisory skills to provide creative leadership in fulfilling NGA's mission. The selected candidate shall provide business advice, contractual guidance, and supervisory oversight while

serving as a Supervisory Contracting Officer within an OCS division. Responsibilities include ensuring that all acquisition activity is executed ethically, legally, efficiently and effectively; and in accordance with applicable DoD policies and procedures. As supervisor, responsibilities will include leading, mentoring and coaching a diverse workforce that may consist of DoD civilian, active duty contracting professionals, and other support personnel. Individuals must demonstrate the experience, training and education, judgment, dependability, character, and business acumen necessary to be delegated unlimited DoD signatory authority, including the authority to compete, negotiate, award, administer, and terminate NGA contracts. Applicants must be free of conflicts of interest and be able to obtain access at various security classification levels. Strong leadership skills are required, as well as professional knowledge of contract law, policy, and procedures. This position meets the OPM definition for the contracting series (GS-1102) and applicants must be able to verify that they meet applicable DAWIA certification requirements for the contracting field. The selected individual will be the candidate(s) who, overall, provides the best fit with the requirements included above, and other mandatory and desired criteria, as stated within this announcement.

MANDATORY QUALIFICATION CRITERIA: For this particular job, applicants must meet all competencies reflected under the Mandatory Qualification Criteria to include education (if required). Online resumes must demonstrate qualification by providing specific examples and associated results, in response to the announcement's mandatory criteria specified in this vacancy announcement:

1) Experience in applying the Federal Acquisition Regulation (FAR) and DOD Federal Acquisition Regulation Supplement (DFARS) to acquisition processes;
2) Contracting for a variety of products and services for major systems and/or complex programs using a wide range of contacting methodologies such as negotiated contract and commercial acquisition procedures;
3) Managing contract actions from conception to implementation with experience and knowledge of source selection procedures/competitive contract actions, cost or price analysis, negotiations, or preparation of related contract documentation;
4) Advising the Agency on the acceptability and applicability of contractual terms, or contracting types;
5) Ability to negotiate contracts while applying policies and Directives.

EDUCATION REQUIREMENT: Bachelor's degree in any field that includes, or has been supplemented by, at least 24 semester (36 quarter) hours of coursework in a business-related field such as Accounting, Business Administration, Contracts, Economics, Finance, Law, Purchasing, or a related discipline. Reference 10 USC Section 1724 for exceptions and waivers.

DAWIA Certification in Contracting, as appropriate for the band, within 24 months of appointment.

DESIRABLE QUALIFICATION CRITERIA: In addition to the mandatory qualifications, experience in the following is desired:

1) Knowledge of policies and procedures regarding performance evaluations, EEO, employee development (Knowledge of Defense Workforce Acquisition Improvement Act (DAWIA) and the DAWIA Acquisition career certification programs), federal diversity policy and other human development related matters;
2) Coaching and project management skills and mentoring experience;
3) Experience in organizational representation, implementation of integrated process team framework, process improvements and management controls;
4) Demonstration of strategic and transformational thinking, leadership, problem identification and resolution skills, flexibility, and ability to develop and implement innovative approaches.

DAWIA REQUIREMENTS: Selectee must meet DAWIA education requirements of a Bachelor's Degree and 24 semester hours (or the equivalent) of study from and accredited institution of higher education in and of the following disciplines: accounting, business, finance, law, contracts, purchasing, economics, industrial management, marketing, quantitative methods, and organization and management.

APPLICANT EVALUATION PROCESS: Applicants will be evaluated for this job opportunity in three stages, 1) All applicants will be evaluated using the Mandatory Qualification Criteria, 2) Qualified applicants will then be evaluated by an expert or panel of experts using a combination of qualification criteria to determine the best-qualified candidates, 3) Best-qualified applicants may then be further evaluated through an interview process. Applicants are encouraged to carefully review the Assignment Description, Additional Information Provided By the Selecting Official, and the Qualification Requirements; and then construct their resumes to highlight their most relevant and significant experience and education for this job opportunity. This description should include examples that detail the level and complexity of the performed work. Applicants are encouraged to provide any education information referenced in the announcement. If education is listed as a mandatory requirement, only degrees obtained from an institution accredited by an accrediting



organization recognized by the Secretary, US Department of Education will be accepted. In accordance with section 9902(h) of title 5, United States Code, annuitants reemployed in the Department of Defense shall receive full annuity and salary upon appointment. They shall not be eligible for retirement contributions, participation in the Thrift Savings Plan, or a supplemental or redetermined annuity for the reemployment period. Discontinued service retirement annuitants (i.e., retired under section 8336(d)(1) or 8414(b)(1)(A) of title 5, United States Code) appointed to the Department of Defense may elect to be subject to retirement provisions of the new appointment as appropriate. (See DoD Instruction 1400.25, Volume 300, at http://www.dtic.mil/whs/directives.)

NGA active duty military service members or reservists on active duty who are assigned to an NGA billet may apply for NGA-wide AONs if they are within 120 calendar days of retirement or separating from active duty or within 60 calendar days of terminal/transition leave start date. Reservists must be on active duty orders for at least 12 months and within four months (120 calendar days) of completing orders.

All candidates will be considered without regard to race, color, religion, sex, national origin, age, marital status, disability, or sexual orientation.

NOTE: NGA utilizes all processes and procedures of the Defense Civilian Intelligence Personnel System (DCIPS). Non-executive NGA employees are assigned to five distinct pay bands based on the type and scope of work performed. The employee's base salary is established within their assigned pay band based on their unique qualifications. A performance pay process is conducted each year to determine a potential base pay salary increase and/or bonus. An employee's annual performance evaluation is a key factor in the performance pay process. Promotions may be conducted during the annual pay for performance process or throughout the year via the Assignment Opportunity Notices (AON).

Application submission involves using NGA's on-line application process through PeopleSoft. Go to PeopleSoft: Enterprise Menu > Employee Self Service > My Career Development > Job Opening Self Nomination/Status

You must be able to obtain and retain a Top Secret security clearance with access to Sensitive Compartmented Information. In addition, you are subject to a Counterintelligence Polygraph (CI) examination in order to maintain access to Top Secret information. All employees are subject to a periodic examination on a random basis in order to determine continued eligibility. Refusal to take the examination may result in denial of access to Top Secret information, SAP, and/or unescorted access to SCIFs.

For additional information including application procedures, please visit NGA at www.nga.mil by clicking the "Related Job Link: NGA Employment Opportunities" link at the top of this page.



# Exhibit 4

UNCLASSIFIED//NONE//NONE

| | | | | | |
|---|---|---|---|---|---|
| Report ID:   NIHR019 | | NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY | | Page No : 1 | |
| Report Date: 07/11/2013 | | Certificate of Eligibles | | Run Time: 11:40:57 | |
| Database:    HRPROD | | PERSONAL DATA - PRIVACY ACT OF 1974 | | | |

Certificate:        20130928    Status: Issued/Received
Job Opening:        20130928    Type:   AON

Jobcode:           09ABS5
PP/Series/Band/Grade: IA/0000/05
Title: Supv Contract Specialist-DAWIA

Action Symbols For Use By Selecting Official
---------------------------------------------
A = Selected   D = Declined   NS = Not Selected

| Name | Office Symbol | PP/Series/ Band/Grade | Veterans Preference | Phone Number | Interview Date & Time | Action |
|---|---|---|---|---|---|---|
| EICHELBERGER, KAREN L | OCSR | IA/0000/04 | | 571-557-2366 | 9/5/13 - 8:45 | A |
| FLOYD, MARK R | OCSJ | IA/0000/04 | | 571-557-0853 | N/A | NS |
| GOODMAN, DYAH | OCSF | IA/0000/04 | | 571-557-2344 | 9/3/13 - 2:15 | NS |
| GREEN, DEMETRIUS R | OCSA | IA/0000/04 | | 571-557-2391 | N/A | NS |
| HERNANDEZ SOTO, CHRISTIAN A | OCSN | IA/0000/04 | | 703-230-6182 | N/A | NS |
| HILL, PATRICIA D | OCSU | IA/0000/04 | | 571-557-2431 | 9/5/13 - 9:45 | NS |
| LABER, STAN P | OCSP | IA/0000/04 | | 571-557-1075 | N/A | NS |
| LADSON, DANITA K | OCSR | IA/0000/04 | | 571-557-2345 | 9/5/13 - 9:00 | NS |
| LAMBERT, HOWARD E | OCSA | IA/0000/04 | | 557-2348 | N/A | NS |
| LARMAN, JOEY E | OCSJ | IA/0000/04 | | 571-557-2349 | 9/5/13 - 3:00 | NS |
| MCDOWELL, SHARON M | OCSA | IA/0000/04 | | 571-557-2333 | N/A | NS |
| MICHAEL, CASSANDRA L | OCSF | IA/0000/04 | | 571-557-2415 | 9/5/13 - 1:30 | NS |
| POMMERENKE, BRENDA A | OCSA | IA/0000/04 | | 571-557-2456 | N/A | NS |
| RHONE JONES, AUNDRA M | MSDC | IA/0000/04 | | 571-557-2416 | N/A | NS |
| SMITH, CATHY A | OCSU | IA/0000/04 | | 571-557-4645 | 9/5/13 - 11:15 | NS |
| WILLIAMS, RAYMOND J | OCSJ | IA/0000/04 | | 571-557-2423 | N/A | NS |

# Exhibit 5

| EEO COUNSELOR'S REPORT | 1. DA DOCKET NUMBER<br>NGAE-14-O03 |
|---|---|

**PRIVACY ACT STATEMENT**

**AUTHORITY:** Public Law 92-261

**PRINCIPAL PURPOSE:** Used for processing complaints of discrimination because of race, color, -national origin, religion, sex, age, physical and/or mental disability, genetics or reprisal by Department of Defense Civilian employees, former employees, applicants for employment, and some contract employees.

**ROUTINE USES:** Information will be used (a) as a data source for complaint information for production of summary descriptive statistics and analytical study of complaints processing and resolution efforts; (b) to respond to general requests for information under the Freedom of Information Act; (c) to respond to requests from legitimate outside individuals or agencies (White House, Congress, Equal Employment Opportunity Commission) regarding the status of a complaint or appeal or (d) to adjudicate complaint or appeal.

**DISCLOSURE:** Voluntary, however failure to complete all appropriate portions of this form may lead to delay in processing and/or rejection of complaint on the basis of inadequate data on which to continue processing.

**SECTION I – PRE-COMPLAINT INTAKE INTERVIEW**

| 2. NAME OF AGGRIEVED *(Print-Last, First, Middle)*<br>LABER, Stan | | 3. SSN | 4. Job Title<br>Supervisor Contract Specialist |
|---|---|---|---|
| 5. PAY GRADE<br>Pay Band 4 | 6. DUTY ORGANIZATION *(Complete Address including office symbol)*<br>National Geospatial Intelligence Agency<br>Office of Contract Services (OCSP)<br>Springfield, VA 22150 | | |
| 7. WORK TELEPHONE<br>COM:<br>DSN:  571-557-1075 | 8. HOME TELEPHONE | 9. HOME ADDRESS: 9412 ATHENS RD., FAIRFAX, VA 22032<br><br>E-MAIL: | |

| 10. DATE OF ALLEGED DISCRIMINATORY ACTION *(YYYYMMDD)*<br>09/09/13 | 11. 45TH CALENDAR DAY AFTER EVENT *(YYYYMMDD)*<br>10/24/13 | 12. REASON FOR DELAYED CONTACT BEYOND 45 DAYS, IF APPLICABLE | |
|---|---|---|---|
| 13. DATE OF INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*<br>10/15/13 | 14. 30TH CALENDAR DAY AFTER INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*<br>11/14/13 | 15. 90TH CALENDAR DAY AFTER INITIAL CONTACT WITH EEO OFFICIAL *(YYYYMMDD)*<br>02/14/13 | 16. DATE COUNSELING EXTENSION GRANTED, IF APPLICABLE *(YYYYMMDD)* |

| 17. DATE PRECOMPLAINT INTAKE INTERVIEW CONDUCTED *(YYYYMMDD)*<br><br>INTAKE SPECIALIST: I Gloria Cunningham | 18. PRECOMPLAINT INTAKE INTERVIEW CONDUCTED:<br><br>Telephonically ☐ In-Person  Other *(facsimile/e-mail)* |
|---|---|

**SECTION II - ORGANIZATION WHERE ALLEGED DISCRIMINATION OCCURRED** *(Complete Address including Office Symbol)*

ACTIVITY:  National Geospatial Intelligence Agency, Office of Contract Services (OCSP)
ADDRESS:  7500 GEOINT Drive, Springfield, VA 22150
MAJOR SUBORDINATE COMMAND:

**SECTION III - RESPONSIBLE MANAGEMENT OFFICIAL(S) INFORMATION** *(include name, complete work address, and phone number if known.)*

*Specify who conducted the alleged discrimination.  Notify the assigned EEO Specialist upon verification of the Responsible Management Official (RMO)(s), so the RMO Notice(s) can be mailed.  If you have more than three (3) RMO's identified, you must substantiate and request approval from the EEO Specialist.*

RMO 1 – Daniel E. Hinchberger, Office of Contract Services (OCSP), Daniel.E.Hinchberger@nga.mil., 571-557-2332
RMO 2 –
RMO 3 –

Page 1 of 6

000018

| SECTION IV – BASIS OF COMPLAINT *(Identify specific race, color, religion, national origin, disability, age, sex, or reprisal if alleged.)* |
|---|

☐ RACE (_____)   ☐ COLOR (_____)   SEX  X  MALE   ☐ FEMALE  X  AGE  DOB (2/1945)
NATIONAL ORIGIN _____   RELIGION X (JEWISH)  DISABILITY ☐  MENTAL ☐  PHYSICAL ☐  GENETICS (GINA) ☐
X REPRISAL

*(Date(s) of prior EEO activity)*

| SECTION V – MATTER(s) GIVING RISE TO THE COMPLAINT *(Specify who, what, where and when.) (Use continuation sheet of paper if necessary.)* |
|---|

Mr. Stan Laber alleged that because of his age (  1945), religion (Jewish), sex (male), and reprisal (prior EEO activity),  he was discriminated by the National Geospatial-Intelligence Agency when he was not interviewed or selected for a Pay Band 5 Contract Specialist position.   Mr. Laber elected to participate in Alternative Dispute Resolution (ADR).  There was no resolution.  Mr. Laber was issued the Notice of Right to File Formal on February 18, 2014.

| SECTION VI – RELIEF SOUGHT |
|---|

1. Mr. Laber seeks the Pay Band 5 Contract Specialist position, pecuniary and non-pecuniary damages.

Page 2 of 6

000019

### SECTION VII – RIGHTS AND RESPONSIBILITIES

**THE AGGRIEVED WAS PROVIDED WITH THE AGGRIEVED PERSON'S RIGHTS AND REPSONSIBILITIES NOTICE AND WAS SPECIFICALLY ADVISED OF THE FOLLOWING:**

x ☐ The basis(es) for filing pre-complaint, formal complaint, and/or class complaint, and of right to file a formal complaint of discrimination.

x ☐ The pre-complaint, formal, and/or class process

x ☐ The 45-day calendar requirement from effective date of personnel action or of the date of the matter alleged to be discriminatory

x ☐ The role of the EEO counselor, including that the counselor is not an advocate for either the aggrieved person or the agency and acts strictly as a neutral.

x ☐ The activity's Alternate Dispute Resolution (ADR) Program and the right to elect either ADR (if offered) or traditional EEO counseling.

x ☐ The right to remain anonymous during the pre-complaint process.

x ☐ The right to representation throughout the complaint process.

x ☐ Responsibility of the Aggrieved to notify the EEO office in writing of any changes in address and/or phone number.

x ☐ Responsibility of the Aggrieved to notify the EEO office in writing of non-attorney or attorney representation, including address and phone number.

x ☐ The election options in age and wage-based discrimination complaints.

### SECTION VIII—ELECTION OF REPRESENTATION

☐ ATTORNEY    x ☐ NON-ATTORNEY    ☐ NON-REPRESENTATIVE

| NAME OF REPRESENTATIVE | | ADDRESS | |
| TELEPHONE NUMBER | FAX | | E-MAIL |

### SECTION IX – ALTERNATIVE DISPUTE RESOLUTION (ADR)

☐ Matter determined not appropriate for ADR

_____
(Aggrieved must sign and date)

☐ Matter determined appropriate for ADR

_____
(EEO Officer must initial and date)

X Wishes to participate in ADR, if offered    GJC 11/13/13
_____
(EEO Officer must initial and date)

Date of written offer of ADR    _____
Date of Agreement to Participate in ADR    November 17, 2013
Name of assigned ADR facilitator/mediator    _____
Date ADR facilitator/mediator assigned    _____

**Result of ADR:**

☐ ADR was successful. Negotiated settlement agreement signed on _____ (YYYYMMDD), is attached.

x ADR was not successful. The Aggrieved was issued a Notice of Right to File a Formal Complaint of Discrimination on 02/18/2014 and notified of requirement to file a formal complaint within 15 calendar days after receipt of Notice of Right to File. The Aggrieved was provided a DD Form 2655, Formal Complaint of Discrimination.

### SECTION X- -- TRADITIONAL EEO COUNSELING (EEO Official to complete only those which apply.)

X Election of traditional counseling.
Name of assigned EEO counselor   Gloria J. Cunningham
Date EEO counselor assigned    November 13, 2013

☐ Election to remain anonymous. X Election to waive right to remain anonymous.

☐ Declined to pursue matter under Title VII.

Page 3 of 6

**SECTION XI—WITNESS INQUIRY**

a. Witness Information *(List all witness data here. Number sequentially and include name, title, organization, phone number, and relevant basis(es)/information.)*

b. Witness Statements

000021

| SECTION XI – WITNESS INQUIRY *(Cont'd)* |
|---|

Witness Statements *(Cont'd)*

c. Documents Reviewed *(List)*
1. EEO Statement of Allegation

d. Reviewed Documents Revealed

No additional documents were provided

FOR NGA: Counselor will notify aggrieved that a Notice of Right to File a Formal Complaint of Discrimination and a DD 2655 will be mailed to the aggrieved via certified mail.

| SECTION XII – OUTCOME OF THE PRE-COMPLAINT INQUIRY |
|---|

X    Resolution was not accomplished; therefore, I conducted the Final Interview with the Aggrieved on February 18, 2014 at which time I informed the Aggrieved of the full scope of my inquiry and the reason(s) articulated by management for action(s) taken. I notified the Aggrieved that a Notice of Right to File a Formal Complaint of Discrimination and a DD Form 2655 will be signed in person or mailed to him/her via certified mail.  The Aggrieved is aware of the requirement to file a formal complaint within 15 calendar days of receipt of the Notice of Right to File a Formal Complaint of Discrimination if not satisfied with the results of my inquiry.

☐    Resolution was accomplished. Negotiated settlement agreement, signed on _____ *(YYYYMMDD)*, is attached.

| PRINTED NAME OF EEO COUNSELOR | SIGNATURE OF EEO COUNSELOR |
|---|---|
| GLORIA CUNNINGHAM | |

| Attachments: | DATE SUBMITTED TO EEO OFFICER |
|---|---|
| 1.  Extension of counseling (if applicable) | *(YYYYMMDD)* |
| 2.  Copies of Reviewed documents | February 18, 2014 |

Page 5 of 6

**10**

000022

Page 6 of 6

**11**

000023

# Exhibit 6

UNCLASSIFIED

# Declaration under Penalty of Perjury

I, **Natasha Grant,** in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## **ORGANIZATIONAL INFORMATION**
Question (Q): What is your full name?
Response (R): Natascha Grant ( correct spelling is Natasha)

Q: What is the year of your birth?
R: 1977
(U)
Q: How old do you believe Mr. Laber is?
R: I do not

Q: What is your religion (if any)?
R: Baptist

Q: What is Mr. Laber's religion?
R: I do not know.

Q: What is your sex?
R: I am female

Q: Do you regard Mr. Laber to be a male?
R: Yes, I suppose.

*Page 1 of 5 Pages*
Declarant's Initials  *N G*

UNCLASSIFIED

Q: Do you have any physical or mental condition(s) that you regard to be a disability? Do you regard yourself to be disabled?
R: Yes

Q: What was your position title, pay plan, job series, and grade on September 6, 2013?
R: HR Specialist, IA-____-03

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? (**i.e., Branch, Section, Division, Directorate, location**)
R: Recruitment, Human Resource Pilot Management Division (HDRT), Deputy Director (DD), Director (D), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: 2007

Q: Who was your **first** level supervisor on September 6, 2013?
R: We have had a lot of organizational changes. It might been Jack Gilford or Melanie Aya.(Syah)

Q: Who was your **second** level supervisor on September 6, 2013?
R: Monica Jenkins

Q: On September 6, 2013, what was your organizational relationship to **Mr. Laber**?
R: He was an employee in an organization that I serviced. He was an NGA employee, and I was the recruiter for OCS. He was an applicant for a position that I was the recruiter for.

Q: Did you know **Mr. Laber** on September 6, 2013?
R: I did not know him.

Q: How often did you interact with **Mr. Laber**?
R: I cannot recall physically meeting with him or talking to him. I have never had any interaction with him.

Q: Did you know Mr. Laber's **AGE, RELIGION, SEX, Disability, or EEO activity** on September 6, 2013?
R: No I did not. The only thing I could presume was that he was male from his name, but that is not always certain. Those traits do not appear on the resumes.

**RETALIATION**
Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: I guess it was two weeks ago when I was contacted for this interview.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: When you called me to schedule the interview.

*Page 2 of 5 Pages*
Declarant's Initials __NG__

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that
Mr. Laber had pursued?
R: No.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO
activity?  If so, when and what type of activity?
R: I have filed an EEO complaint before, when I worked at NGA. I never went formal with it; I
just filed an informal complaint to speak to a counselor. That complaint had nothing to do with
Mr. Laber. That is my only other EEO activity.

## DISABILITY
Q: Mr. Laber alleges that he was disabled with a physical or mental impairment.  What
knowledge did you have of his apparent impairment?
R: None at all. I still don't know what he might have.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013
Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and
EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay
Band 05.  Explain the knowledge and involvement you had in the selection action, including
any/all guidance or advice you provided to agency officials as part of the selection action.

Q: What was your role in the selection process?
R: As a recruiter, my role was to receive all applications and resumes. I took the job
announcement and read through the resumes to determine whether they were qualified for the
position. Then, I made a recommendation to the hiring manager about whether the candidates
were referred. A referral certificate is sent to the hiring manager and they make their pick from
the list after doing their part. I don't know how many people applied for the position off the top
of my head. I can't say how many people were referred for the position. I am not involved in the
selection panel activity. Once the selection has been made, the recruiter comes back into the
process. I receive the packet for the selectee; I make sure that the hiring process works correctly.
I do not believe that any HR personnel were involved in the panel process. HR personnel do not
sit in on panel activity unless the hiring manager requests that; and the requests are not done that
much because hiring managers have to take training, and they know how to do the selections.

Q: Describe selection process?
R: See above.

Q: Who determined the criteria for the selection process?
R: The mandatory requirements are created by the hiring manager. The hiring manager says
there is a need for the hiring. They write up their desired criteria – Assignment of Opportunity
Notice (AON). Then the recruiter reviews the AON for accuracy, to be sure there is a natural
flow to it and that it is compatible with their organization. If the hiring manager is asking for
something they can't ask for, we let them know. Each organization has a workload description;
as long as they are working within their workload description, it is fine. I can't recall who the
hiring manager was in this case. I know Daniel Hinchberger, because he is a hiring manager who
does announcements, but I don't remember his role in this particular case.

*Page 3 of 5 Pages*
Declarant's Initials _NG_

Q: What role, if any, did Ms. Tonya Crawford have in the selection action at issue?
R: In this case, I don't know who was on the panel. I think she might be a staff officer. She could have been a panel member, I am not sure. Any panel member is going to rate and rank resumes.

Q: Did the panel review, rate, and rank applicants' resumes?
R: Yes

Q: Explain how the resumes were reviewed, rated, and ranked.
R: I can't explain what they did in this case, but I can tell you about the process generically. Once the recruiter makes the referral, they send it to the panel. The panel meets and decides who they are going to interview. They are going to rate and rank the resumes based on the experience of the applicants. They rate and rank the candidates in numeric order. Then they decide where the cut point will be for the applicants who will be interviewed and who will not be interviewed. The panel has the authority to decide where the cutoff is and who will be interviewed. Once they decide where the cut point is (whatever they decide it is), then they have to stick with it. They might decide it's an 8, or 7, or 6; whatever, they have to be consistent and stick with that. The highest possible score is 9. The panel has to determine where their cut point is and stick with it. If they want to, the panel can decide to forego interviews entirely. But they still have to rate and rank the resumes. As long as there is a clear distinction for a cutpoint, they can decide to use that cutpoint. For promotions, we strongly advise that they interview, but they don't have to. If they want to, the panel can decide to interview everybody. But that rarely happens. Usually if there is a clear break, there is no reason to interview everybody because a well-identified cutpoint eliminates the low-scoring applicants. The panel can also decide to interview only some of the candidates, as long as they are consistent once they decide on the cutpoint. Sometimes, if you only have five or six people on the list, they might interview everybody. But when you have a lot of applicants, you don't have time to investigate everybody so you use the cutpoint.

Q: In this case, it seems that the panel received 16 referred applicants, and they decided to interview the top seven candidates, who all scored above 7, 8, or 9.
R: So anybody that fell at 6 or lower would not have been interviewed. The cutoff point for this panel was 7. That is logical and how the process works. They interviewed just about 50% of the list. They chose to interview a good amount of people. 7 people out of 16 is a large number of interviews.

Q: How was Mr. Laber's resume and application reviewed, rated, and ranked?
R: I don't know. I don't review that portion of the process. I do remember that he was referred by me to the panel. But I don't know what they did with his application. My assessment is different than their assessment.

Q: Did the panel make a recommendation to a selecting official?
R: I wouldn't know that part of the process. I don't see it again until the process is just about finished.

Q: Do panel members or selecting officials receive any demographic data about applicants: Age, Race, Sex, Disability, or EEO activity?

*Page 4 of 5 Pages*
Declarant's Initials __NG__

UNCLASSIFIED

R: No they do not. The only thing they receive is the applicants' resume, and the blank forms for rating and ranking the candidates. There is no demographic information provided to them.

Q: Did you give any guidance or advice to Mr. Hinchberger, Mr. Unis, Ms. Verdon, Ms. Williams, or Ms. Crawford as part of the selection process?
R: No I did not.

Q: Based on what you know, did the selecting official(s) and panel members follow applicable rules, regulations, and guidelines when conducting the selection action?
R:

Q: If so, explain how and why.
R: Yes, all of the documents i.e., rating and ranking sheet, signature pages and certificate of eligible were inside of the packet. The panel composition was correct as far as male/female/minority.

Q: What are the rules, regulations, and guidelines that govern this type of selection action?
R  The rules are; the selectee is the individual with the highest interview score or the most closely match skill sets for the position.

Q: Do you have anything to add that is relevant to the accepted claim?
R: Nothing further to add.

END OF STATEMENT

I, *Natasha Grant,* declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____            ___7/22/2014___
Declarant's Signature                                    Date

UNCLASSIFIED

000143

# Exhibit 7

## Declaration under Penalty of Perjury

I, **Daniel Hinchberger**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

AUTHORITY: *The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

PURPOSE AND USES: *The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ORGANIZATIONAL INFORMATION

Question (Q): What is your full name?
Response (R): Daniel E. Hinchberger

Q: What is the year of your birth?
R: 1964

Q: How old do you believe Mr. Laber is?
R: I don't know. I would guess early 60's maybe.

Q: What is your religion (if any)?
R: I don't really identify with a specific religion.

Q: What is Mr. Laber's religion?
R: I believe he is Jewish.

Q: If you know Mr. Laber's religion, explain why.
R: He wears a skull cap in the office. We have spoken about his religion once or twice. I can't recall how that came up.

Q: What is your sex?
R: Male

Q: Do you regard Mr. Laber to be a male?
R: He is male.

Q: Do you one or more physical or mental conditions that you consider to be a disability?
R: No, I do not.

Q:  What was your position title, pay plan, job series, and grade on September 6, 2013?
R: Group Chief, Office of Contract Services, IA-1102-DISL (SES - I)

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? **(i.e., Branch, Section, Division, Directorate, location)**
R: Compliance and Operations Group (OCS), Office of Contract Services (OCS), Deputy Director (DD), Director (D), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: July 1993

Q: Who was your **first** level supervisor on September 6, 2013?
R: Tonya Crawford

Q: Who was your **second** level supervisor on September 6, 2013?
R: Michael Rodrigue

Q: Has your position changed since September 6, 2013?
R: Yes. We re-organized. In September I was over our Policy, Acquisitions/Governance, and Contracting Groups. We hired a new SES, and she took the Policy Group. So now I am the Acquisitions/Governance and Major Systems Contracting Group.

Q: If so, when did your position change?
R: Early May, 2014.

Q: On September 6, 2013, what was your organizational relationship to **Mr. Laber**?
R: I was his second level supervisor.

Q: Did you know **Mr. Laber** on September 6, 2013?
R: Yes I did.

Q: How often did you interact with **Mr. Laber**?
R: Maybe once a month.

Q: Did you know Mr. Laber's **AGE**, **RELIGION**, and/or **SEX** on September 6, 2013?
R: I did not know his age for certain; I assumed he was early 60's. I did know he was Jewish and I assumed he was male.

Q: What role, if any, did **Ms. Tonya Crawford** have in the selection action at issue?
R: I was the chair of the hiring panel, and I think she would have been designated as the Selecting Official. I made the recommendation to her and she signed off on it. Or, maybe it is more correct to say I was the selecting official and she was the approving official. Ms. Crawford

*Page 2 of 13 Pages*
Declarant's Initials

signed off on the selection I made. I don't recall her making any separate action or changes to what I had recommended. I think she took the recommendation I made. I don't recall if I discussed the selection with her at all; it is hard to remember nine or ten months later.

## RETALIATION

Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: I will have a hard time with the exact date, but I am guessing it was five or six months ago when I was contacted by our EEO office. We subsequently had a mediation that did not resolve the case.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: From the EEO office.

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that Mr. Laber had pursued?
R: I don't think so. Mr. Laber may have mentioned something to me in the past, but I can't recall the details. It is really foggy, so I'm not sure if I knew something about his EEO activity before this case.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO activity? If so, when and what type of activity?
R: Yes. I served as an agency mediator on an EEO complaint about ten years ago; that did not involve Mr. Laber. I am learning that there might be a new EEO complaint filed against the agency now; that does not involve Mr. Laber.

## DISABILITY

Q: Mr. Laber alleges that she was disabled with a physical impairment. What knowledge did you have of her identified impairment?
R: When the EEO Office told me about his complaint, they mentioned disability. I was not aware of any mental or physical disability that he has. There is nothing apparent, at any rate. If he has a physical or mental impairment, I don't know what it is. The only time I have heard that mentioned was when the EEO Office or an NGA lawyer mentioned it was part of his complaint. I have never spoken to Mr. Laber about an impairment of any kind.

Q: Did Mr. Laber submit medical documentation that identified the alleged impairment?
R: If he has, I am not aware of it.

Q: Did you think of Mr. Laber as being unable to do something because of his alleged impairment?
R: I was not aware of any impairment at all. I have never regarded him as being unable to do something because of a mental or physical reason.

Q: Did Mr. Laber request an accommodation in the workplace?
R: No, not that I am aware of.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013

Q: Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay

*Page 3 of 13 Pages*
Declarant's Initials ⟨H⟩

**68**

Band 05.  Explain the knowledge and involvement you had in the selection action, including any/all decisions you made as a management official on behalf of the agency. What was your role in the selection process?

R: I am not sure if I am using the right terminology, but I was the chair of the hiring panel. Ms. Crawford designated me the panel chair. I am a senior in the organization, but I couldn't say why she made me panel chair. I used to be the Employee Development Officer, so I have a strong background in the Human Development (HD) functions. I am sure that the panel members were selected based off of a conversation between Ms. Crawford and myself. We knew that the position would be within our Operational Contracting Functions, although we did not know exactly where. We knew the selectee would be a Contracting Officer, not a staff-oriented function. The panel members are all Division Chiefs of our Operational Groups, so they knew the organization where the selectee would be working. We also had to meet the diversity requirements that the agency requires. We had to have at least one male, one female, and one minority on every panel. In this case, Ms. Williams was the minority (African-American).

We fill all of our vacancies as soon as they arise, so the position must have been recently vacated. At the time of the selection, it was not clear who the incumbent would be working for. 80% of our workforce are <u>Contract Specialists</u>, and we typically wait until we see the strengths of the selectee before we decide which Band 05 position the person would be going into. We knew the billet, but we didn't know which specific position we would place them in. The selectee was Karen Eichelberger, and she reports directly to Deanna Merchant (in OCS-R); they focus on commercial satellite imagery acquisition. It was within a couple weeks of the hire that Ms. Eichelberger was placed under Ms. Merchant.

Q: Describe selection process?

R: The first step was that the panel was assembled. The panel members received the referral certificate and the resumes. Each panel member independently rated and ranked the resumes on a 1 – 9 scale, which is a generic promotion profile. (1) is lowest, and (9) is highest. All of the candidates are rated and ranked based on their applications. Then I gathered the ratings and rankings and consolidated them. The agency process is that if there is a split of more than two points between any two raters, the panel must convene to make a decision. If one applicant is rated at 8 and 7, that is ok. But if an applicant is rated as a 5 and a 9 by two separate applicants, the panel must meet to discuss the rating. Then, once we have done that, we look for a logical break about who to interview and how many to interview. You can decide to interview everybody, but we decided to interview only the top seven applicants, who were rated at 7 or above.

Q: Who determined the criteria for the selection process?

R: Those criteria are contained in the announcement (AON). The announcement has mandatory and desirable criteria. I would say there were multiple people involved in establishing those criteria, myself, Gayle Painter, Tonya Crawford, and a couple of our senior leaders look at it. I would say the criteria was fairly standard for what we usually use for the vacancies in the past.

Q: What was the purpose of panel?

R: The first step was to rate and rank candidates, and decide who would be interviewed. Then we conducted the interviews. After the interviews we rated and ranked the people who we had interviewed. Then the panel has a consensus discussion to make a recommendation for selection.

I was part of the panel, and I took the collective recommendation to Ms. Crawford, who signed off and approved our selection.

Q: Who asked you to serve on the panel?
R: Tonya Crawford.

Q: Did the panel review, rate, and rank applicants' resumes?
R: Yes

Q: Explain how the resumes were reviewed, rated, and ranked.
R: I don't recall how many people applied overall; we only received the referral certificate from HR (HD). The referral certificate had 16 people who were deemed qualified for potential selection. The referral certificate had no information to indicate applicants' age, religion, sex, disabling conditions, or EEO activity. Each panel member sat down with the resumes on their own. Each panel member compared the AON criteria to each applicants' resume. We did not rate each applicant on each individual AON criteria. It is not a quantitative thing like that. It is more of a holistic review; we look at the resume overall as compared to the AON. If you look at the rating and ranking sheets, you will see a lot of notes about things that ultimately relate back to the criteria. But it is not a quantitatively structured process for each criteria. We did apply an overall numeric score for each resume, based on our judgment and expertise. We studied each resume against the AON and came up with our own quantitative number for that resume.

Q: How was Mr. Laber's resume and application reviewed, rated, and ranked?
R: After the panel members rated each resume independently, the scores of each panel member were averaged for each applicant. All four panel members scored Mr. Laber's resume as 5, which meant that he ended up with an overall 5 rating. Once the individual scores for each applicant were averaged, we ranked the applicants in order based on their averaged scores. There were four people who received an overall 5, including Mr. Laber. Above the 5's there were 10 applicants who scored 6 or higher. Ms. Eichelberger received an overall average score of 9, which was the highest. Mr. Laber was in the bottom third, or thereabouts. There were 10 applicants above him, there were three applicants with his same score, and then there were three applicants who scored lower than he did.

Q: Explain why Mr. Laber's resume and application was rated and ranked as it was.
R: I can only speak about my own individual rating/ranking. If you look at the AON, you see that our Band 05's are expected to supervise 3-15 people. He had no or very limited supervisory experience in an operational contracting role. While his current position title is Supervisory Contract Specialist, the position is not an operational contracting role. In this position, he administers the NGA Contracting Officers Representative (COR) program. In the one operational contracting position where he appears to have a leadership role, he called himself a "Team Lead," which is typically an informal, quasi-supervisory position. Even if he had been in a formal supervisory position, it was relatively limited. My biggest concern was his apparent lack of supervisory experience. In Ms. Eichelberger, I saw a person who had supervised larger teams, and supervised at the division level. Mr. Laber's supervisory experience, to the extent he had it, was at the first-line level. His supervisory experience in a contracting group was limited. Although he had some supervisory experience, there were others who had a greater degree of supervisory experience, and at a higher level. These AON's force you to compare one candidate against the others. So a candidate like Mr. Laber might be good, but there were also other

candidates who were stronger. Mr. Laber had decent contracting experience, but it did not strike me as being the same depth or breadth as other candidates. That, combined with what I perceived as relatively limited supervisory experience in the operational role were the biggest factors. I gave him a respectable score; it was not a weak score. He was a good solid performer, but not necessarily outstanding.

Q: Were interviews conducted?
R: Yes. As a panel, we could have skipped interviews and cancelled the AON, but that wouldn't have been a good decision because we had several strong candidates. We could have interviewed all of the candidates, but we decided not to because we had seven strong candidates, and there was a logical cut point to separate the strong candidates from the lesser candidates. We did not feel the need to interview everyone. We interviewed seven candidates, all of whom had an average score of 7 or above. We felt that among those seven candidates were clearly the strongest, and that there was a clear distinction between that group and the others.

Q: Did the panel decide to interview Mr. Laber?
R: We did not interview him.

Q: If not, explain why.
R: He got an average of 5, so he was not interviewed. But it was not a personal decision against him. We decided to interview the candidates who scored 7 or above, and he did not. When it comes to age and sex, I can only guess at a person's traits based on my interactions with them. My guess about ages and sex are just suppositions, and may not be accurate. All of the referred candidates were employees of OCS, so they were all internal candidates. I knew all of them to one degree or another at the time of the vacancy.

We interviewed the following seven people:

| Name | Score | Age | Religion | Sex | Disability | EEO |
|---|---|---|---|---|---|---|
| Karen Eichelberger | 9 | Mid-40's | Unknown | Female | Unknown | Unknown |
| Denita Ladson | 8 | Early 40's | Unknown | Female | Unknown | Unknown |
| Cassandra Michael | 8 | Early 50's | Unknown | Female | Unknown | Unknown |
| Cathy Smith | 8 | Mid-30's | Unknown | Female | Unknown | Unknown |
| Patricia Hill | 7 | Mid-30's | Unknown | Female | Unknown | Unknown |
| Dya Goodman | 7 | Mid-30's | Unknown | Female | Unknown | Unknown |
| Joey Larman | 7 | Mid-30's | Unknown | Male | Unknown | Unknown |

We did not interview the following nine people:

| Name | Score | Age | Religion | Sex | Disability | EEO |
|---|---|---|---|---|---|---|
| Demetrius Green | 6 | Maybe 40 | Unknown | Male | Unknown | Unknown |
| Howard Lambert | 6 | Probably 50 | Unknown | Male | Unknown | Unknown |
| Andre Rohn-Jones | 6 | Mid-40's | Unknown | Female | Unknown | Unknown |
| Sharon McDowell | 5 | Mid-40's | Unknown | Female | Unknown | Unknown |
| Stan Laber | 5 | Early 60's | Jewish | Male | Unknown | Yes |
| Ray Williams | 5 | Mid-50's | Unknown | Male | Unknown | Unknown |
| Brenda Pomeransky | 4 | Mid-50's | Unknown | Female | Unknown | Unknown |
| Christian Hernandez-Soto | 4 | Early 30's | Unknown | Male | Unknown | Unknown |
| Mark Floyd | 3 | Mid-40's | Unknown | Male | Unknown | Unknown |

Q: Did you, or the panel as a whole, make a recommendation to a selecting official?
R: Yes, we did. We recommended Karen Eichelberger as the selectee. We also recommended an alternate, who Denita Ladson. There were three candidates who were ranked with a score of 8, and she was one of them. Ms. Eichelberger's biggest strength was that she had a lot of contracting experience and source selection experience. She had also successfully managed fairly large teams at the Division level. When she was Deputy Division Chief for OCS-R she had 20+ people under her. That was the big thing that set her apart. Ms. Ladson was strong as an alternate. She had recently completed a very difficult, major source selection to support our R&D group. She had done a flawless job at that. The contract award process can be very contentious, and Ms. Ladson handled the protests very thoroughly and capably. I was very impressed about that. Again, for me, Mr. Laber did not have the leadership experience with an operational contracting group that we were looking for in the incumbent. If you look at his resume, you will see that he was in a supervisory position for a couple of years. But the reality is that he was only supervising one or two people, and it was not an operational contracting role. It wasn't entirely clear to me that he had any supervisory contract experience prior to NGA. I saw the "Team Lead" on his resume, but that is not usually a formally recognized and permanent supervisory position. Even if we gave him the benefit of the doubt on that, his experience was still relatively limited. If I recall, the size of the team he managed was small. Our Supervisory Band 05 Contractors are typically managing at least 10 people. And most of the time they are second-line supervisors with 15-20 people under them.

Q: Did you have to resolve any scores amongst the panel?
R: Yes, although I don't remember how many. It might have been four or five candidates where we had to have a consensus discussion about the scoring. Mr. Laber was not one of those. I recall that all of the panel members scored him 5 independently. I don't recall the names of the applicants who we had to discuss. Where there were splits on scoring, I think it was only off by a point, which was minor. Our panel discussions were pretty smooth; there were no contentious disagreements.

Q: Who did you make recommendation to?
R: Yes, we made a recommendation for Ms. Eichelberger as selectee and Ms. Ladson as alternate. The recommendation went to Ms. Crawford, and she signed off on it. I don't recall having any meetings with Ms. Crawford to explain our recommendation. She received the paperwork, concurred with our recommendation, and signed off on it. Ms. Crawford had no role or involvement in the resume review, the interviews, or the panel meetings.

Q: Was the panel's recommendation followed by the selecting official?
R: Yes, it was.

Q: Did you know Mr. Laber at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **physical or mental impairment** at the time of the selection?
R: No, I did not. I still do not.

Q: Did you know Mr. Laber's **EEO activity** at the time of the selection?

R: No, I did not.

Q: Did you know Mr. Laber's **AGE** at the time of the selection?
R: I presumed or supposed he was in his early 60's, but I did not think about that at all.

Q: Did you know Mr. Laber's **RELIGION** at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **SEX** at the time of the selection?
R: Yes, I knew he was male.

Q: Where did Mr. Laber rank among candidates who applied for the position?
R: He was toward the bottom. He did not make the cut for the interview.

Q: What was Mr. Laber lacking compared to the candidates who were interviewed?
R: See above.

Q: What was Mr. Laber lacking compared to the candidate who was selected?
R: See above.

Q: Mr. Laber counters that he should have been selected because he has over 30 years of experience in his field, with multiple DAWIA certifications and over 300 completed training courses. He believes that it is impossible for any of the other applicants to have the level of experience and qualifications he had. What is your response?
R: I have been in contracting for 27 years, and I have been in a management position for close to 15 years. It is not necessarily the case that the person with the most on-the-ground working experience makes the best manager. We had a greater degree of demonstrated success at a slightly higher level with Ms. Eichelberger.

Q: Were you directed or persuaded to recommend a particular candidate?
R: No, nobody coerced me to pick a specific candidate.

Q: Were you directed or persuaded not to recommend a particular candidate?
R: No, nobody coerced me to avoid a specific candidate.

Q: Was Mr. Laber's **AGE** a factor in your decision not to interview or select him? If yes, explain fully.
R: No it was not.

Q: Was Mr. Laber's **RELIGION** a factor in your decision not to interview or select him? If yes, explain fully.
R: No it was not.

Q: Was Mr. Laber's **SEX** a factor in your decision not to interview or select him? If yes, explain fully.
R: No it was not.

Q: Was Mr. Laber's **apparent physical or mental condition** a factor in your decision not to interview or select him?  If yes, explain fully.
R: No it was not. I was and still am unaware of what that might be.

Q: Was Mr. Laber's **EEO activity** a factor in your decision not to interview or select him?  If yes, explain fully.
R: No it was not.

Q: During your tenure in the organization, how many times have you served as a panel member or a selecting official for an open position?
R: I have spent some time as the agency Employee Development Officer, so it is a lot. I am guessing 15-20 times at least, and maybe more.

Q: How many times have you selected an applicant **over** 40?
R: Without being able to name them all, I am pretty confident that I have been part of selections where people over 40 and under 40 were hired.

Q: How many times have you selected an applicant **under** 40?
R: Without being able to name them all, I am pretty confident that I have been part of selections where people over 40 and under 40 were hired.

Q: Of the 15-20+ people you have selected, how many did you know the **religion** of?
R: I did not know the religion of any of the people I have been party to selecting. I can't ever remember that being an issue or coming up. Religion was never a factor in my hiring decision.

Q: How many times have you selected a **male** applicant?
R: I don't recall, but I know I have hired men.

Q: How many times have you selected a **female** applicant?
R: I don't recall, but I know I have hired women.

Q: How many times have you selected an applicant with a known or apparent **physical or mental condition**?
R: We hired at least one, a wounded warrior. The condition was not obvious, and I never asked, but he came through the wounded warrior program so I presumed he had some condition. Other than that, I don't recall any overt or known conditions of the selectees.

Q: How many times have you selected an applicant with **EEO activity**?
R: Never to my knowledge. They may have had it, but I certainly didn't know.

Q: Was Mr. Laber's prior EEO activity a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No

Q: Was Mr. Laber's physical or mental impairment a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No



Mr. Laber testified that:

*"I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies."*

Q: What is your response?
R: I had no specific awareness or knowledge of FOIA or IG complaints. I had some vague recollection of something EEO-related, but it was a non-issue for me. There was no negative impression on me, even if I had known anything about his EEO activity. There was no discussion of EEO activity on the panel.

Mr. Laber testified that:

*"I imagine they [the panel members] entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected... I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview."*

Q: What is your response?
R: The only thing I can say to that is we do have a history of interviewing all applicants for a position. This was an instance where the panel decided not to interview everyone. We agreed that the top seven candidates were the strongest, and we didn't need to interview the others. I don't know what to say about the rest of his statement. I think each panel member brought their judgment and expertise to the process. He seems to be suggesting there was bad faith, and there was not.

Mr. Laber testified that:

*"I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization."*

Q: What is your response?
R: I don't know what to say to that, other than that it is not true. I don't know how to describe the age issue other than to say that we have folks in the organization who are in positions of responsibility, with bonuses and promotions who are older. I think his characterization is unfair and inaccurate.

Mr. Laber testified that:

*"...So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory."*

Q: What is your response?
R: The best I can say in response to that is we rated everyone independently, followed the process to the best of our ability. I know everybody on the panel and I think they are all decent, conscientious people and they did their best to rate and rank the resumes in a fair way.

Mr. Laber testified that:
*"I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me."*

Q: What is your response?
R: See response above.

Mr. Laber testified that:
*"There was a consensus among our group that [management] wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski."*

Q: What is your response?
R: I think if you look across the Band 05 population in our organization at the time this position was open, a fair number of them were older than 50, and some of those had been selected for Band 05 fairly recently. Mr. Mostowksi is an outstanding leader. He is not under 30. He is an extraordinary individual who deserved his promotion.

Mr. Laber testified that:
*"The leadership of OCS have a long history of shoving older employees into dead end positions, and not promoting them. The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions.*"

Q: What is your response?
R: All I can say is that I don't believe that to be true.

Mr. Laber testified that:
*"I believe I have seen everyone who works within OCS, and none of them exhibit the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do.*

Q: What is your response?
R: That seems to be a fairly straightforward statement that his religion is apparent. I would agree that it is. I did not know that he does not shake hands with women, but he makes no secret of the fact that he is Jewish. I don't think anybody holds his religion against him; I have never seen or heard that. As a point of interest, the one person he mentioned, Mr. Mostowski is also Jewish.

Mr. Laber testified that:

*based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times."*

Q: What is your response?
R: I was unaware of any of those actions. I had no idea that he refused or refuses to do things. That is entirely new information to me.

Mr. Laber testified that:
*"Most selectees in OCS are female, particularly those with military experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females."*

Q: What is your response?
R: Ms. Crawford is a female with military experience. I don't believe Ms. Eichelberger had any military experience. Off the top of my head, several of the senior Division Chiefs in the organization are male. I think Ms. Crawford has promoted multiple men into Band 05 positions. I don't have the exact numbers. I don't believe she has a bias against men in favor of women.

Mr. Laber testified that:
*"Even though the panel does the selection, Ms. Crawford gives the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. The panel acts with impunity."*

Q: What is your response?
R: The panel does not act with impunity. We made a good faith effort to find the best candidate. Ms. Crawford did not give us any instructions about who to select or not select. She did not meddle or improperly influence the selection process.

Mr. Laber testified that:
*"There is a history and pattern of females being selected at OCS."*

Q: What is your response?
R: See answer above. There is no pattern per se that I recognize.

Q: Do you have anything to add that is relevant to the accepted claim?

*Page 12 of 13 Pages*
Declarant's Initials ⏤ DVH

000089

R: No

END OF STATEMENT

I, **Daniel Hinchberger,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____          _____
          Declarant's Signature                                Date

# Exhibit 8

#2

| Approving Official | Sex | Birthdate | Religion | Disability | EEO |
|---|---|---|---|---|---|
| Crawford, Tonya M. | F | ████-71 | Not Listed | None | None |

| Selecting Official | Sex | Birthdate | Religion | Disability | EEO |
|---|---|---|---|---|---|
| Hinchberger, Daniel E. | M | ████-64 | Not Listed | None | None |

| Human Resource Specialist | Sex | Birthdate | Religion | Disability | EEO |
|---|---|---|---|---|---|
| Noel, Lara M. | F | ████-67 | Not Listed | None | None |

| Panel Members | Pay Plan | Band/Grade | Position Title | Sex | DOB | Religion |
|---|---|---|---|---|---|---|
| Hinchberger, Daniel E. | IP | 01 | Group Chief | M | ████-64 | Not Listed |
| Unis, Richard E. | IA | 05 | Supv. Contract Spec. | M | ██-62 | Not Listed |
| Verdon, Tamara J | IA | 05 | Supv. Contract Spec. | F | ████-60 | Not Listed |
| Williams, Johnetta B. | IA | 05 | Supv. Contract Spec. | F | ██-59 | Not Listed |

| Panel Members | Disability | EEO |
|---|---|---|
| Hinchberger, Daniel E. | None | None |
| Unis, Richard E. | None | None |
| Verdon, Tamara J | None | None |
| Williams, Johnetta B. | None | None |

**289**

# Exhibit 9

**UNCLASSIFIED**



National Geospatial-Intelligence Agency

**POLICY NOTICE**

NUMBER 1405.1
5 November 2012

HD

SUBJECT:  Selection Panel Membership

References:  NGA Instruction 1405.8, Filling Civilian Positions Including Promotions,
09 November 2007.

1.  <u>PURPOSE</u>.  This NGA Policy Notice (NGAPN) establishes a change in Selection
Panel Membership requirements.  The Instruction on Filling Civilian Positions Including
Promotions, NGAI 1405.8, is under revision to include this policy change.

2.  <u>APPLICABILITY</u>.  This Policy Notice applies to all NGA Components.

3.  <u>POLICY</u>.  All panels must adhere to the following guidance:

   a.  Panel membership must reflect the diversity of the NGA population to encourage
consistency, fairness and equity, and to demonstrate continued commitment to a
discrimination-free work environment.

   b.  Each panel must include the selecting official, one male, one female, and one
minority representative to ensure a broader perspective.  Panels must have a minimum
of three members; the selecting official may represent one of those groups.

   c.  Panels may include an additional employee, if the selecting official recommends
more diversity.  All panel members must complete Diversity and EEO for Decision
Makers training once each year before serving as a voting member on the panel.

4.  <u>EFFECTIVE DATE</u>.  This Policy Notice is effective on the date of signature.

Ellen E. McCarthy
Chief Operating Officer

000262

# Exhibit 10

# Declaration under Penalty of Perjury

I, **Tonya Crawford**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ORGANIZATIONAL INFORMATION

Question (Q): What is your full name?
Response (R): Tonya M. Crawford

Q: What is the year of your birth?
R: 1971

Q: How old do you believe Mr. Laber is?
R: I do not know

Q: What is your religion (if any)?
R: Christian

Q: What is Mr. Laber's religion?
R: I believe he is Jewish

Q: If you know Mr. Laber's religion, explain why.
R: He has told me and a number of other people that he is Jewish.

Q: What is your sex?
R: I am female

Q: Do you regard Mr. Laber to be a male?
R: He is male

Q: Do you one or more physical or mental conditions that you consider to be a disability?
R: No

Q: What was your position title, pay plan, job series, and grade on September 6, 2013?
R: Director of Contracts, SES (III)

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? **(i.e., Branch, Section, Division, Directorate, location)**
R: Office of Contract Services (OCS), Deputy Director (DD), Director (D), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: 1997

Q: Who was your **first** level supervisor on September 6, 2013?
R: Mike Rodrique

Q: Who was your **second** level supervisor on September 6, 2013?
R: Letitia Long

Q: Has your position changed since September 6, 2013?
R: No, I am in the same job.

Q: On September 6, 2013, what was your organizational relationship to **Mr. Laber**?
R: At that time, before we restructured, I think I was four levels above him.

Q: Did you know **Mr. Laber** on September 6, 2013?
R: Yes, I did.

Q: How often did you interact with **Mr. Laber**?
R: I would say monthly. He might have briefed me on topics in meetings. He sits on a different floor, so I don't run into him in the hallway much.

**RETALIATION**
Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: Dan Hinchberger told me that he was participating in an arbitration, and that was two or three months ago. Maybe it was three or four months ago.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: Dan Hinchberger mentioned that he was in a mediation with Mr. Laber.

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that Mr. Laber had pursued?
R: No I did not.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO activity? If so, when and what type of activity?

R: I have never filed my own complaint, but I have had complaints filed against me. I believe there was one complaint about five years ago; an employee filed against their entire supervisory chain and I was the third or fourth level up. That claim was dismissed. There was another complaint that was the same. The first complaint was dismissed. The second is still in our HR department because it had to do with a performance evaluation score. Neither involved Mr. Laber. Both of those Complainant's alleged all of the protected bases.

## DISABILITY
Q: Mr. Laber alleges that he was disabled with a physical impairment. What knowledge did you have of his impairment?
R: None at all. This is the first time I have ever heard of him having a disability.

Q: Did Mr. Laber submit medical documentation that identified the alleged impairment?
R: As far as I know, he has never submitted medical documentation identifying his impairment.

Q: Did you think of Mr. Laber as being unable to do something because of his alleged impairment?
R: No. In fact, the performance rating that he received was an excellent rating.

Q: Did Mr. Laber request an accommodation in the workplace?
R: As far as I know, he never requested an accommodation.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013
Q: Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay Band 05. Explain the knowledge and involvement you had in the selection action, including any/all decisions you made as a management official on behalf of the agency. What was your role in the selection process?
R: I was the approving official of record. As the approving official, I receive a selection package that our HR department has prepared after the process has been conducted. I see everyone who applied, who was on the selection panel, and the summary of who was called for an interview. I look to see whether the panel complied with the agency's rules on diversity; this panel did. I also verified that the panel conducted a resume review before they decided who they would interview. They applied criteria in order to establish a ranking. I believe the scale was 1 to 9. They did a ranking, and they selected the highly competitive resumes. I verified that they didn't interview someone who was way down on the scoring scale. There was a line drawn based on the criteria, and the most highly rated candidates were interviewed. Once I verified that the interviews were decided based on consistently applied criteria, I looked at how the panel scored all of the individuals who were interviewed. Again, I was looking to see that the panel selected someone from amongst the most highly qualified candidate. I made sure that the panel used objective criteria, and that they applied it consistently. Once I looked at panel composition, how they rated resumes, how they selected interviewees, and how they rated the interviews. Then I made sure that the job was given to the most qualified candidate. After that I sign off on the selection. In addition to being female, I am also African-American, and I have been an Equality executive for a large organization. I am one of the minority representatives on the Agency Executive Review Board. So I am very familiar with the fairness criteria that are at play in selection actions. Our Diversity office reviews selections and at the end of the year they report out on the demographics that represent the selections that we had that year. It is only at the end

of the year that we look at those criteria. The purpose of that discussion is not to tell future selection panels that specific people are selected next time. The purpose of the annual review is to ensure that there is a reasonable pool of competitive women, minorities, and people with disabilities that are available to compete. As we make decisions about where to recruit people, are there certain trade organizations and colleges we should go to... We only use that as a tool to increase the diversity of our highly competitive candidate pool. But once applications are submitted, we don't look at those traits during the selection process.

In this case I concurred with the process and the way it was run. I did not see any red flags or any need to provide course corrections to the subordinate agency officials who were running the selection action. I think we might have done more than one Band 05 promotion that year. I believe the person promoted was Karen Eichelberger. Without having the package in front of me, I could not tell you specific numbers about the rankings and candidates. I recall that there were a number of people who applied, and I did make sure that there was a resume review prior to deciding who would get interviewed. I also recall that there was a pretty significant number of interviewees. Sometimes a panel will only interview the top two or three people. I remember that this panel interviewed a lot of people. I understand Mr. Laber's concern about not being interviewed, but at some point the numbers become unmanageable. I felt the panel went out of their way to interview more than just the top two or three people.

The selection was made purely based on the process used by the panel. Based on what I know about Ms. Eichelberger, I have an opinion about her qualifications. But I did not review her resume or interview her myself because I was not a member of the panel. In the past, I have been on panels that Ms. Eichelberger and Mr. Laber have applied for. I have seen both of their resumes in the past. This is historical, not specific to this selection. My decision to approve was based on the process being followed. But based on my previous review of her resume, I was not surprised that Ms. Eichelberger scored highly. For that position, we are looking for individuals with strong technical, leadership, and collaboration skills. From my recollection of both of their resumes, if I had to compare (which I did not because I was not a member of the panel), I would say that Ms. Eichelberger has more extensive supervisory experience than Mr. Laber does. She has a deep network throughout the agency and the intelligence community in terms of her ability to collaborate and drive for results. She is also highly technically skilled. Mr. Laber's performance rating was at our organizational average; an Excellent. Mr. Laber is an Excellent performer but he is not as strong as Ms. Eichelberger, particularly in terms of leadership and collaboration. He does not have the extensive leadership or collaborative networks that Ms. Eichelberger has.

Q: Did the panel as a whole, make a recommendation to you?
R: Yes. The consensus recommendation was that Ms. Eichelberger should be selected, and I concurred with or upheld that recommendation.

Q: Did you know Mr. Laber's **impairment** at the time of the selection?
R: No I did not.

Q: Did you know Mr. Laber's **EEO activity** at the time of the selection?
R: No I did not.

Q: Did you know Mr. Laber's **AGE** at the time of the selection?

R: I don't know his age specifically. He talks about the number of great grandchildren he has, so I assume he is older than I. I assume he is over the age of 40.

Q: Did you know Mr. Laber's **RELIGION** at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **SEX** at the time of the selection?
R: Yes, I did.

Q: Where did Mr. Laber rank among candidates who applied for the position?
R: I don't recall specifically.

Q: What was Mr. Laber lacking compared to the candidates who were interviewed?
R: See above

Q: What was Mr. Laber lacking compared to the candidate who was selected?
R: See above.

Q: Were you directed or persuaded to recommend a particular candidate?
R: Not at all

Q: Were you directed or persuaded not to recommend a particular candidate?
R: Not at all

Q: Was Mr. Laber's **AGE** a factor in the decision you made to select Ms. Eichelberger?
R: No

Q: Was Mr. Laber's **RELIGION** a factor in the decision you made to select Ms. Eichelberger?
R: No

Q: Was Mr. Laber's **SEX** a factor in the decision you made to select Ms. Eichelberger?
R: No

Q: Was Mr. Laber's **impairment** a factor in the decision you made to select Ms. Eichelberger?
R: No

Q: Was Mr. Laber's **EEO activity** a factor in the decision you made to select Ms. Eichelberger?
R: No

Q: During your tenure in the organization, how many times have you served as a approving official for a selection?
R: A lot. It is definitely in the dozens.

Q: How many times have you selected an applicant **over** 40?
R: I don't know the specific numbers, but I have hired people over 40. Given the years of experience that tends to be required, the majority of our Band 05 selectees are over 40. Almost 40% of our workforce are eligible to retire in the next five years.

Q: How many times have you selected an applicant **under** 40?
R: I don't know the specific numbers, but I have hired people under 40.

Q: Of the people you have selected, how many did you know the **religion** of?
R: The majority of the selectees I had no knowledge of their religion. I would say that it is a minority of our workforce that even discuss their religion in the workplace.

Q: How many times have you selected a **male** applicant?
R: I don't know the specific numbers, but I have hired many male candidates. Throughout the entire federal Government the contracting career field is demographically populated by women. Because of that, we have taken great steps to ensure that we have a diverse pool of highly qualified candidates that includes men. We ensure that our selection panels include men because they are a minority in our organization. We also have been successful in ensuring that our leadership group includes men.

Q: How many times have you selected a **female** applicant?
R: I don't know the specific numbers, but I have hired many female candidates. Our career field is heavily populated by women.

Q: To the extent that you are aware; how many times have you selected an applicant with a known or apparent **physical or mental condition**?
R: I can only think of one person in the organization that has self-identified with a disability. We have an individual who is a wounded warrior, so we assume that he is disabled, but we have never asked. We certainly don't go around asking.

Q: To the extent that you are aware; how many times have you selected an applicant with **EEO activity**?
R: I am trying to think of the instances in which we have had someone apply for something and they had ongoing EEO activity. I just can't think of any instances where I knew that an applicant had ongoing EEO activity. I have known about ongoing EEO cases, but I can't recall any of those individuals applying for jobs. On the other side, applicants may have had EEO activity but I would have had no way of knowing.

Q: Mr. Laber believes that he should have been selected because he has over 30 years of experience in his field, with multiple DAWIA certifications and over 300 completed training courses. He believes that it is impossible for any of the other applicants to have the level of experience and qualifications he had. What is your response?
R: That goes back to what we were looking for in the incumbent. While Mr. Laber has a wealth of technical experience, that is not all we were looking for. We were also looking for leadership and collaboration experience. I can remember on the panel I sat on we asked him how many years of supervisory experience he had, and it was a very small number of years. So I could see how a number of people were rated higher than he was in terms of supervision, mentoring, coaching, etc.

Mr. Laber testified that:

*Page 6 of 10 Pages*
Declarant's Initials
000133

*"I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies."*

Q: What is your response?
R: I personally had no knowledge of his EEO activity. I don't even know how we would have found out about his FOIA, IG, or EEO complaints. If other agency officials were aware, they did not say anything to me.

Mr. Laber testified that:
*"I imagine they [the panel members] entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected... I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview."*

Q: What is your response?
R: A lot of times when applicants apply for positions multiple times, they don't carefully read the announcement. I don't know that is what happened with Mr. Laber. But we have been updating our requirements in our announcements, to emphasize higher levels of leadership. That is consistent with where our organization is going. In order to get promoted to certain levels, applicants must have taken a number of leadership classes. I don't know whether Mr. Laber was submitting the same resume and not paying attention to the leadership component. It was a supervisory position.

Mr. Laber testified that:
*"I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization."*

Q: What is your response?
R: That statement is all over the place. I can take it in parts. All of the people he names are over 40. When we look at the number of people over the age of 40 who get promoted, and who get favorable ratings, bonuses, etc... the data speaks for itself. People over the age of 40 are treated well. Again, I can't think of any instances where someone was going for a promotion and they had known EEO activity. The agency's promotion process is top-down to some degree because it requires each organization to appoint a selection panel and an approving official. But I don't see that as a pejorative thing.

Mr. Laber testified that:
*"...So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and*

*knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory."*

Q: What is your response?
R: I can say that within recent years, I can think of at least two individuals who were Jewish, and they are some of our highest rated employees in the organization and they are in supervisory positions. That statement doesn't make any sense to me. We have multiple people of the Jewish faith in supervisory roles.

Mr. Laber testified that:
*"I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me."*

Q: What is your response?
R: I don't believe that is true. I was not on the panel, so I can't speak for the panel members. But when I looked at the results, I felt the process was followed correctly and clearly.

Mr. Laber testified that:
*"There was a consensus among our group that [management] wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski."*

Q: What is your response?
R: Mr. Mostowski is Jewish. It is strange that Mr. Laber would compare himself to Mr. Mostowski because Mr. Mostowski is Jewish. I don't think there was a conspiracy to get younger leaders. We look at all applicants, at their resumes, and pick the right leader regardless of age. Mr. Mostowksi was able to demonstrate a very well-balanced package in terms of technical, leadership, and collaboration. At the end of the year, when the office of diversity comes in, that is the only point in the year we look at anything on anyone's birth certificate in regards to our promotion process. And even then we only look at it in terms of expanding our applicant pool. If anything, the number of people at the Band 05 level under the age of 40 is a small number. We would not discriminate against Mr. Mostowski simply because he was under 40. The fact that we did not discriminate against Mr. Mostowski does not mean we were pushing for younger people. The bottom line is we selected Mr. Mostowski based on what was in his resume and what he said in his interview; his age and religion had nothing to do with it.

Mr. Laber testified that:
*"The leadership of OCS has a long history of shoving older employees into dead end positions, and not promoting them. The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions."*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Mr. Laber testified that:
*"I believe I have seen everyone who works within OCS, and none of them exhibit the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I*

*do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do.*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Mr. Laber testified that:
*I do my utmost to tell the truth, and not do anything inappropriate in my professional position. If there is something that I don't think is proper or according to regulation/law, I refuse to do it based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times."*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Mr. Laber testified that:
*"Most selectees in OCS are female, particularly those with military experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females."*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Mr. Laber testified that:
*"Even though the panel does the selection, Ms. Crawford gives the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. The panel acts with impunity."*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Mr. Laber testified that:
*"There is a history and pattern of females being selected at OCS."*

Q: What is your response?
R: See my answers above; I think I have answered that already.

Q: Do you have anything to add that is relevant to the accepted claim?
R:No


### END OF STATEMENT


I, *Tonya Crawford,* declare (*certify, verify or state)* under penalty of perjury, that the foregoing is true and correct.


_____          _____
         Declarant's Signature                              Date
                                                              31 Jul 14