# Exhibit 11

## Declaration under Penalty of Perjury

I, **Richard Unis**, in accordance with 28 U.S.C. Section 1746, make the following statement:

*EFFECTS OF NONDISCLOSURE: Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ORGANIZATIONAL INFORMATION

Question (Q): What is your full name?
Response (R): Richard Unis

Q: What is the year of your birth?
R: 1962

Q: How old do you believe Mr. Laber is?
R: He is probably close to 60

Q: What is your religion (if any)?
R: I am Lutheran, Protestant, Christian

Q: What is Mr. Laber's religion?
R: He is Jewish

Q: If you know Mr. Laber's religion, explain why.
R: He has mentioned his religion to me, and he wears a skull cap

Q: What is your sex?
R: Male

Q: Do you regard Mr. Laber to be a male?
R: He is male

Q: Do you have one or physical or mental conditions that you consider to be disabling? Do you regard yourself to be disabled?
R: No I don't.

Q: What was your position title, pay plan, job series, and grade on September 6, 2013?
R: Contracts Division Chief for OCSR, IA-1102-05

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? **(i.e., Branch, Section, Division, Directorate, location)**
R: Contracts Division (OCSR), Contracts Directorate (OCS), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: September 2007

Q: Who was your **first** level supervisor on September 6, 2013?
R: Deanna Merchant

Q: Who was your **second** level supervisor on September 6, 2013?
R: Tonya Crawford

Q: On September 6, 2013, what was your organizational relationship to **Mr. Laber**?
R: I did not have a direct organizational relationship with him. We were both members of OCS but in different divisions and groups. I was not in his chain of command.

Q: Did you know **Mr. Laber** on September 6, 2013?
R: Yes I did.

Q: How often did you interact with **Mr. Laber**?
R: Not very often; he sat on a different floor. I would see him around the office once a week or every couple of weeks.

Q: Did you have any organizational or managerial authority over **Mr. Laber** in September 2013?
R: No

**RETALIATION**
Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: I believe it was sometime in April 2014 when I was notified of the Protective Order from the NGA General Counsel.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: When I received the Protective Order and told not to destroy any evidence relating to the selection.

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that Mr. Laber had pursued?
R: No, none at all.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO activity? If so, when and what type of activity?
R: No, I have not.

## DISABILITY
Q: Mr. Laber alleges that was disabled with a physical or mental impairment. What knowledge did you have of his apparent impairment?
R: None at all. If he has a condition I don't know what it is; I couldn't even venture a guess.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013
Q: Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay Band 05. Explain the knowledge and involvement you had in the selection action, including any/all decisions you made as a management official on behalf of the agency. What was your role in the selection process?
R: I was a panel member for the selection action. I don't remember who asked me to serve; I think it was our Employee Development Officer (EDO). I was required to make sure my bi-annual EEO training was current and up to date. The HD Directorate sent me a list of candidates who were screened and potentially met the selection criteria. There were quite a few qualified candidates; I think there were around 20 on the referral list. It was a large pool. First I reviewed, rated and ranked the resumes by myself according to the requirements for the position in the AON vacancy. I matched the requirements against the resumes. I ranked the candidates top to bottom, racking and stacking according to how well they met the criteria. I did not have a numeric score for each candidate at first. I initially just ranked them subjectively based on how I thought they met the qualifications. Then I went back a second time and assigned a score to each resume. Mr. Laber was in the middle portion of my ranking list. His initial resume scored 5 out of 9.

I gave Mr. Laber a score of 5 based on his resume. The biggest issue was his lack of broad experience across NGA contracts. This position had been identified as one of the most senior within the office of contracts. We were looking for someone with significant breadth and depth of contract experience, particularly within multiple buying divisions of NGA. I noticed that Mr. Laber had a lot of experience, duties, and assignments that were outside the normal buying realm. The one exception was on our international team. I was really looking for somebody with more experience across multiple divisions within contracting, in particular someone with significant source-selection experience. Mr. Laber had some of that with the international team, but it was restricted to IT and I was looking for someone with breadth and depth across more than IT components. There were quite a few candidates; 16 total. I had five people who were rated "9" based on the resumes:

1. Demetrius Green
2. Patricia Hill
3. Denita Ladson
4. Howard Lambert
5. Cassandra Michael

I scored four people as "8"
1. Karen Eichelberger

2. Joey Larmen
3. Dyah Goodman
4. Aundra Rhone-Jones

After the independent rating-rankings, the panel came together and each person provided their scores. To reconcile our scores, we looked for differences of more than two points. Then through consensus, we arrived at an individual score that we could all support. Each individual spoke about what they saw in the person's resume that led them to score the way they did. We talked about it and came to a consensus. So there was some Fact Finding and some negotiation. I don't remember the conversation being contentious. There may have been a couple of cases where we did not settle on the same number, but we were able to agree about the positions. We did not have any really wide differences in scoring. Through consensus we arrived at a final ranking of the candidates.

The next step was to identify which candidates we would interview. We were looking for a natural cut point. I don't recall how we established that cut point. It was probably those who scored 7 or higher. I think when the final scores settled out, there was clearly a group toward the top, and a group at the bottom. Mr. Laber was in the lower group. We decided to interview the top eight applicants, which was a pretty good number. In past selections, we typically interviewed all the candidates. But in this case we had so many candidates that we decided not to interview them all. And, there was a natural break in qualifications from the scoring, so we knew that it was appropriate to take the top eight.

The next step was the interviews. After the interviews, the panel rank-ordered our final candidates (combining resume and interview together). Ms. Eichelberger was our number one candidate, and I believe Danita Ladson was our number two. The process of coming up with the selectee and the alternate was not contentious. Then we provided our score sheets to the panel lead (Mr. Hinchberger), who wrote the recommendation report and then sent it to our HR folks. At that point my role was done. My role was to screen, score, and interview candidates.

Q: Describe selection process?
R: See above

Q: Who determined the criteria for the selection process?
R: We have a standard Position Description for a Supervisory Band 05 job. I am sure we started with that, and it may have been tweaked for the particular position. I think Dan Hinchberger provided the final vacancy announcement and PD.

Q: Who asked you to serve on the panel?
R: I don't remember but it was probably our EDO.

Q: Did the panel review, rate, and rank applicants' resumes?
R: Yes, see above.

Q: Explain how the resumes were reviewed, rated, and ranked.
R: See above

Q: How was Mr. Laber's resume and application reviewed, rated, and ranked?

R: See above. I ranked him in the bottom half of the applicants.

Q: Explain why Mr. Laber's resume and application was rated and ranked as it was.
R: See above.

Q: Were interviews conducted?
R: Yes

Q: Did the panel decide to interview Mr. Laber?
R: The panel decided not to interview Mr. Laber, along with the other seven applicants who were in the bottom half.

Q: Did you, or the panel as a whole, make a recommendation to a selecting official?
R: Yes, as a panel we recommended Karen Eichelberger and an alternate in Danita Ladson. My assessment of Ms. Eichelberger is that she had supervisory contract experience across four different buying divisions within NGA Contracts. She had 13 years of experience in those four buying division. She was currently serving in the Deputy role. In essence, she was already performing the Band 05 work. She had source selection experience and a lot of depth and breadth in working various contracts. By contrast, a lot of Mr. Laber's experience was outside of NGA. He came to NGA in 2006 when he was assigned to our international team. He was there just over 2 years before he moved on to a different role, as a subject matter expert for acquisition (not a Contracting Officer role). Since April 2011 he has been leading our Contracting Officer Representative program. So he did not have a whole lot of experience working in buying divisions at NGA. The person in this role really needs to have a good understanding of various customers across the agency and their requirements. Ms. Eichelberger had worked with headquarters support, major systems, IT, Research and Development, and Commercial Imagery. The position we were filling was one of the senior positions within the Contracting organization and we really needed someone with the depth and breadth of experience that Ms. Eichelberger had.

Q: Who did you make recommendation to?
R: The panel passed our recommendation to Mr. Hinchberger, who then sent it HR. I think the decision was officially Mr. Hinchberger's; he was the hiring authority. He is a former Employee Development Officer for OCS, so he knew the process. As far as I know, Tonya Crawford had no role in the selection action. I am sure Mr. Hinchberger met with her to let her know what his decision was. But I don't think she had any input or influence in the selection. The person who was ultimately hired was the person who was recommended by the panel. Ms. Crawford did not participate in any of the panel's proceedings.

Q: Was the panel's recommendation followed by the selecting official?
R: Yes, it was.

Q: Did you know Mr. Laber at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **AGE** at the time of the selection?
R: No. I still don't know exactly.

Q: Did you know Mr. Laber's **RELIGION** at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **SEX** at the time of the selection?
R: Yes, I did.

Q: Did you know about Mr. Laber's **disabling condition** at the time of the selection?
R: No I did not. I still don't know.

Q: Did you know Mr. Laber's **EEO activity** at the time of the selection?
R: No I did not.

Q: Where did Mr. Laber rank among candidates who applied for the position?
R: He was in the bottom half.

Q: What was Mr. Laber lacking compared to the candidates who were interviewed?
R: See above.

Q: What was Mr. Laber lacking compared to the candidate who was selected?
R: See above.

Q: Were you directed or persuaded to recommend a particular candidate?
R: No I was not.

Q: Were you directed or persuaded not to recommend a particular candidate?
R: No I was not.

Q: Was Mr. Laber's **AGE** a factor in your decision not to interview or select him? If yes, explain fully.
R: No, not in my decision.

Q: Was Mr. Laber's **RELIGION** a factor in your decision not to interview or select him? If yes, explain fully.
R: No, not in my decision.

Q: Was Mr. Laber's **SEX** a factor in your decision not to interview or select him? If yes, explain fully.
R: No, not in my decision.

We interviewed the following seven people:

| Name | Age | Religion | Sex | Disability | EEO |
|------|-----|----------|-----|------------|-----|
| Karen Eichelberger | 50 | Presume Catholic | Female | Unknown | Unknown |
| Danita Ladson | 46 | She attends church | Female | Unknown | Unknown |
| Cassandra Michael | 46 | Unknown | Female | Unknown | Unknown |
| Cathy Smith | 43 | Unknown | Female | Unknown | Unknown |
| Patricia Hill | 44 | Unknown | Female | Unknown | Unknown |
| Dyah Goodman | 38 | Unknown | Female | Unknown | Unknown |

| Joey Larman | 36 | Unknown | Male | Unknown | Unknown |

We did not interview the following nine people:

| Name | Age | Religion | Sex | Disability | EEO |
|------|-----|----------|-----|------------|-----|
| Demetrius Green | 46 | Unknown | Male | Unknown | Unknown |
| Howard Lambert | 48 | Unknown | Male | Unknown | Unknown |
| Andre Rohn-Jones | 43 | Unknown | Female | Unknown | Unknown |
| Sharon McDowell | 40 | Unknown | Female | Unknown | Unknown |
| Stan Laber | 60 | Jewish | Male | Unknown | Yes |
| Ray Williams | 62 | Unknown | Male | Unknown | Unknown |
| Brenda Pommeranke | 55 | Unknown | Female | Unknown | Unknown |
| Christian Hernandez-Soto | 33 | Unknown | Male | Unknown | Unknown |
| Mark Floyd | 44 | Unknown | Male | Yes he does | Unknown |

I can't be certain that the candidates' age is what I think it is. These are just my suppositions. Our highest-rated person who was not interviewed was Demetrius Green. We were on the fence about him but we chose not to interview him.

Q: During your tenure in the organization, how many times have you served as a panel member or a selecting official for an open position?
R: I think this is my third time.

1. Karen Eichelberger (see my guess at demographics above)
2. Teresa Lukavec
3. Can't recall

Q: How many times have you selected an applicant **over** 40?
R: More than likely, all three were.

Q: How many times have you selected an applicant **under** 40?
R: More than likely, none of them were.

Q: Of the three applicants you have selected, how many did you know the **religion** of?
R: None of them for certain.

Q: How many times have you selected a **male** applicant?
R: I can't recall.

Q: How many times have you selected a **female** applicant?
R: Twice that I recall.

Q: Was Mr. Laber's prior EEO activity a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No it was not.

Q: Was Mr. Laber's physical or mental impairment a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.

R: No it was not.

Mr. Laber testified that:
*"I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies. The EEO Office dismissed my allegation of reprisal."*

Q: What is your response?
R: I was not aware of any current or former EEO action, FOIA or IG requests by Mr. Laber.

Mr. Laber testified that:
*"I imagine they [the panel members] entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected... I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview."*

Q: What is your response?
R: My resume score was a direct result of a comparison of Mr. Laber's experience against the criteria for the position. I did not and currently do not have any negative opinions about Mr. Laber. Whether or not someone gets selected for an interview is due in part to the individuals' experience and qualifications and also the quality of the pool of applicants for the position.

Mr. Laber testified that:
*"I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization."*

Q: What is your response?
R: I really don't know what Mr. Laber is referring to. Age was not a factor in the selection. He has never worked for me in my Division nor have I had any direct dealings with him. I know for a fact that I never act with impunity!

Mr. Laber testified that:
*"So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory."*

Q: What is your response?
R: I do not have a negative view of Mr. Laber and I have no objections to his religion, the way he looks or dresses. I scored his resume against the selection criteria. Bottom line: there were

better qualified candidates for the position. There was no "lobbying" on the panel to push him down the list.

Mr. Laber testified that:
*"I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me."*

Mr. Laber testified that:
*"There was a consensus among our group that they wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski."*

Q: What is your response?
R: The age of the candidates had no bearing on the selection for the position. The person who was selected, Ms. Eichelberger, is not a "younger, fresher" leader. She was the best candidate for the position based on her experience and qualifications.

Mr. Laber testified that:
*"The leadership of OCS have a long history of shoving older employees into dead end positions, and not promoting them. The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions."*

Q: What is your response?
R: I believe OCS promotes the best candidate for the position based on the pool of candidates that apply for each position. Recent selections for Band 5 do not support Mr. Laber's statement. The recent selectees were all in their upper 40's and/or 50's. In fact, I believe I was 46 years old when I was selected for Band 5.

Mr. Laber testified that:
*"I believe I have seen everyone who works within OCS, and none of them exhibit the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do. I do my utmost to tell the truth, and not do anything inappropriate in my professional position. If there is something that I don't think is proper or according to regulation/law, I refuse to do it based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I*

*prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times."*

Q: What is your response?
R: I am not aware of any situations that Mr. Laber is referring to. However, I have had Contracting Officers who did not feel comfortable signing a contract action and they kicked it up to their Supervisor. That's exactly what they should do for resolution. That situation, in my opinion, is not viewed negatively. In fact, that's what I would expect from a Contracting Officer.

Mr. Laber testified that:
*"Most selectees in OCS are female, particularly those with female experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females."*

Q: What is your response?
R: Based on my observation, those recent (over the last 6 or 7 years) selectees for a Band 5 position seem to be essentially equally split between male and female. I don't believe his perception and statement is accurate.

Mr. Laber testified that:
*"Even though the panel does the selection, Ms. Crawford gives the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. The panel acts with impunity."*

Q: What is your response?
R: I did not have any discussions or interaction with Ms. Crawford relative to this selection.

Mr. Laber testified that:
*"There is a history and pattern of females being selected at OCS."*

Q: What is your response?
R: See my response above.

Q: Do you have anything to add that is relevant to the accepted claim?
R: Mr. Laber was qualified for the position, but we had multiple candidates, both male and female, who were better qualified. I am confident that Mr. Laber was provided with a fair opportunity for consideration for promotion.


END OF STATEMENT


I, **Richard Unis,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____                    _____
Declarant's Signature                                        Date  8 July 2014

Page 10 of 10 Pages
Declarant's Initials REU

# Exhibit 12

# Declaration under Penalty of Perjury

I, **Tamara J Verdon**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ORGANIZATIONAL INFORMATION
Question (Q): What is your full name?
Response (R): Tamara J. Verdon

Q: What is the year of your birth?
R: 1960

Q: How old do you believe Mr. Laber is?
R: I don't know his age, but I am confident he is a little bit older than I am.

Q: What is your religion (if any)?
R: I am a non-practicing Catholic.

Q: What is Mr. Laber's religion?
R: He is Jewish

Q: If you know Mr. Laber's religion, explain why.
R: Stan worked for me for a short period a year or so ago. We have had conversations about his religion and my sexual orientation. We have discussed being oddities in our environment. Also, in offsite work functions, he keeps very kosher. We would talk about offsite functions, particularly lunch functions, and way to enable Stan to remain kosher.

Q: What is your sex?
R: I am female

Q: Do you regard Mr. Laber to be a male?
R: He is male

Q: Do you have one or more physical or mental conditions that you consider to be disabling conditions? Do you consider yourself to be disabled?
R: No, I do not.

Q:  What was your position title, pay plan, job series, and grade on September 6, 2013?
R: I was a Supervisory Contract Specialist, IA-1102-05 (GS-15), Chief OCS-U, Contracting Division

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, location)
R: Chief, Office of Contract Services, U Division (OCS-U), Office of Contracting Services (OCS), Office of the Director (D/NGA), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: I have been with the federal government since 1983. I came to this agency in September 1995.

Q: Who was your first level supervisor on September 6, 2013?
R: Susan Pollmann

Q: Who was your second level supervisor on September 6, 2013?
R: Tonya Crawford

Q: On September 6, 2013, what was your organizational relationship to Mr. Laber?
R: We were just co-workers within the larger OCS. We were in the same organization but different offices and I was no longer part of his chain of command.

Q: Did you know Mr. Laber on September 6, 2013?
R: Yes

Q: How often did you interact with Mr. Laber?
R: At that time, probably only once every two weeks.

Q: Did you know Mr. Laber's AGE, RELIGION, SEX, disabling condition, or EEO activity on September 6, 2013?
R: I knew his approximate age range, without knowing his exact age. I did know he was Jewish at that point, and I knew he was male. I knew nothing about his disabling condition then or now. The only EEO activity I am aware of now is this case.

Q: Did you have any organizational or managerial authority over Mr. Laber in September 2013?
R: No

Q: What role, if any, did Ms. Tonya Crawford have in the selection action at issue?
R: I think on paper she might have been the final selecting authority, but Mr. Hinchberger was the panel lead. I don't think she had any functional, practical, or active role in the selection though. Ms. Crawford had no role or presence in the panel proceedings.

**RETALIATION**
Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: I got an email from our OGC Rep (Kendall) saying that there was an EEO complaint and I was supposed to retain all of my documentation from the selection process. That was in early April 14.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: From our agency legal team.

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that Mr. Laber had pursued?
R: No, not at all.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO activity? If so, when and what type of activity?
R: No, I haven't.

**DISABILITY**
Q: Mr. Laber alleges that he was disabled with a physical or mental impairment. What knowledge did you have of his apparent impairment?
R: None at all. I still don't know anything about it.

**NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013**
Q: Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay Band 05. Explain the knowledge and involvement you had in the selection action, including any/all decisions you made as a management official on behalf of the agency. What was your role in the selection process?

R: I don't recall who asked me to serve on the panel, but my involvement on interview panels is common. People at my level (OCS supervisors) are on selection panels all the time. This was a supervisory position, and the announcement was made through our HR system. After HR compiles the applications, they look at the resumes and figure out who meets the requirements from the vacancy. At that point the panel members are given the resumes to rate and score against the position description. We (panel members) scored them individually on a scale of 1-10, then the team meets together to adjudicate the scores and come to a ranking of those resumes. Based off of those rankings, we decide on the most highly rated resumes. From that point on, we only interviewed the top candidates. Then we do the interviews and decide who are the best candidates. We then make a recommendation for hiring to Ms. Crawford, and she approves or disapproves the recommendation. Once the recommendation went to Ms. Crawford, my role was done. Sometimes a candidate will want some feedback on why they were not selected. In this case, Mr. Laber said he wanted to talk to me about the selection. At that point time neither of us closed the loop to discuss it. At that point it was the end of the fiscal year and there were

furloughs, so we never got back to one another on the issue. We deferred the discussion until after the fiscal year ended, and then the furlough hit, and neither of us circled back to discuss it.

Q: Describe selection process?
R: See above

Q: Who determined the criteria for the selection process?
R: Part of the criteria is driven by regulation (requirements for a senior contracting officer), and other criteria are created internally with senior leadership and HR. I couldn't tell you exactly who came up with the criteria, but it was geared toward skill-set/knowledge base of contracting and leadership/strategic thinking/agility; the ability to lead large groups of people. We were looking to fill a senior leadership position.

Q: What was the purpose of panel?
R: To rate and rank the resumes, conduct interviews, and make a recommendation.

Q: Who asked you to serve on the panel?
R: I don't recall.

Q: Did the panel review, rate, and rank applicants' resumes?
R: Yes. Each panel member rated and ranked the resumes separately. The way I review resumes is to keep the announcement next to the resumes. The announcement has the desired and mandatory requirements. I cross-check the resume against the requirements. I make notes on the resume, with positive and negative comments. Then I use a scale of 1-10, with 10 being the highest. There is no mathematical formula for that; it is subjective based on my qualitative assessment. I come up with a numeric score for each applicant.

Q: Explain how the resumes were reviewed, rated, and ranked.
R: See above.

Q: How was Mr. Laber's resume and application reviewed, rated, and ranked?
R: I gave Mr. Laber a "5". Mr. Laber's resume demonstrated strong contracting knowledge, which was one of the requirements. His contracting knowledge was not in question. But the part of his resume that was the weakest was his demonstrated leadership experience; leading medium to large teams. Although he had some supervisory experience, to my knowledge while at NGA, he only supervised one person at a time, and most recently it was not in contracting. His weakest area was leadership and strategic involvement. He had no experience leading medium or large teams. Strategic thinking/agility and managing multiple people were not clear in his resume. He did not have the experience of setting up a larger operation and implementing it. He had not been a team lead of more than one person at a time, and he had not managed across organizational lines. He had not been involved in resolving or implementing strategic visions.

I gave Ms. Eichelberger a "9." She has been in a leadership position at least as far back as 2002-2003 when she was the deputy of ACW, one of our contracting divisions. In that role, she probably had ten direct subordinates, and she shared responsibility for maybe 20 total. She has been in supervisory roles ever since then, in different divisions and levels. She was also a team lead for OCS-R, our R&D division at the Band 04 level. She was the Deputy of that office, with 10-15 people. She had an active role in writing performance appraisals in DCIPS. She worked

with multiple customers in base operations, major systems customers. She has been involved in working with smaller offices as well. She has ridden a wave of leadership for many years.

Q: Explain why Mr. Laber's resume and application was rated and ranked as it was.
R: See above. He was in the middle area of the resume rankings I did. There were some who clearly missed the mark, with scores in the 1-3 range. Then we had 7-9's who were solid. The bulk (over half) were somewhere between the 4 and 6 range. I think there were eight above Mr. Laber and here were eight at or below him. Sixteen resumes were reviewed.

Q: Were interviews conducted?
R: Yes, they were. The panel members came together. We had a spreadsheet with our numeric ratings, individually. If we had more than 2 points difference between any rating (i.e a split), we have to have a discussion to reconcile the differential. For example, if we had a 5 and a 2 split on a score, we talk about why one member thinks the person is a 5 and the other person thinks they should be a 2. I don't recall how much of this kind of discussions in this particular selection action but there were splits that had to be resolved. I don't remember there being a gap with Mr. Laber's scoring requiring additional discussions. I think we all rated him similarly (in the 5 range). I remember we discussed his qualifications as a panel as we did with other candidates. I don't recall whether we had broad agreement about his weaknesses. After we closed any gaps in scoring, we came up with an average numeric score for each applicant. I don't recall Mr. Laber's overall average numeric score, but I think he was still in the 5-6 range.

In the past, we would interview all of the candidates so that everybody had an opportunity to grow and learn in the interview process. We have since learned how time consuming that is from a leadership point of view. And, we have to decide what the value is in that step. We came to decide that if there was a strong, competitive group of candidates, and a lesser qualified group, we would focus our resources on those candidates who we felt had the best chance of stepping in and performing this role. So the panel decided to make a cut line. We looked for a logical cut point. There was no mathematical formula. We looked to find a logical cut point. If we had a bunch of people in 8 and 9, there were no 6 or 7, and the next group was 5, it would make sense to cut from 8 and up. It is a subjective discussion. I don't remember exactly what the discussion was for this cut line. I think we interviewed 7 or 8 of the top candidates. I can count six off the top of my head.

I don't remember the exact scores, but we interviewed the top 7. I remember that Mr. Green was former military. I don't think his resume demonstrated leadership in a civilian environment. So I think leadership of civilians as NGA was what set Mr. Green apart from Mr. Larman, the lowest scoring candidate that we interviewed. Mr. Larman has supervisory / team lead experience and supervised a small team of employees in NGA. I think he team size is about 6. He had strategic hands-on involvement.

Based on my knowledge and awareness, here were their traits. These are my guesses only, or my suppositions based on my knowledge of them. My guesses could be incorrect.

We interviewed the following seven people:

| Name | Age | Religion | Sex | Disability | EEO |
|------|-----|----------|-----|------------|-----|
| Karen Eichelberger | Late-40's (48) | Unknown | Female | Unknown | Unknown |

| Danita Ladson | Mid-40's | Unknown | Female | Unknown | Unknown |
| Cassandra Michael | Early-40's | Unknown | Female | Unknown | Unknown |
| Cathy Smith | Mid/Late-40's | Unknown | Female | Unknown | Unknown |
| Patricia Hill | Mid-40's | Unknown | Female | Unknown | Unknown |
| Dyah Goodman | Late 30's | Unknown | Female | Unknown | Unknown |
| Joey Larman | Late 30's | Unknown | Male | Unknown | Unknown |

We did not interview the following nine people:

| Name | Age | Religion | Sex | Disability | EEO |
|------|-----|----------|-----|-----------|-----|
| Demetrius Green | Early/Mid-40's | Unknown | Male | Unknown | Unknown |
| Howard Lambert | Early 50's | Unknown | Male | Unknown | Unknown |
| Andre Rhone-Jones | Mid-40's | Unknown | Female | Unknown | Unknown |
| Sharon McDowell | Early 40's | Unknown | Female | Unknown | Unknown |
| Stan Laber | Early 50's | Jewish | Male | Unknown | Yes |
| Ray Williams | Mid-50's | Unknown | Male | Unknown | Unknown |
| Brenda Pommerenke | Late 40's | Unknown | Female | Unknown | Unknown |
| Christian Hernandez-Soto | Early 30's | Unknown | Male | Unknown | Unknown |
| Mark Floyd | Late 40's | Unknown | Male | Unknown | Unknown |

Q: Did the panel decide to interview Mr. Laber?
R: We decided not to interview him. But we also decided not to interview seven other people.

Q: If not, explain why.
R: See above

Q: Did you, or the panel as a whole, make a recommendation to a selecting official?
R: Yes. We recommended Karen Eichelberger for selection, and Danita Ladson as alternate.

Q: Who did you make recommendation to?
R: We made the recommendation as a panel. Mr. Hinchberger then made the recommendation to Tonya Crawford, who signed off on it.

Q: Who did you recommend and why?
R: See above.

Q: Was the panel's recommendation followed by the selecting official?
R: Yes, Ms. Crawford signed off on Ms. Eichelberger, and Ms. Eichelberger took the job.

Q: Did you know Mr. Laber at the time of the selection?
R: Yes

Q: Did you know Mr. Laber's **AGE** at the time of the selection?
R: I had an assumption about his age although I didn't know for sure.

Q: Did you know Mr. Laber's **RELIGION** at the time of the selection?
R: Yes

Q: Did you know Mr. Laber's **SEX** at the time of the selection?
R: Yes

Q: Where did Mr. Laber rank among candidates who applied for the position?
R: See above

Q: What was Mr. Laber lacking compared to the candidates who were interviewed?
R: See above

Q: What was Mr. Laber lacking compared to the candidate who was selected?
R: See above

Q: Were you directed or persuaded to recommend a particular candidate?
R: No I was not

Q: Were you directed or persuaded not to recommend a particular candidate?
R: No I was not

Q: Was Mr. Laber's **AGE** a factor in your decision not to interview or select him?  If yes, explain fully.
R: No

Q: Was Mr. Laber's **RELIGION** a factor in your decision not to interview or select him?  If yes, explain fully.
R: No

Q: Was Mr. Laber's **SEX** a factor in your decision not to interview or select him?  If yes, explain fully.
R: No

Q: During your tenure in the organization, how many times have you served as a panel member or a selecting official for an open position?
R: I would say probably 10 times or more in the last 15 years or so. But I may have been involved in the hiring of 25-30 people (maybe more).

Q: How many times have you selected an applicant **over** 40?
R: I don't know the numbers, but I know I have selected people who were over 40.

Q: How many times have you selected an applicant **under** 40?
R: I don't know the numbers, but I know I have selected people who were under 40.

Q: Of the 25-30 selectees you have selected, how many did you know the **religion** of?
R: I don't think I knew any of their religious identifications.

Q: How many times have you selected a **male** applicant?
R: I don't know the numbers, but I am sure I have selected people who were male.

Q: How many times have you selected a **female** applicant?
R: I don't know the numbers, but I know I have selected people who were female.

Q: Was Mr. Laber's prior EEO activity a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No

Q: Was Mr. Laber's physical or mental impairment a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No

Mr. Laber testified that:
*"I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies. The EEO Office dismissed my allegation of reprisal."*

Q: What is your response?
R: I was not aware of Mr. Laber's EEO complaints or the outcome of those complaints.

Mr. Laber testified that:
*"I imagine they [the panel members] entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected... I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview."*

Q: What is your response?
R: Evaluating the resumes involves much subjectivity. Mr. Laber's resume supported his subject matter expertise as a contracting officer but lacked demonstration of leadership of medium / large teams. Supervision, resource management, personnel development, strategic leadership areas were not as strong in Mr. Laber's resume.

Mr. Laber testified that:
*"I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization."*

Q: What is your response?
R: The selection panel did not take age into consideration for this selection. I have never used age as a determining factor for making personnel decisions, assigning workload, or providing training and career broadening assignments. I have hired several older team members in recent years and have encouraged other older team members to pursue education and cross-training

opportunities to develop stronger skill sets. This approach is common throughout OCS, to include Mr Hinchberger, Mr Unis, Ms Williams and Ms Crawford.

Mr. Laber testified that:
*"So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory."*

Q: What is your response?
R: Mr. Laber appears to be asserting that the panel intentionally skewed scores to as to remove him from the interview group. This is an incorrect assertion. As discussed above, independent assessments were performed using resumes and AON criteria, followed by panel discussions and final scoring. The cut line was not set to intentionally remove Mr. Laber from the interview pool. Seven other candidates were also removed from the interview pool

Mr. Laber testified that:
*"I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me."*

Mr. Laber testified that:
*"There was a consensus among our group that they wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski."*

Q: What is your response?
R: As stated above, the process and interview cut line was not established with the purpose of removing Mr. Laber from the interview pool. Age was not a consideration. With regard to Mr. Mostowski, he was promoted to a Band 5 several years ago. Yes, he is younger than Mr. Laber, although I don't know his exact age when he was promoted. Jonathan is a bright employee, engages in strategic and transformation activities in OCS and at the Agency level, had accepted leadership and supervisory roles as a Band 4, and led major contract efforts for NGA. Mr. Mostowski is also Jewish. Neither his religion nor his age were taken into consideration when selecting him for promotion.

Mr. Laber testified that:
*"The leadership of OCS have a long history of shoving older employees into dead end positions, and not promoting them. The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions."*

Q: What is your response?
R: OCS leadership constantly looks for opportunities for employees to grow and progress in their careers. In some instances, contracting isn't a good fit for an employee so we try to find a better fit for a person's skills and abilities. Rotational opportunities are often presented to employees, exclusive of age. For example, OCS' employee development officer (EDO) is a rotational position, currently being held by a Band 4 employee who is in her 30's. Former EDO rotations

have included personnel in their 30s and 40s. I myself have rotated into and out of a staff role. That rotation was to give me an opportunity to grow, not to be penalized - I was 50 when that rotation occurred. These rotations are offered for the benefit of the employee and the organization, however, the employee is never forced to rotate.

Mr. Laber testified that:

*"I believe I have seen everyone who works within OCS, and none of them exhibit the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do. I do my utmost to tell the truth, and not do anything inappropriate in my professional position. If there is something that I don't think is proper or according to regulation/law, I refuse to do it based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times."*

Q: What is your response?
R: I agree that I do not know anyone currently in OCS that has outward appearances similar to Mr. Laber and to my knowledge, none of the applicants have appearances or religious practices similar to Mr. Laber. However, there was a gentleman, Michael Shimoff, who worked for me several years ago who was also Jewish and who had similar religious beliefs and practices as Mr. Laber. While at NGA, Mr Shimoff was promoted to a Band 4 and was provided an opportunity to participate in a 20/20 program (20 hours week for graduate school (funded by the Government) and 20 hours per week at work). In addition to Mr. Shimoff, I am aware of two other Jewish team members who were promoted. This demonstrates that OCS is not prejudiced against Jewish people.

Contracting actions are not cut and dry and require critical thinking and extensive analysis, much of which is subjective. What may be comfortable for me to sign may not be comfortable for others, and vice versa. To my knowledge, Mr. Laber's honestly and truthfulness has ever been in doubt. There is nothing better than being able to stand in your own integrity, and as such, to my knowledge, Mr. Laber's refusal to sign a document that he does not believe in has never been held against him.

Mr. Laber testified that:
*"Most selectees in OCS are female, particularly those with female experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females."*

Q: What is your response?
R: Ms. Crawford supports the selection of the most qualified person and does not support a gender bias. The OCS workforce is diverse in many ways, although females generally out number males. I do not know the statistics, but I would guess about 60% are female, 40% are male. For example, the eight person OCS leadership team is comprised of 5 females, 3 males (approx. 60/40 ratio). Currently, I estimate that there are ten (10) other Band 5 supervisory and non-supervisory team lead positions. Of those positions, at least 4 are held by females (Lukavec, Eichelberger, Fox, Pinkston) 6 are held by males (Tran, Mostowski, Pappalardo, Malaney, Stallsmith, Rainey) (approx at 40/60 ratio). So in all, the Band 5 workforce is about a 50/50 split. Many of these folks were promoted under Ms Crawford's leadership as either the Director, OCS, or in her prior role as Deputy Director, OCS. This supports that Ms. Crawford and OCS leadership does not use gender in the selection process.

Mr. Laber testified that:
*"Even though the panel does the selection, Ms. Crawford gives the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. The panel acts with impunity."*

Q: What is your response?
R: The manner in which Ms. Crawford conveys what she is looking for in a candidate is through the AON description and the mandatory and desired qualifications. Ms. Crawford did not involve herself in the resume review or interview process nor did she influence who we did or did not select for interviews.

Mr. Laber testified that:
*"There is a history and pattern of females being selected at OCS."*

Q: What is your response?
R: See response above regarding the mix of male/female. Senior contracting positions (Band 5) filled with a balanced male/female mix.

Q: Do you have anything to add that is relevant to the accepted claim?
R: I have worked for OCS for almost 20 years and have held leadership positions since 2001. During that time, I have been witness to the many opportunities provided to the entire OCS workforce. I have witnessed diverse promotion selections, including a deaf person, people of varying races and cultures, and religions. OCS' promotion process, selection for training and other rotational opportunities are provided on the basis of skills, abilities, knowledge and the desire to progress in one's career. These decisions are not made on the basis of age, gender, disability, sex, etc. As an out lesbian, who was out at the time of my Band 5 promotion, I can personally attest that discrimination is not an OCS core value.

END OF STATEMENT

I, **Tamara J Verdon,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____
Declarant's Signature

_____3 July 14_____
Date

# Exhibit 13

## Declaration under Penalty of Perjury

I, Tamara J. Verdon, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ADDITIONAL DECLARATION

**Q:** What method of recruitment was used to fill this vacancy, open competitive or promotion, if you recall?

**A:** This competitive promotion opportunity was announced through NGA's PeopleSoft announcement process. Ref: AON 20130928 open NGA Wide.

**Q:** Were selection criteria developed and utilized in the assessment of those qualified applicants meriting an interview?

**A:** AON 20130928 identified key characteristics and requirements along with other mandatory and desired criteria for this PB5 supervisory position. All candidates were provided this information in the AON.

**Q:** If so, what were the selection criteria?

**A:** As stated in the AON in the ADDITIONAL INFORMATION section: The selected individual will be the candidate(s) who, overall, provides the best fit with the requirements included above, and other mandatory and desired criteria as stated within this announcement.

Page 1 of 4 Pages
Declarant's Initials

The ADDITIONAL INFORMATION section of the AON provides insight to what OCS is seeking in its selection, to include operational experience and leadership skills. This section also provides insight to the activities and responsibilities of a Supervisory Contracting Officer. The following information is extracted from the ADIDITONAL INFORMATION section:

- Individuals must demonstrate the experience, training and education, judgement, dependability, character, and business acumen necessary to be delegated unlimited DOD signatory authority, including the authority to compete, negotiate, award, administer, and terminate NGA contracts.
- Strong leadership skills are required, as well as professional knowledge of contract law, policy, and procedures.
- This position meets the OPM definition for the contracting series (GS-1102) and applicants must be able to verify that that they meet applicable DAWIA certification requirements for the contracting field.

The MANDATORY QUALIFICATION CRITERIA section of the AON states that applicants must meet all competencies reflected under the Mandatory Qualification Criteria to include:

- Experience in applying the Federal Acquisition Regulation (FAR) and DOD Federal Acquisition Regulation (DFARS) to acquisition processes.
- Contracting for a variety of products and services for major systems and/or complex programs using a wide range of contracting methodologies such as negotiated contract and commercial acquisition procedures.
- Managing contract actions from conception to implementation with experience and knowledge of source selection procedures/competitive contract actions, cost or price analysis, negotiations, or preparation of related contract documentation.
- Advising the Agency on the acceptability and applicability of contract terms or contract types.
- Ability to negotiate contracts while applying policies and Directives.

The DESIRED QUALIFICATION CRITERIA section of the AON provides a list of desired experiences to include:

- Knowledge of policies and procedures regarding performance evaluation, EEO, employee development (Knowledge of defense Workforce Acquisition Improvement Act (DAWIA) and the DAWIA Acquisition career certification programs), federal diversity policy and other human development related matters.
- Coaching and project management skills and mentoring experience.
- Experience in organizational representation, implementation of integrated process team framework, process improvements and management controls.
- Demonstration of strategic and transformational thinking, leadership, problem identification and resolution skills, flexibility, and ability to develop and implement innovative approaches.

**Q:**   Who informed the panelists of the selection criteria to be used in rating the applicants?

**A:**   The panels used the selection criteria as stated in the AON.

*Page 2 of 4 Pages*
Declarant's Initials

**Q:**   Were any of the selection criteria weighted (of more importance) than the others?

**A:**   No. The panel did not develop a weighting scheme for the criteria and did not rate each criterion separately.

**Q:**   The attached 1-9 rating scale was the standard provided by HD for evaluating selection criteria. Was this scale used by you in assessing the applicants for the vacant positions?

**A:**   The panel used a 1-9 scale.  Although I do not have the actual rating sheet provided, the sheet attached appears to be consistent with NGA's rating standard.

**Q:**   If so, does the commentary corresponding to the numbers reflect the standard you used in this case?

**A:**   Yes

**Q:**   To the best of your recollection, and after review of your notes and your affidavit, please explain the basis for your rating as to each of the seven applicants, and then compare each to your assessment of Mr. Laber, distinguishing the basis of his rating from the interviewees.

**A:**   The panel worksheet provided shows that I rated Mr. Laber as a "5" indicating that he met all of the desired skills and competencies and exhibits about the same performance based potential as most employees.  My affidavit recognizes his strong contracting knowledge. My affidavit also highlighted several areas where his resume lacked depth and demonstration of key characteristics and qualifications (leadership experience, strategic thinking, managing multiple people, implementing strategic vision) that would warrant a rating above "5".

The information you provided to me is not sufficient for me to fully respond to question #8 regarding the basis of my ratings for each candidate and a comparison to Mr. Laber. I do not have, nor did you provide, my resume review notes for the seven candidates selected for interview and for Mr. Laber – I was only provided notes from the interview stage.  The review of the resumes were used to determine what candidates would be selected for interview.  However, I can glean from my interview notes and final ratings that the top rated candidates were deeper in leadership, managing people, and strategic involvement than Mr. Laber.

**Q:**   Do you have any additional comments as to the reasoning behind how your ratings were reached?

**A:**   I did not assign individual ratings for each criterion (requirement, mandatory qualification or desired qualification), rather, I capitalized on my then 20 years of contracting experience and expertise to assign a single 1-9 rating for initial resumes and a final 1-9 rating for those candidates selected for interview.  I took into consideration all the requirements and qualifications (the collective whole) in my ratings leading to the selection of a candidate who, overall, provides the best fit with the requirement and other mandatory and desired criteria.  I did not (nor did the panel) consider factors such as age, religion, sex, disability or EEO activities in evaluating and rating potential candidates and selecting the best candidate to fill this position.

**Q**:   Mr. Laber is contending that the panel members knew his religion and religious beliefs (knew that he was Jewish) from the workplace and from his personal interaction with the panel members. So, even though the resumes do not report out an applicant's beliefs, he contends that the panel knew from personal interactions with him and held his faith as an exclusionary factor. The question I have for you is whether or not you knew of the religion or religious beliefs of any of the other people selected for interview from perhaps your personal interaction with the applicant in the work place. If so, do you happen to know if any of those interviewed were of the Jewish faith?

**A**:   I reaffirm that I knew Mr. Laber is Jewish prior to the interview. His religion and religious beliefs were made known to the panel and other OCS team members by Mr. Laber himself throughout his career at NGA. As stated in my affidavit, at the time of the selection, I did not know the religion of the candidate pool members. The panel did not seek information relative to any candidate's religion or any other EEO protected class (age, race, disability, sexual orientation, etc.) at any point in the selection process. I reaffirm that Mr. Laber's religion and religious beliefs were not factors in the decision to not select him for an interview -- nor was the religion or religious beliefs of any candidate a factor in selecting candidates for an interview.

Religion (and other EEO categories) has never been an exclusionary factor in OCS' hiring or promotion processes. OCS' non-discriminatory personnel hiring and promotion practices have led to hiring and promoting of a plethora of personnel that fall within EEO protected categories. Some of which are Jewish, with hiring and promotions at the Band 4 and Band 5 levels. I have served as a panel member for hiring and promotion decisions which involved Jewish and non-Jewish candidates, and when a Jewish candidate was selected or promoted, it was based on capabilities and not based on religion.


## END OF STATEMENT

I, TAMARA VERDON, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my information and knowledge.


_Tamara Verdon_
(Declarant's Signature)

5 AUG 19
(Date)

*Page 4 of 4 Pages*
Declarant's Initials_____

# Exhibit 14

# Declaration under Penalty of Perjury

I, **Johnetta Williams**, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## **ORGANIZATIONAL INFORMATION**
Question (Q): What is your full name?
Response (R): Johnetta B. Williams

Q: What is the year of your birth?
R: 1959

Q: How old do you believe Mr. Laber is?
R: Mid 60's

Q: What is your religion (if any)?
R: Catholic

Q: What is Mr. Laber's religion?
R: He is Jewish

Q: If you know Mr. Laber's religion, explain why.
R: He worked for me, and he took a lot of Jewish holidays off. He talked about his family traditions, so I was familiar.

Q: What is your sex?
R: Female

Q: Do you regard Mr. Laber to be a male?
R: He is male

Q: Do you have one or physical or mental conditions that you consider to be disabling? Do you regard yourself to be disabled?
R: No I do not.

Q:  What was your position title, pay plan, job series, and grade on September 6, 2013?
R: Supervisory Contract Specialist, IA-1102-05. I was Division Chief OCSJ, Office of Contract Services in support of the of T-Directorate. (OCS-J)

Q: On September 6, 2013, what was your organization starting with the lowest level to the highest? (i.e., Branch, Section, Division, Directorate, location)
R: Division Chief (OCS-J), Office of Contract Services (OCS), Deputy Director (DD), Deputy Director (D), National Geospatial Intelligence Agency (NGA), Springfield, VA

Q: When did you join the organization?
R: 1996

Q: Who was your first level supervisor on September 6, 2013?
R: DeaaAnna Merchant

Q: Who was your second level supervisor on September 6, 2013?
R: Daniel Hinchberger or Tonya Crawford

Q: On September 6, 2013, what was your organizational relationship to Mr. Laber?
R: At that point he no longer worked for me. He was an employee in another division.

Q: Did you know Mr. Laber on September 6, 2013?
R: Yes, I did.

Q: How often did you interact with Mr. Laber?
R: Not very often. I would see him in the hallways from time to time.

Q: Did you have any organizational or managerial authority over Mr. Laber in September 2013?
R: No I did not. I was not in his chain of command.

**RETALIATION**
Q: When was the first time you learned that Mr. Laber had initiated this complaint?
R: It was when I was contacted for this interview, a few weeks ago.

Q: How did you first learn that Mr. Laber had initiated this complaint?
R: I received notice from the EEO Office that I would be interviewed.

Q: Prior to learning about this complaint, did you have knowledge of any other EEO activity that Mr. Laber had pursued?
R: No I did not. This is the first time I learned anything about his EEO activity.

Q: Prior to participating in this complaint, have **you** ever been involved in any other EEO activity? If so, when and what type of activity?
R: No, this is a first for me.

## DISABILITY
Q: Mr. Laber alleges that was disabled with a physical or mental impairment. What knowledge did you have of his apparent impairment?
R: I did not know that he had or has an impairment. If he has one, I have no knowledge of it at all.

## NON-SELECTION FOR CONTRACT SPECIALIST – SEPTEMBER 6, 2013
Q: Mr. Laber alleges he was discriminated against based on his age, religion, sex, disability, and EEO activity when he was not interviewed or selected for the position of Contract Specialist, Pay Band 05. Explain the knowledge and involvement you had in the selection action, including any/all decisions you made as a management official on behalf of the agency. What was your role in the selection process?
R: I was one of the panel members for the selection; I was the minority representativecandidate. There must be a minority represented on the panel, a female on the panel, etc. That was me.

Q: Who asked you to serve on the panel?
R: I think it was Dan Hinchberger

Q: Describe selection process.
R: We reviewed the resumes on our own, before we met as a group. We scored each resume from 1 to 10 (with 10 being the highest). Then we rank-ordered them, and turned in our scores to the panel chair (Mr. Hinchberger). Based on the number of applicants, we established a cutoff about who would be interviewed and who would not. I can't recall whether the panel had a discussion about that or not. We may have had some discussion about where the cutoff would be located. I can't recall whether our panel discussion was a formal thing, or just something that Mr. Hinchberger decided himself. I don't think we met as a panel until the interviews were held. I was aware that there was a cutoff, I just can't recall how we arrived at the cutoff. Once the cutoff was established, we had determined which candidates would be interviewed and which would not. We held interviews with maybe five people, but I'm not exactly sure. We scored each interviewee separately, and then after all of the interviews were done, we shared our scores with the group. The panel came to consensus for a recommendation on selection; we recommended Karen Eichelberger for selection. I think there was an alternate, but I can't remember who it was. Mr. Hinchberger took our recommendation forward to Ms. Crawford, who concurred with it. Ms. Eichelberger was offered the position and she took it.

Q: Who determined the criteria for the selection process?
R: I did not come up with the criteria for rating and ranking the resumes. We looked at the criteria in the job announcement (AON), and we cross-checked each resume to see if the candidate had met those criteria. The interview questions were already established by the time we did the interviews.

Q: Did the panel review, rate, and rank applicants' resumes?
R: Yes, we did rate and rank each resume on our own before we met as a group.

Q: Explain how the resumes were reviewed, rated, and ranked.
R: I reviewed each resume, reading each one a handful of times. I took each resume and reviewed it for key experiences, strengths, knowledge, skills, and abilities. Looking for how many times they had served in a lead position, training experience, holding a warrant, awards, recognition, and all the other specific criteria in the AON. We had to see if they met the criteria, and if so, at what level. The review and scoring is rated 1 to 10, but the determination is subjective. We always independently read the resumes and then assigned an overall number value based on what the particular job role and responsibilities will be. I don't remember how many applicants there were for the position, but I would imagine there were quite a few. Those types of positions don't open up that regularly. I would guess at least ten, if not more.

Q: How was Mr. Laber's resume and application reviewed, rated, and ranked?
R: It is hard for me to remember the details of my rating and ranking of Mr. Laber's resume. I know some of the things he did because at one point he worked for me. I can't recall the specifics of my rating for him, but I followed the same process with each applicant. It has been awhile since I did it, and I haven't seen his resume since then. I would imagine that he was probably close to getting an interview. I don't think he would have been in the lower part of the group. But I do remember that he did not make the cutoff for the interview. A lot of his prior experience was outside of the agency.

Q: Explain why Mr. Laber's resume and application was rated and ranked as it was.
R: Like I said above, I really don't remember the details.

Q: Were interviews conducted?
R: Yes

Q: Did the panel decide to interview Mr. Laber?
R: The panel did not interview Mr. Laber. The decision was based on the cutoff. Depending on where that line fell, we determined who was going to be interviewed. There was no conversation where we decided we were not going to interview him personally; he just did not make it above that cut point for the interviews.

Q: Did you, or the panel as a whole, make a recommendation to a selecting official?
R: Yes we did.

Q: Who did you make recommendation to?
R: The panel sent its recommendation to Ms. Tonya Crawford.

Q: Was the panel's recommendation followed by the selecting official?
R: Yes, Ms. Eichelberger was hired.

Q: Did you know Mr. Laber at the time of the selection?
R: Yes, I did.

Q: Did you know Mr. Laber's **AGE** at the time of the selection?
R: I knew him, but I did not know his exact age. I still don't know his exact age.

Q: Did you know Mr. Laber's **RELIGION** at the time of the selection?

R: Yes I did. He wears a yarmulke, so it is apparent to anyone who meets him.

Q: Did you know Mr. Laber's **SEX** at the time of the selection?
R: Yes I did.

Q: Did you know about Mr. Laber's **disabling condition** at the time of the selection?
R: No I did not; I still do not.

Q: Did you know Mr. Laber's **EEO activity** at the time of the selection?
R: No. I knew nothing about his EEO activity.

Q: Where did Mr. Laber rank among candidates who applied for the position?
R: I can't remember where he ranked overall, but I know that he did not make the cut for the interview.

Q: What was Mr. Laber lacking compared to the candidates who were interviewed?
R: I haven't looked at the materials for over a year, and I have not seen anybody's resume since that time. But I do know that Karen served as Contract Specialist on the floor, as Deputy Division Chief, and a lot of different projects. Without having the criteria in front of me, Ms. Eichelberger had been Deputy Division Chief. She had worked on some major contracts that were pretty significant in terms of impact to the agency. She was a team lead who had mentored others. She had a strong grasp of contracting; the regulations. She was very knowledgeable, and I recall that from her interview. I can't remember what the questions were, but I remember that she responded very well to the different scenarios that we put in front of her.

Q: What was Mr. Laber lacking compared to the candidate who was selected?
R: I don't know that he was lacking anything. His qualifications just were not at the same level as those who were interviewed. He had never been in an Acting Deputy Division Chief position. He had never led a large team as Ms. Eichelberger had. I think at some point he had been a Team Lead in positions outside of the agency. A Deputy Division Chief takes on a lot of responsibilities in terms of personnel, and acting for the Division Chief. It is a decision-making position for the management team with a large span of authority. A Team Lead typically has to come to a Deputy Division Chief to make decisions. The authority in terms of a warrant size is smaller for a Team Lead. Mr. Laber held a warrant, but I'm not sure if it was unlimited or not. A Deputy Division Chief usually gets there by demonstrating that they are suited for the position.

Q: Were you directed or persuaded to recommend a particular candidate?
R: No I was not.

Q: Were you directed or persuaded not to recommend a particular candidate?
R: No I was not.

Q: Was Mr. Laber's **AGE** a factor in your decision not to interview or select him? If yes, explain fully.
R: No

Q: Was Mr. Laber's **RELIGION** a factor in your decision not to interview or select him? If yes, explain fully.

R: No

Q: Was Mr. Laber's **SEX** a factor in your decision not to interview or select him? If yes, explain fully.
R: No

Q: During your tenure in the organization, how many times have you served as a panel member or a selecting official for an open position?
R: Numerous times. I was a hiring manager for NGA, so I did a lot. I have sat on panels outside of OCS.

Q: How many times have you selected an applicant **over** 40?
R: I am sure I have hired people who were over 40 and under 40, but I can't recall the exact figures. You don't know how old people are going into the process because that information is not provided to you.

~~Q: How many times have you selected an applicant **under** 40?~~
~~R R: I am sure I have hired people who were over 40 and under 40, but I can't recall the exact figures. You don't know how old people are going into the process because that information is not provided to you.~~

Q: Of the applicants you have selected, how many did you know the **religion** of?
R: I would say none. Besides Mr. Laber, I can remember one other person who came to interview for a different job who wore a yarmulke; I can't remember his name. But aside from obvious religious affiliations, there is no way to know applicants' religion and it is not something we are allowed to question.

Q: How many times have you selected a **male** applicant?
R: I can't say with any specificity, but I would guess that I have probably been party to selecting quite a few men.

Q: How many times have you selected a **female** applicant?
R: I can't say with any specificity, but I would guess that I have probably been party to selecting quite a few women. I would say that I have probably hired more women, simply because there are more women in the 1102 workforce.

Q: How many times have you selected an applicant who had a known **physical or mental impairment**, of which you were aware?
R: I don't know. Not all impairments are obvious, and most people don't come in and declare their condition or make it known. I can't recall anybody who had a clearly identifiable impairment. If I selected anybody with a physical or mental impairment, I would not have known they had it. I can't recall anyone applying that I knew to have a physical impairment.

Q: How many times have you selected an applicant who had EEO activity of which you were aware?
R: None. I would have no way of knowing anybody's EEO activity, especially not as part of a selection action.

Q: Was Mr. Laber's prior EEO activity a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No. I was not aware of his prior EEO activity.

Q: Was Mr. Laber's physical or mental impairment a factor in any decisions you made in the agency actions in this complaint?  If yes, explain fully.
R: No it was not. I am still not aware of any impairment he may have.

Mr. Laber testified that:
*"I am also alleging reprisal for filing EEO complaints with other agencies, and also FOIA and IG requests that are not EEO complaints, but which are interpreted negatively by management. Management was aware of my prior EEO complaints with other agencies."*

Q: What is your response?
R: I did not know anything about his EEO activity.

Mr. Laber testified that:
*"I imagine they [the panel members] entered scores that were not objective, so that I would not be interviewed for the position. If the scores had been more objective, I would have been interviewed or selected… I presume they will have scored me in a way that did not match my qualifications. I presume that they used their opinions about me rather than my actual experience. I have never been prevented from interviewing for any position I applied for at NGA. This was the first time that I was not interviewed for a position I applied for in the agency. I cannot believe that they could have objectively scored me lower than the people who were selected for an interview."*

Q: What is your response?
R: That is his opinion. I think we followed the rules, and there was no discussion about Stan Laber being excluded from an interview. If that's the way he sees things, I can't change it, and I respect it.

Mr. Laber testified that:
*"I do know that based on my experiences at NGA, and particularly these officials (Hinchberger, Unis, Verdon, Williams, Crawford), they act with impunity. If they believe that someone is too old, then they get nothing. If somebody filed a complaint, they get nothing. It is a very top-down driven organization."*

Q: What is your response?
R: Again, that is his opinion. I can't refute what he says. That's how he feels, but I don't agree. We see things from a different ~~angel~~ lense.

Mr. Laber testified that:
*"So anyone who has a negative view of me, based on my complaints, my religion, the way I look, the way I dress, they have an idealized view of what a supervisor is, and I didn't meet their views. In order not to select me, in order to discriminate against me, they took the scores and knocked them down a little bit. Then, they drew the line for interviews so that I would fall below that line. I would say that is discriminatory."*

Q: What is your response?
R: All I can say is that we did not do what he is alleging. We are all professionals with long careers in 1102, and we had a responsibility to select the individuals who were best suited for the job. In this case, there were other candidates who were rated/ranked, and interviewed and found to be better qualified. I believe that we chose the best candidate for the job. As a hiring manager, I take my responsibilities very seriously. I don't agree with his allegation.

Mr. Laber testified that:
*"I presume there was lobbying going on within the panel to push me farther down the list, so as not to interview me, so that I would not be selected. It is easier for them to say I did not make the cutoff for the interview. It places some distance between them and me."*

Q: What is your response?
R: See answer above. There was no lobbying. I think the process worked the way it was intended to work.

Mr. Laber testified that:
*"There was a consensus among our group that they wanted to hire younger, fresher leaders within OCS. There was a hire for Band 05 who was under 30; Johnathan Mostowski."*

Q: What is your response?
R: Well, Johnathan is Jewish, for one thing. The decision to hire Johnathan was done by a senior leader, the Director of Contracts who is now deceased. I was not part of that selection decision so I can't speak to it.

Mr. Laber testified that:
*"The leadership of OCS have a long history of shoving older employees into dead end positions, and not promoting them. The agency has a track record of promoting younger employees as opposed to older employees. They have a history of moving older employees to jobs that are less qualifying for future promotions."*

Q: What is your response?
R: I disagree with that allegation. Most of the OCS employees are eligible for retirement (about 60%). If we bring in younger people at the mid-career stage, it is for succession planning because our workforce is older.

Mr. Laber testified that:
*"I believe I have seen everyone who works within OCS, and none of them exhibit the religious dress and behaviors that I have. I wear a skull cap. I have an untrimmed and unkempt beard. I do not work on Jewish holidays. My manner of speaking is devoid of swear words. I do not shake hands with women. I don't make any physical contact with women. I guess there are a few more, but I am trying to think of what they are. I have not seen any other employees in the agency with those traits, mannerisms, or practices. So I presume that nobody who applied for the position had the same religious tenants or practices that I do."*

Q: What is your response?
R: I don't know that he can make that statement. There are other religions being practiced, so unless he knows about every employee's religious affiliation and practice, he can't possibly

make that claim. Whatever religious traits and practices he might have had nothing to do with our decision not to interview him.

Mr. Laber testified that:
*"I do my utmost to tell the truth, and not do anything inappropriate in my professional position. If there is something that I don't think is proper or according to regulation/law, I refuse to do it based on my religion. I think it is perceived as being uncooperative. When there is a contract action, and I don't believe it is an appropriate action, I won't sign it, and I will ask my supervisor to sign it. If something does not conform to regulations or public law, or I feel it is improper, I refuse to sign off on it. I tell my supervisor why I can't sign something, and then they sign it. But otherwise I am always cooperative. The reason I don't sign something is based on my religion. I have a high level of moral behavior, and if I don't think something is right, or should not have been done, or is not proper, then I don't do it. If I think something would bring disrespect against me, I won't do it. For example, there was an action that gave money to a contractor that I felt was improper. I did not want to sign it. I told my supervisor that I could not sign off on the action in good faith, and I prepared it for his signature. I don't think that was interpreted or received well. In the years I have been at NGA, I think that situation has happened about five or six times."*

Q: What is your response?
R: I don't think any of us in Contracting would want anyone to sign something that made them uncomfortable. I would never force anyone to sign anything. I would not sign anything if I felt uncomfortable about. But as far as him being retaliated against for his religion, that just does not make sense to me. I would never want anybody to put themselves in a situation where their character was called into question. I can't speak about his experience. Everybody has a right to speak up if they feel uncomfortable with an action. Nobody is forced to do anything they don't agree with.

Mr. Laber testified that:
*"Most selectees in OCS are female, particularly those with military experience. For example, Tonya Crawford is a female with military experience. So she prefers to select females."*

Q: What is your response?
R: I don't know that we have a lot of females with military experience. Ms. Crawford usually goes with the recommendation of the panels. Because of the number of women in the 1102 career field, there may seem to be more women being selected. It is a career field with a high number of women in it. But that does not mean the hiring is biased toward women. Ms. Crawford is the only woman I know in ~~of at~~ NGA Contracting who has a military background.

Mr. Laber testified that:
*"Even though the panel does the selection, Ms. Crawford gives the team lead of the panel what she is looking for, and which of the applicants should be selected. Most likely, it is discrimination from the top-down, from Ms. Crawford. She probably did not want to have to interview me, and she probably gave the panel instructions about that. The panel acts with impunity."*

Q: What is your response?

R: Well, Ms. Crawford never does the interviews herself unless it is for a senior level position. She does not give instructions to the panel. I did not speak to her one time on any of the selection process. I do not agree with his allegation. Ms. Crawford never approached me to have any conversations about any of the applicants.

Q: Do you have anything to add that is relevant to the accepted claim?
R: No

END OF STATEMENT

I, **Johnetta Williams,** declare (*certify, verify or state*) under penalty of perjury, that the foregoing is true and correct.

_____     _____
Declarant's Signature                              7.10.2014
                                                          Date

# Exhibit 15

# Declaration under Penalty of Perjury

I, Johnetta Williams, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ADDITIONAL DECLARATION

**Q:** What method of recruitment was used to fill this vacancy, open competitive or promotion, if you recall?

**A:** This recruitment was an open competition throughout NGA.

**Q:** Were selection criteria developed and utilized in the assessment of those qualified applicants meriting an interview?

**A:** AON 20130928 identified mandatory and desirable qualifications which were used in assessing each applicant.

**Q:** If so, what were the selection criteria?

**A:** As stated above, the AON listed mandatory qualifications related to education and experience which an applicant had to demonstrate to even be considered as minimally qualified to be considered for the position. The AON also listed desirable qualifications; an applicant needed to show knowledge

*Page 1 of 3 Pages*
Declarant's Initials *JBW*

and experience in leadership, strategic thinking, and organizational representation, to name a few, as additional criteria in which to assess the applicants.

**Q:**  Who informed the panelists of the selection criteria to be used in rating the applicants?

**A:**  The AON informed applicants and panelists of the selection criteria to be assessed.

**Q:**  Were any of the selection criteria weighted (of more importance) than the others?

**A:**  Not that I now recall.

**Q:**  The attached 1-9 rating scale was the standard provided by HD for evaluating selection criteria. Was this scale used by you in assessing the applicants for the vacant positions?

**A:**  Yes, I used the 1-9 scale.

**Q:**  If so, does the commentary corresponding to the numbers reflect the standard you used in this case?

**A:**  Yes.

**Q:** To the best of your recollection, and after review of your notes and your affidavit, please explain the basis for your rating as to each of the seven applicants, and then compare each to your assessment of Mr. Laber, distinguishing the basis of his rating from the interviewees.

**A:**  What I wrote in the affidavit and in my interview notes is my record of what occurred during the process. It is hard to do another analysis of the data six years later.

**Q:**  Do you have any additional comments as to the reasoning behind how your ratings were reached?

**A:**  No, I do not have any additional comments.

**Q:**       Mr. Laber is contending that the panel members knew his religion and religious beliefs (knew that he was Jewish) from the workplace and from his personal interaction with the panel members. So, even though the resumes do not report out an applicant's beliefs, he contends that the panel knew from personal interactions with him and held his faith as an exclusionary factor. The question I have for you is whether or not you knew of the religion or religious beliefs of any of the other people selected for interview from perhaps your personal interaction with the

applicant in the work place.  If so, do you happen to know if any of those interviewed were of the Jewish faith?

**A:** I do not know the religious beliefs of the applicants except as to Mr. Laber.  I did know that Mr. Laber was Jewish.  He had informed me of his religious preference, but it was not a factor in his non-selection.  Religion was not even discussed in the course of assessing the candidates' packages.

### END OF STATEMENT

I, JOHNETTA WILLIAMS, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my information and knowledge.

williams johnetta b williamjb

Digitally signed by williams johnetta b williamjb
DN: c=US, o=U.S. Government, ou=DoD, ou=NGA,
ou=People, cn=williams johnetta b williamjb
Date: 2019.08.06 12:04:29 -04'00'

_____
(Declarant's Signature)

August 06, 2019
_____
(Date)

*Page* 3 *of* 3 *Pages*
Declarant's Initials _JBW_

# Exhibit 16

## Declaration under Penalty of Perjury

I, Daniel E. Hinchberger, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

## ADDITIONAL DECLARATION

---

**Q:** What method of recruitment was used to fill this vacancy, open competitive or promotion, if you recall?

**A:** I reviewed the original AON provided with your email and it confirmed my recollection that the method was competitive, but limited to NGA Government.

**Q:** Were selection criteria developed and utilized in the assessment of those qualified applicants meriting an interview?

**A:** Selection criteria were developed. There were mandatory and desirable criteria. They were utilized by the panel.

**Q:** If so, what were the selection criteria?

**A:** I cannot recall the specific criteria. However, they are detailed in the copy of the announcement provided with these questions.

**Q:** Who informed the panelists of the selection criteria to be used in rating the applicants?

**A:** Panelists were likely provided a copy of the AON which included the criteria. I cannot recall who provided the AON to them.

**Q:** Were any of the selection criteria weighted (of more importance) than the others?

**A:** I believe the only distinct difference in importance would have been between those criteria identified as 'mandatory' and those identified as 'desirable.'

**Q:** The attached 1-9 rating scale was the standard provided by HD for evaluating selection criteria. Was this scale used by you in assessing the applicants for the vacant positions?

**A:** I used the 1-9 rating scale in my assessments.

**Q:** If so, does the commentary corresponding to the numbers reflect the standard you used in this case?

**A:** Initial Response: do not have access to the 1-9 rating scale with associated narratives used in the subject AON evaluations, but would have evaluated using the rating scale provided at the time. Follow-up Response: The rating scale was provided subsequent to my initial response. I think the best I can offer is that it looks familiar and assuming it is was provided by HD in 2013, I would have used it to develop my evaluation scores.

**Q:** To the best of your recollections, and after review of your notes and your affidavit, please explain the basis for your rating as to each of the seven applicants, and then compare each to your assessment of Mr. Laber, distinguishing the basis of his rating from the interviewees.

**A:** After review of my notes, I don't believe I can recapture a contemporaneous buildup of the complete rational that led to my final rating of each candidate. I do recall a few isolated thoughts I had at the time, but can't characterize the extent to which they contributed to my final rating.
   a. Karen Eichelberger: I believe my rating of Ms. Eichelberger was based in part on her demonstrated ability to lead contracting professionals and manage a broad array of acquisition efforts.
   b. Danita Ladson: I believe my rating of Ms. Ladson was based in part on her ability to lead a large acquisition team and manage the IFSP acquisition from start to finish.

c.  Stan Laber: I believe my rating of Mr. Laber was based in part on the extent of his demonstrated leadership, i.e., he had demonstrated a level of leadership that was consistent with the rating given.

**Q:** Do you have any additional comments as to the reasoning behind how your ratings were reached?

**A:** No

Q:  Do you recall drafting a document summarizing the panel's assessment of each candidate and rationale for final selection?  If so, was the document approved by the Director, OCS?  Would you still happen to have a copy of it in your documents file as it is not in the Human Directorate recruitment records?

A:  I searched my files and could not find a selection document. I do not remember drafting a selection document.

Q:  Mr. Laber is contending that the panel members knew his religion and religious beliefs (knew that he was Jewish) from the workplace and from his personal interaction with the panel members.  So, even though the resumes do not report out an applicant's beliefs, he contends that the panel knew from personal interactions with him and held his faith as an exclusionary factor. The question I have for you is whether or not you knew of the religion or religious beliefs of any of the other people selected for interview from perhaps your personal interaction with the applicant in the work place.  If so, do you happen to know if any of those interviewed happened to be of the religion or religious beliefs espoused by Complainant?

A:  I don't recall having any knowledge of the religion of any of the other interview selectees. Of the seven we selected for interview, I know that at least two were over forty and one was male.

END OF STATEMENT

I, DANIEL HINCHBERGER, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my information and knowledge.

_____
(Declarant's Signature)

_____
(Date)

*Page 3 of 3 Pages*
Declarant's Initials_____

# Exhibit 17

## Declaration under Penalty of Perjury

I, Richard Unis, in accordance with 28 U.S.C. Section 1746, make the following statement:

EFFECTS OF NONDISCLOSURE: *Military members and civilian employees of the Department of Defense (DoD) and its components and agencies are obligated to cooperate in official investigations and may be subjected to administrative action for failing to do so. If I am not a military member or civilian employee of DoD, the disclosure of information by me is voluntary; however, my failure to respond will result in a recommended disposition of the case on the basis of information available.*

*AUTHORITY: The authority to collect the information requested is derived from one or more of the following: Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 5, United States Code, Sections 1302, 1303, 1304, 3301, and 3302; Executive Order 11478, as amended; Executive Order 10577; and 29 CFR 1614.*

*PURPOSE AND USES: The information supplied will be used as a part of the record in an equal employment opportunity discrimination complaint. The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint. The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to Department of Defense, to Federal intelligence agencies, or to others as may be published in the Federal Register.*

### ADDITIONAL DECLARATION

**Q:** What method of recruitment was used to fill this vacancy, open competitive or promotion, if you recall?

**A:** An internal NGA Vacancy Announcement was issued to recruit candidates for the open position of Supervisory Contract Specialist. It was competitive and was open to all qualified candidates within NGA.

**Q:** Were selection criteria developed and utilized in the assessment of those qualified applicants meriting an interview?

**A:** The Vacancy Announcement contained the mandatory qualification criteria which were used by the panel to evaluate each applicant.

**Q:** If so, what were the selection criteria?

A:  The selection criteria was as follows: "The Office of Contract Services (OCS) seeks applicants with extensive hands-on contracting experience including major systems, base operations or complex programs and strong supervisory skills to provide creative leadership in fulfilling NGA's mission.  The selected candidate shall provide business advice, contractual guidance, and supervisory oversight while serving as a Supervisory Contracting Officer with an OCS Division.  Responsibilities include ensuring that all acquisition activity is executed ethically, legally, efficiently and effectively; and in accordance with applicable DoD policies and procedures.  As a supervisor, responsibilities will include leading, mentoring and coaching a diverse workforce that may consist of DoD civilian, active duty contracting professionals, and other support personnel.  Individuals must demonstrate the experience, training and education, judgment, dependability, character and business acumen necessary to be delegated unlimited DoD signatory authority, including the authority to compete, negotiate, award, administer, and terminate NGA contracts.  Applicants must be free of conflicts of interest and be able to obtain access at various security clearance levels.  Strong leadership skills are required, as well as professional knowledge of contract law, policy and procedures.  This position meets the OPM definition for the contracting series (GS-1102) and applicants must be able to verify that they meet applicable DAWIA certification requirements for the contracting field.  The selected individual will be the candidate(s) who, overall, provides the best fit with the requirements included above, and other mandatory and desired criteria, as stated within this announcement.

Mandatory Qualification Criteria.  For this particular job, applicants must meet all competencies reflected under the Mandatory Qualification Criteria to include education (if required).  Online resumes must demonstrate qualification by providing specific examples and associated results, in response to the announcement's mandatory criteria specified in this vacancy announcement:

1) Experience in applying the Federal Acquisition Regulation (FAR) and DoD Federal Acquisition Regulation Supplement (DFARS) to acquisition processes;
2) Contracting for a variety of products and services for major systems and/or complex programs using a wide range of contracting methodologies such as negotiated contract and commercial acquisition procedures;
3) Managing contract actions from conception to implementation with experience and knowledge of source selection procedures/competitive contract actions, cost or price analysis, negotiations, or preparation of related contract documentation;
4) Advising the Agency on the acceptability and applicability of contractual terms, or contracting types;
5) Ability to negotiate contracts while applying policies and Directives.

Education Requirement:  Bachelor's degree in any field that includes; or has been supplemented by, at least 24 semester (36 quarter) hours of coursework in a business related field such as Accounting, Business Administration, Contracts, Economics, Finance, Law, Purchasing or a related discipline.  Reference 10 USC Section 1474 for exceptions and waivers."

Q:  Who informed the panelists of the selection criteria to be used in rating the applicants?

*Page 2 of 4 Pages*
Declarant's Initials *KEU*

**A:** The criteria was expressly stated in the Vacancy Announcement.

**Q:** Were any of the selection criteria weighted (of more importance) than the others?

**A:** The mandatory criteria was more important than the desirable qualifications/criteria.

**Q:** The attached 1-9 rating scale was the standard provided by HD for evaluating selection criteria. Was this scale used by you in assessing the applicants for the vacant positions?

**A:** Yes, the standard 1-9 rating scale was used by the panel to evaluate applicants.

**Q:** If so, does the commentary corresponding to the numbers reflect the standard you used in this case?

**A:** Yes, the rating scale descriptor matched the scale that was used by the panel.

**Q:** To the best of your recollection, and after review of your notes and your affidavit, please explain the basis for your rating as to each of the seven applicants, and then compare each to your assessment of Mr. Laber, distinguishing the basis of his rating from the interviewees.

**A:** I no longer have the resume's that were submitted for this Vacancy Announcement to refer to and since the scoresheet is redacted, it is not possible for me to compare and contrast each of the interviewees with Mr. Laber's qualifications. After reviewing my affidavit it is apparent that I rated at least 9 candidates, who had significantly more relevant contracting experience, well ahead of Mr. Laber. As stated in my affidavit, this position was a senior level supervisory team lead position that requires the successful applicant to have significant depth and breadth of contracting experience.

**Q:** Do you have any additional comments as to the reasoning behind how your ratings were reached?

**A:** I have no additional comments relative to my evaluation and scoring of the candidates.

Q:  Mr. Laber is contending that the panel members knew his religion and religious beliefs (knew that he was Jewish) from the workplace and from his personal interaction with the panel members. So, even though the resumes do not report out an applicant's beliefs, he contends that the panel knew his religious affiliation from personal interactions with him and held his faith as an exclusionary factor. The question I have for you is whether or not you knew of the religion or

religious beliefs of any of the other people selected for interview from perhaps your personal interaction with the applicant in the work place. If so, do you happen to know if any of those interviewed claimed Judaism as their religious faith?

A: I believe Ms. Dyah Goodman is Jewish. I know that her family background is Israeli. She used to be one of my team leads. She was one of the top candidates for this particular position and was interviewed by the panel. Although she wasn't selected for this particular position, she has since been promoted to PB5.


END OF STATEMENT


I, RICHARD UNIS, declare under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my information and knowledge.

_____          _____
(Declarant's Signature)                              31 Jul 2019
                                                          (Date)

# Exhibit 18

**Selection Profile Score**

| Rating | Rating Scale Descriptor |
|---|---|
| 9 | Greatly exceeds the desired skills and competencies and exhibits greater performance-based potential than all but a few employees |
| 8 | |
| 7 | Exceeds the desired skills and competencies and exhibits more performance-based potential than most employees |
| 6 | |
| 5 | Meets all of the desired skills and competencies and exhibits about the same performance-based potential as most employees |
| 4 | |
| 3 | Meets some of desired skills and competencies and exhibits less performance-based potential than most employees |
| 2 | |
| 1 | Does not posses the desired skills and competencies and exhibits lower performance-based potential than all but a few employees |

# Exhibit 19

## Maxey George P Esq NGA ODEE USA GOV

| | |
|---|---|
| **From:** | Devine Jessica M NGA HDCTR USA GOV |
| **Sent:** | Monday, July 22, 2019 9:59 AM |
| **To:** | Maxey George P Esq NGA ODEE USA GOV |
| **Subject:** | Religious Data |

Classification: UNCLASSIFIED
=======================================================

Good morning again Phil,

Per our conversation, I have confirmed with the PeopleSoft Team that religious data is not maintained in the NGA HR database (PeopleSoft).

Please let me know if I can assist further.

v/r
Jessica

*Jessica Devine*

Employee Relations Branch Lead|Ph: 314-676-3214|Secure: 577-5695
Team Line|Ph: 571-557-8042|Secure: 577-4955



Employee Relations Website
NGA Supervisory Council

PERSONAL DATA – PRIVACY ACT OF 1974
*Information contained in this email and/or attachments contain personally identifiable information and is for official use only. If you have received this email in error, please advise the sender immediately and delete the entire message together with all attachments. All unintended recipients are hereby advised that any use, distribution, copying or any other action regarding this email is strictly prohibited. Unauthorized dissemination or use of personally identifiable information is a violation of Federal law. Individuals in violation may be subject to fines, disciplinary actions or both. (P.L. 93-579).*

=======================================================
Classification: UNCLASSIFIED

1

# Exhibit 20

## AON Promotion Panel Worksheet

**AON Number:** 20130928          **Band Level:** 5

Note 1.  The average panel score from the initial rating of resumes is the final score used to determine the best qualified candidates.  However, if the panel decides to hold interviews, members must reasess each best qualified applicant based his/her application package and also, on responses to interview questions and other available information using the "whole person" concept.

Note 2.  If interviews are conducted, panel members should document their assessments of the interview on the Individual Rating Form.

Note 3.  Round and enter the closest whole number.

Note 4.  Please Do Not Modify This Sheet

| | Initial Resume Rating | | | | | Final Reassessed Package Score (Whole Person Concept) | | | | | Selection | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Panel Members Scores (1-9) | | | | | | Panel Members Reassessed Scores (1-9) | | | | | |
| Applicant | Hinchberger | Unis | Verdon | Williams | Average | Hinchberger | Unis | Verdon | Williams | Average | Selectee | Alternate |
| Michael, Cassandra | 7 | 9 | 7 | 7 | 8 | 5 | 6 | 5 | 6 | 6 | Eichelberger* | Ladson |
| Hill, Patricia | 6 | 8 | 8 | 6 | 7 | 4 | 6 | 6 | 6 | 6 | | |
| Smith, Cathy | 8 | 7 | 8 | 7 | 8 | 7 | 7 | 7 | 7 | 7 | | |
| Goodman, Dyah | 6 | 8 | 7 | 6 | 7 | 7 | 8 | 7 | ~7 | 7 | | |
| Larman, Joey | 6 | 8 | 6 | 6 | 7 | 7 | 7 | 7 | 8 | 7 | | |
| Eichelberger, Karen | 9 | 8 | 9 | 8 | 9 | 8 | 7 | 8 | 8 | 8 | | |
| Ladson, Danita | 7 | 9 | 8 | 7 | 8 | 8 | 8 | 8 | 8 | 8 | | |
| Lambert, Howard | 6 | 7 | 5 | 5 | 6 | | | | | #DIV/0! | | |

Note: While Eichelberger and Ladson were equally ranked by The panel, The panel selected Eichelberger based on demonstrated successful experience providing leadership at The OCS division level.

# Exhibit 21

UNCLASSIFIED//FOUO//NONE

## National Geospatial-Intelligence Agency

### Internal Resume

**Name:** Eichelberger,Karen L
**Location:** Springfield, VA

**Employee Id:** 1013381
**Current Dept Id:** OCSR

### Job History

| Date | Assignment | DeptId | PayPlan | Bnd/Grd | Location |
|------|-----------|--------|---------|---------|----------|
| 01/13/2013 | Supv Contract Specialist-DAWIA | OCSR | IA | 04 | Springfield |
| 07/29/2012 | Supv Contract Specialist-DAWIA | OCSR | IA | 04 | Springfield |
| 12/05/2011 | Supv Contract Specialist-DAWIA | ACR | IA | 04 | Springfield |
| 12/04/2011 | Contract Specialist-DAWIA | ACR | IA | 04 | Springfield |
| 02/27/2011 | Contract Specialist-DAWIA | ACF | IA | 04 | Springfield |
| 09/18/2005 | Contract Specialist-DAWIA | ACA | NI | 04 | Washington |
| 05/16/2004 | Supv Contract Specialist-DAWIA | ACW | NI | 04 | Bethesda |
| 07/14/2002 | Contract Specialist-DAWIA | ACW | NI | 04 | Bethesda |
| 12/16/2001 | Acquisition (Contract Specialist) | ACW | NI | 04 | Bethesda |
| 04/23/2000 | Acquisition (Contract Specialist) | PCA | NI | 04 | Bethesda |

### Education

| As of Date | Education Level | Major | School |
|------------|----------------|-------|--------|
| 05/1984 | Associate Degree | Business Management | Prince Georges Community Coll |

### Licenses and Certifications

| Type | Description | Issue Date | Expiration Date |
|------|-------------|------------|-----------------|
| DAWIA | Contracting  Level III | 02/05/2001 | |

### Training

| Date | Course |
|------|--------|
| 09/30/2013 | DAWIA ACQ 101 Fundamentals of Systems Acquisition Management - CBT |
| 03/26/2013 | Matrix - Contract Funds Status Report (CFSR) |
| 01/17/2013 | DoD Government Purchase Card Refresher Training CLG004 Section : 888 |
| 10/09/2012 | Cost Accumulation Framework (CAF) |
| 03/29/2012 | Fiscal Law |
| 03/07/2012 | Federal Appropriations Law Training |
| 02/10/2012 | Performance Management for NGA Supervisors |
| 01/19/2012 | Matrix - Best Value Source Selection |
| 04/15/2010 | Advanced Negotiations (FT-091) |
| 08/03/2006 | Managing Cost Reimbursement Contracts |
| 01/22/2004 | Financial Resource Management |
| 03/27/2003 | Business Briefing Techniques |
| 03/21/2003 | DAWIA CON 244 Construction Contracting |
| 04/19/2002 | DAWIA CON 243 Architect-Engineer Contracting |
| 11/08/2001 | DAWIA GRT 201 Grants And Agreements Management |
| 06/29/2001 | Leadership Lessons from Lincoln |
| 06/30/2000 | Executive Contracting |
| 05/09/2000 | Performance Based Contracting |

### Honors and Awards

| Date | Type | Justification |
|------|------|---------------|
| 04/21/2013 | Individual Time Off Award | For invaluable support to the DSC 2  contract |
| 12/08/2012 | Joint Meritorious Unit Award | Dedicated and professional intelligence support to the Nation |
| 03/27/2011 | Individual Time Off Award | Above and beyond efforts assoc. with AC move to NCE |
| 10/24/2010 | Individual Cash Award | Support to Office of Security during negotiations and extention |
| 08/02/2009 | Individual Time Off Award | AMR team finish its review of FY08 action and found files of notable. |
| 07/19/2009 | Individual Cash Award | IR&D team is recognized for their outstanding help to the InnoVision. |
| 12/09/2007 | Individual Cash Award | For providing leadership to the BRITE program office. |
| 10/26/2007 | Meritorious Unit Citation | InnoVision Research and Development Contract Team |
| 07/22/2007 | Individual Cash Award | For support to the InnoVision Research and Development program. |
| 08/06/2006 | Individual Cash Award | Provided leadership req'd to meet the aggressive schedule of SMARTS |
| 05/29/2005 | Individual Cash Award | Team Member of the Quarter - Category II |
| 11/28/2004 | Individual Cash Award | Outstanding service to NGA in awarding the Reston I & II O&M contract. |

UNCLASSIFIED//FOUO//NONE

UNCLASSIFIED//FOUO//NONE

# National Geospatial-Intelligence Agency

## Internal Resume

**Name:** Eichelberger,Karen L
**Location:** Springfield, VA

**Employee Id:** 1013381
**Current Dept Id:** OCSR

### Honors and Awards

| Date | Type | Justification |
|---|---|---|
| 07/25/2004 | Individual Cash Award | SI Group Cash Award |
| 08/10/2003 | Individual Cash Award | Acting Chief of ACW 2-28 May 2003. |
| 04/20/2003 | Individual Cash Award | 2nd QTR Quarterly Award for Leadership |

### Performance Ratings

| Review Date | Rating | Description | Organization | Band | Org. Band Average |
|---|---|---|---|---|---|
| 09/30/2012 | 4.1 | Excellent | (Weighted Avg) | 04 | |
| 09/30/2011 | 3.7 | Excellent | A | 04 | 3.6 |
| 09/30/2010 | 3.5 | Successful | A | 04 | 3.5 |

### Resume Narrative

I have experience in leading, coaching and mentoring people towards meeting the organizations vision, mission and goals. Due to my strong leadership skills I was asked to serve as Deputy Chief of OCSR and previously as the Deputy Chief of ACW. I have provided an inclusive workforce that fosters the development of others, facilitates cooperation and teamwork, and supports constructive resolution of conflicts. In addition to being the OCSR Deputy Chief, I currently lead the Remote Sensing/Readiness Team of eight (2 senior contracting officers, 6 mid-level to junior contract specialists and one intern) and as the Deputy Chief of ACW lead a diverse team of up to 22 supervisors, military, senior, and junior contract specialists and purchasing agents. While continuously providing feedback and opportunities to learn through formal and informal methods I helped develop a team that was able to manage diverse acquisition requests and customize procurements for a wide range of mission critical requirements using various contract instruments to meet the needs of our customers. Through mentoring and coaching I developed a team that improved acquisition planning, contract administration and customer service skills. During fiscal year 2012 I directly oversaw or supported the award and administration of 18 active commercial imagery contracts and task orders supporting Source (value $8.8B), 19 active contracts, task orders, calls, purchase orders and delivery orders supporting the Military Support Directorate (value $245M), and 6 active task orders supporting the Safety of Navigation Office (value $31M).

I'm responsible for performance plans and evaluations, mid-point reviews, setting employee expectations, and developing employees within the Defense Workforce Acquisition Improvement Act (DAWIA) and the DAWIA Acquisition career certification programs. I manage the team based on organizational goals and staffing needs ensuring employees are appropriately selected for work assignments, appraised and rewarded. The team is cohesive and flexible, assisting each other until the job gets done.

I have demonstrated the experience, training and education, judgment, dependability, character, and business acumen necessary to be delegated the authority to award, administer, terminate, compete, negotiate and make determinations and findings for contract actions with an unlimited DoD signatory authority since 2002 and held a DCI warrant for individual actions up to $10M. I possess a DAWIA Level III Certification in Contracting and I'm currently pursuing DAWIA Level I Program Management Certification. I have over 18 years of experience as an 1102 Contract Specialist applying the Federal Acquisition Regulation (FAR), DoD Federal Acquisition Regulation Supplements (DFARS), local policy and directives to acquisition processes. I have extensive hands-on contracting experience including systems, base operations and complex programs where I routinely provide business advice, contractual guidance, and supervisory oversight while serving as a Supervisory Contract Specialist.

My experience includes contracting for a variety of products and services for complex programs using a wide range of contracting methodologies. Examples include Request for Proposals, Best Value, Lowest Price Technically Acceptable, Small Business Innovative Research (SBIR), Broad Agency Announcements, Sole Source, Firm Fixed Price (FFP), FFP Level of Effort, Cost-Plus-Fixed-Fee Term/Completion, Cost-Plus-Award-Fee, Performance Based, Time & Materials, Labor Hour, Letter, Indefinite Delivery/Indefinite Quantity (IDIQ), Blanket Purchase Agreements, Basic Ordering Agreements, Grants, Delivery Orders, Purchase Orders, and credit card buys. I manage contract actions from conception to implementation with experience and knowledge of source selection procedures, competitive contract actions, cost and price analysis, and negotiations such as the Support to Management and Resources for Technical Services (SMARTS) multiple award IDIQ contracts and more recently worked with MS in preparing Acquisition Strategy Panel, NGA Procurement Board and NGA Acquisition Review Board briefings for the Deployed Logistics Support 2 source selection insuring key players were involved.

I ensure all acquisition activity is executed ethically, legally, efficiently and effectively; and in accordance with applicable policies and procedures. My demonstration of these abilities earned my appointment as an Independent Contracting Officer Reviewer (ICOR) in 2012, wherein I was entrusted with the responsibility of reviewing and certifying that solicitations and contracts comply with all applicable regulations.

As the Contracting Officer for the IR&D DCI contract for Geospatial Intelligence Scientific and Subject Matter Experts and S&T Laboratory Prototyping there was a need under the program to send contractor's into theater; however, none of the four contract vehicles under the program were written to include such support. The program office was informed it would take months to research and modify a contract to cover this support as there was no guidance at the time from within the agency and little was known about the process. The program office approached me and I took on the challenge of researching the process, working with the USCENTCOM Theater Business Clearance point of contact, legal counsel, and the program office to modify the contract and statement of work to achieve Theater Business Clearance approval for the USCENTCOM Area of Responsibility in a few short weeks. This allowed the program office to get contracted support in the field and meet their mission.

When the former OCSR team was reorganized (2012) it took over the contract support for the Military Support Directorate where the team was inundated with small purchases, commercial items, General Services Administration and Government wide Acquisition Contract buys. Some examples of these purchases include spectrum analyzers, antennas, shredders, electric forklifts, memory, a utility vehicle and plotters. The team was behind the learning curve as they were

UNCLASSIFIED//FOUO//NONE

## National Geospatial-Intelligence Agency

### Internal Resume

| | | | |
|---|---|---|---|
| **Name:** | Eichelberger,Karen L | **Employee Id:** | 1013381 |
| **Location:** | Springfield, VA | **Current Dept Id:** | OCSR |

administering lager contract vehicles and we had to learn or re-familiarize ourselves with the applicable regulations.  To facilitate a faster turnaround time for these purchase I developed a check sheet of all the DFARS and local clauses and provisions that were required, depending on the dollar threshold. This action streamlined our efforts in creating solicitations, requests for quotes, awards, etc.  The team took ownership of this tool and keeps it updated as regulations change.

As a supervisor I'm responsible for the planning, directing, assigning, leading and monitoring the work of the unit.  I regularly meet with customers to review/discuss spend plans and report findings to management.  I interact regularly with customers to keep current with their mission needs and ascertain if support is or will be available to properly support their requirements.  After moving on to other groups or projects former customers will often call on me for advice as I have gained their trust and respect.  I ensure the technical quality and timeliness of the work produced by employees in the unit, collaborating with others across the organization.  At the end of the 2012 calendar year I was working to administratively reissue an IDIQ contract and two orders under a stringent deadline.  The initial guidance and Standard Operating Procedure (SOP) was geared toward "C" type contract vehicles and many nuances of this process were not addressed for IDIQ's.  I worked closely with the policy staff to address these differences and as these nuances were discovered, reported, and resolved, the SOP was continuously updated.  One team member received an award for his efforts working the administrative reissue of the contracts.

When OCSR was more recently reorganized (2013) the team dynamics changed significantly, with new team members and a new customer - InnoVision.  Two teams were developed under OCSR, one supporting Remote Sensing (Source) and Readiness (Military Support), and one supporting Research & Development (InnoVision). With so many changing requirements and budget fluctuations it didn't appear feasible to divide the work according to the two separate teams and keep everyone fully engaged and more importantly develop their contracting skills with maximum results.  I have been able to maximize the organizations resources by dividing the work efforts based on skill level, knowledge, and ability, while providing more efficient support to our customer groups with this diverse involvement fostering the team's ability to network and partner in order to build strategic relationships.

UNCLASSIFIED//FOUO//NONE

# National Geospatial-Intelligence Agency

## Internal Resume

**Name:** Eichelberger,Karen L
**Location:** Springfield, VA

**Employee Id:** 1013381
**Current Dept Id:** OCSR

### Optional Cover Letter Text

Karen L. Eichelberger
NGA OCSR
571-557-2366
Karen.L.Eichelberger@nga.mil
Karen.L.Eichelberger@nga.ic.gov

June 27, 2013

Dear Mr. Hinchberger,

I respectfully request to be considered for your Supervisory Contract Specialist position AON 20130928 within the Office of Contract Services. My resume is enclosed for your review and consideration. Given my related experience and capabilities as a Supervisory Contract Specialist my skills are a great fit for this position.

I have over 18 years of experience as an 1102 Contract Specialist applying the Federal Acquisition Regulations, DoD Federal Acquisition Regulation Supplements, local policy and directives to acquisition processes. I have extensive hands-on contracting experience including systems, base operations, and complex programs where I routinely provide business advice, contractual guidance, and supervisory oversight while serving in my current leadership role.

I have experience in leading, coaching and mentoring a diverse team of up to 22 supervisors, military, senior, and junior contract specialists, purchasing agents, and interns towards meeting the organizations vision, mission and goals.

I have always enjoyed the opportunity to grow professionally and, as a result, my professional expertise has evolved over the years. I feel this has given me greater insight into the responsibilities I have successfully taken on.

I appreciate your time to review my credentials and experience.

Sincerely,

Karen L. Eichelberger

# Exhibit 22

**Cunningham Gloria J NGA-ODEE USA CIV**

| | |
|---|---|
| **From:** | Laber Stan P NGA-OCSP USA CIV |
| **Sent:** | Tuesday, October 15, 2013 9:58 AM |
| **To:** | Cunningham Gloria J NGA-ODEE USA CIV |
| **Subject:** | FW: RECENT B5 AON |

v/r
Stan Laber
OCS
COR/COTR Program Support
571-557-1075

-----Original Message-----
From: Hinchberger Daniel E Mr NGA-OCS USA CIV
Sent: Monday, September 16, 2013 1:43 PM
To: Laber Stan P NGA-OCSP USA CIV
Cc: Verdon Tamara J Ms NGA-OCS USA CIV; Unis Richard E NGA-OCSR USA CIV; Williams Johnetta B Ms NGA-OCSJ USA CIV
Subject: RE: RECENT B5 AON

Stan,

My apologies for taking a few days to get back. It is not agency policy to provide those numbers. I would be happy to provide you more substantive feedback...or, you can talk to anyone else on the panel if you wish.

Sincerely,
Dan

-----Original Message-----
From: Laber Stan P NGA-OCSP USA CIV
Sent: Monday, September 09, 2013 3:10 PM
To: Hinchberger Daniel E Mr NGA-OCS USA CIV
Cc: Verdon Tamara J Ms NGA-OCS USA CIV; Unis Richard E NGA-OCSR USA CIV; Williams Johnetta B Ms NGA-OCSJ USA CIV
Subject: RE: RECENT B5 AON

Thanks. Can you please provide my rating and ranking and what rating and ranking was needed to be interviewed?
Stan

-----Original Message-----
From: Hinchberger Daniel E Mr NGA-OCS USA CIV
Sent: Friday, September 06, 2013 9:03 AM
To: Laber Stan P NGA-OCSP USA CIV
Cc: Verdon Tamara J Ms NGA-OCS USA CIV; Unis Richard E NGA-OCSR USA CIV; Williams Johnetta B Ms NGA-OCSJ USA CIV
Subject: RE: RECENT B5 AON

Stan,

1

**18**

000030

I would like to thank you personally for applying to our recent B5 Contract Specialist AON. We received numerous outstanding applications. The panel's decisions regarding which candidates were selected for interview as well as the candidate that will ultimately be selected were equally difficult as the ratings and rankings of the applications were very competitive. Ultimately, we decided not to interview all candidates. I strongly encourage you to continue to apply for future opportunities. The panel members for this AON were Rich Unis, Tammy Verdon, Johnetta Williams and myself. Please feel free to schedule an appointment with one of the panel members to get feedback on how to strengthen your resume for future opportunities.

Sincerely,
Dan Hinchberger

000031

# Exhibit 23

**Cunningham Gloria J NGA-ODEE USA CIV**

| | |
|---|---|
| **From:** | Laber Stan P NGA-OCSP USA CIV |
| **Sent:** | Tuesday, October 15, 2013 9:19 AM |
| **To:** | Williams Shaun D NGA-ODEE USA CIV; Cunningham Gloria J NGA-ODEE USA CIV; Goodwin Margaret J Mrs NGA-ODEE USA CIV; Johnson Timothy Mr NGA-ODEE USA CIV |
| **Subject:** | Request for EEO counseling |

Classification: UNCLASSIFIED
================================================================

ODEE staff,

On Sept 9th, 2013 I was notified by email from Dan Hinchberger that I was not interviewed or selected for a recent Band 5 AON in OCS. Can you please put me in touch with an EEO counselor? I believe unfair discrimination may have occurred. Thanks
Stan Laber
71075
================================================================

Classification: UNCLASSIFIED

000032

# Exhibit 24



**NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY**
7500 GEOINT Drive
Springfield, Virginia 22150

U-058-14/ODE

Office of Diversity Management                   February 18, 2014
and Equal Employment Opportunity

Mr. Stan Laber
9412 Athens Road
Fairfax, VA 22032
NGA Case:  NGAE-14-O03

Dear Mr. Laber:

You initially contacted the National Geospatial-Intelligence Agency (NGA), Office of Diversity Management and Equal Employment Opportunity (ODE) on November 8, 2013, and filed an informal complaint on November 08, 2013.  You elected to participate in the Alternative Dispute Resolution (ADR) process on November 15, 2013.  There was not resolution to your complaint.  This is notice that the counseling stage in this informal complaint is complete.

If you believe that you have has been discriminated against on the basis of race, color, religion, sex, national origin, disability, genetics, and/or reprisal, you have the right to file a formal complaint of discrimination within 15 calendar days after receipt of this notice.

If you believe you have been discriminated against on the basis of age, you have the option of filing a formal complaint of discrimination within 15 calendar days after receipt of this notice or you may file a civil action directly in the U.S. District Court under the Age Discrimination in Employment Act (ADEA) of 1967.

If you elect to file a complaint in the administrative process, you must exhaust administrative remedies before you can file a civil action in U.S. District Court.

If you elect to file a civil action directly in the U.S. District Court, you must provide the Equal Employment Opportunity Commission (EEOC) with a written notice of your intent to sue under ADEA.  The notice must be filed within 180 calendar days of the date of the alleged discriminatory action. Once a timely notice of intent to sue is filed with EEOC, you must wait 30 calendar days before filing a civil action. The notice may be mailed to the EEOC Headquarters at the following address:

000049

Hand delivered to:

      Equal Employment Opportunity Commission
      Office of Federal Operations
      Federal Sector Programs
      1801 L Street N.W.
      Washington, D.C. 20507

Or sent by facsimile to:

      (202) 663-7022

The formal complaint must be submitted in writing, preferably using DD Form 2655, Complaint of Discrimination in the Federal Government, signed and filed in person or by mail with the following office/individuals authorized to receive discrimination complaints:

      National Geospatial-Intelligence Agency
      Office of Diversity Management and Equal Employment Opportunity
      Attn: Gloria J. Cunningham
      3838 Vogel Rd.
      Arnold, MO 63010
      Phone Number: 571-557-9692
      Fax Number: 571-558-3172

The formal complaint must specify the claim(s), which form(s), the basis for the complaint, and must be specific to the claim(s) raised during EEO counseling. It is important that you state your claim as concisely as you can, citing the nature of the action, the date of the action, and the persons involved, if any. You may only raise claims that have been counseled or are like or related to the claims counseled. The complaint should also state whether you have filed a grievance under a negotiated grievance procedure or an appeal to the Merit Systems Protection Board on the same subject matter, including dates. This information is necessary to determine if your complaint is appropriate for processing under 29 Code of Federal Regulation, Section 1614.

In accordance with EEO Management Directive 110, Chapter V, and unless otherwise indicated in writing, if you retain an attorney or any other person as a representative, or change your address or telephone number, you must immediately notify ODE in writing at the above listed address.

**38**

000050

If you have a representative, copies of the acknowledgment and all subsequent actions on the complaint will be mailed or delivered to your representative with a copy to you.

Sincerely,

Patsy A. Coleman
Director, Resolution Resource Center
Office of Diversity Management and
Equal Employment Opportunity

Enclosure:
DD Form 2655

3

**39**

# Exhibit 25

| COMPLAINT OF DISCRIMINATION IN THE FEDERAL GOVERNMENT | FOR AGENCY USE |
|---|---|
| *(This form is subject to the Privacy Act of 1974)* *(See Page 3 for Privacy Act Statement and Iinstructions - Please type or print)* | |

**1. FULL NAME OF COMPLAINANT** *(Last, First, Middle Initial)*
Stan Laber

**2. TELEPHONE NUMBER** *(Include Area Code)*

**3. ADDRESS** *(Street, City, State, and ZIP Code)*
9412 Athens Rd
Fairfax VA 22032

a. HOME
( 703 )4264989

b. OFFICE
( 571 )557-1075

**4. FEDERAL OFFICE YOU BELIEVE DISCRIMINATED AGAINST YOU**
*(Prepare a separate complaint form for each office which you believe discriminated against you.)*

**5. ARE YOU NOW WORKING FOR THE FEDERAL GOVERNMENT?**
*(If answer is "Yes" complete a, b, and c below.)*
[X] YES   [ ] NO

a. NAME OF OFFICE THAT YOU BELIEVE DISCRIMINATED AGAINST YOU
NGA/OCS

a. NAME OF AGENCY WHERE YOU WORK
NGA/OCS

b. ADDRESS OF OFFICE *(Street, City, State, and ZIP Code)*
7500 Geoint Way
Springfield A V

b. ADDRESS OF YOUR AGENCY *(Street, City, State, and ZIP Code)*
7500 Geoint Way
Springfield A V

c. NAME AND TITLE OF PERSON(S) YOU BELIEVE DISCRIMINATED AGAINST YOU *(If you know)*
Unknown

c. TITLE AND GRADE OF YOUR JOB
IA-1102-04

**6. ELECTION OF REPRESENTATION** | ATTORNEY | [X] NON-ATTORNEY | | NO REPRESENTATION

**7. DATE ON WHICH MOST RECENT ALLEGED DISCRIMINATION TOOK PLACE** *(YYYYMMDD)*

a. NAME OF REPRESENTATIVE *(If applicable)*
Stan Laber

b. ADDRESS *(Include ZIP Code)*
SAMEAaS ABOVE

c. TELEPHONE NUMBER *(Incl. area code)*
SAME

d. FAX NUMBER *(Incl. area code)*
na

e. E-MAIL ADDRESS
STAN.P.LABER@NGA.MIL

**8. CHECK BELOW WHY YOU BELIEVE YOU WERE DISCRIMINATED AGAINST**

| | |
|---|---|
| | a. RACE *(If so, state your race)* |
| | b. COLOR *(If so, state your color)* |
| ✓ | c. RELIGION *(If so, state your religion)* Jewish |
| | d. NATIONAL ORIGIN *(If so, state your national origin)* |
| ✓ | e. SEX *(If so, state your sex)* Male |
| ✓ | f. AGE *(If so, state your age) (See Note 1)* 68 |
| ✓ | g. DISABILITY *(If so, state whether mental or physical)* |
| | h. SEXUAL HARASSMENT *(If so, state your sex and the sex of the person you believe harassed you)* |
| ✓ | i. REPRISAL FOR PREVIOUS EEO ACTIVITY *(If so, when)* Prior complaints not at NGA |
| | j. GENETIC INFORMATION |
| | k. PREGNANCY |

Note 1: Complaints of discrimination because of age apply only to employees or applicants who were at least 40 years of age at the time the discriminatory action is alleged to have occurred.

**9. EXPLAIN IN SPECIFICS HOW YOU BELIEVE YOU WERE DISCRIMINATED AGAINST** *(treated differently from other employees or applicants)* DUE TO YOUR RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, AGE, PREGNANCY, GENETIC INFORMATION, DISABILITY, OR REPRISAL *(For each allegation, please state to the best of your knowledge, information and belief what incident occurred and when the incident occurred. If you need more space, continue on another sheet of paper.)*

On Sep 06, 2013, I received the following from Dan Hinchberger:
From: Hinchberger Daniel E Mr NGA-OCS USA CIV
Cc: Verdon Tamara J Ms NGA-OCS USA CIV; Unis Richard E NGA-OCSR USA CIV; Williams Johnetta B Ms NGA-OCSJ USA CIV
Subject: RE: RECENT B5 AON
I would like to thank you personally for applying to our recent B5 Contract Specialist AON. We received numerous outstanding applications. The panel's decisions regarding which candidates were selected for interview as well as the candidate that will ultimately be selected were equally difficult as the ratings and rankings of the applications were very competitive. Ultimately, we decided not to interview all candidates. I strongly encourage you to continue to apply for future opportunities. The panel members for this AON were Rich Unis, Tammy Verdon, Johnetta Williams and myself. Please feel free to schedule an appointment with one of the panel members to get feedback on how to strengthen your resume for future opportunities.

Additionally, I believed those who discriminated against me did so the basis of my reputation as a "frequent filer".

**DD FORM 2655, JUN 2012**     PREVIOUS EDITION IS OBSOLETE.

| 10. I HAVE DISCUSSED MY COMPLAINT WITH AN EQUAL EMPLOYMENT OPPORTUNITY COUNSELOR *(See instructions)* | 11. NAME OF COUNSELOR *(If applicable)* |
|---|---|
| [X] YES    [ ] NO | Glroia Cunningham |

| 12. HAVE THE ISSUES IDENTIFIED IN BLOCK 9 BEEN APPEALED TO THE MERIT SYSTEMS PROTECTION BOARD (MSPB) OR FILED UNDER A UNION NEGOTIATED GRIEVANCE PROCEDURE?   [X] NO    [ ] YES *(If Yes, complete 12.a., b., and c. below)* | | |
|---|---|---|
| a. *(X one)*  [ ] MSPB   [ ] UNION NEGOTIATED GRIEVANCE | b. DATE FILED *(YYYYMMDD)* | c. MSPB OR UNION DOCKET NUMBER *(If known)* |

**13. WHAT RELIEF ARE YOU SEEKING TO RESOLVE THIS COMPLAINT?** *(State specific corrective action desired for each allegation.)*

To be made whole in every permitted under Title VII as amended.

CONTINUATION FROM BLOCK 9.
This was the first time that that my application for a promotion resulted in my not being provided an interview opportunity. I believe that ny qualifications were significantly superior to those applicants who were granted interviews. If I had been granted an interview absent the discrimination, I believe I would have been selected over the selectee.

**14. LIST NAME(S) OF WITNESS(ES) AND BRIEFLY STATE WHAT INFORMATION WITNESS MAY CONTRIBUTE TO THE INVESTIGATION OF YOUR COMPLAINT.**

I do not know all of the names of all those who participated in my non-selection.

| 15. SIGNATURE OF COMPLAINANT | 16. DATE OF THIS COMPLAINT *(YYYYMMDD)* |
|---|---|
| LABER.STAN.P.1230554060   Digitally signed by LABER.STAN.P.1230554060   DN: c=US, o=U.S. Government, ou=DoD, ou=PKI, ou=OSD, cn=LABER.STAN.P.1230554060   Date: 2014.03.10 16:34:47 -04'00' | 3/10/2014 |

DD FORM 2655, JUN 2012

**PRIVACY ACT STATEMENT**

**AUTHORITY:** 10 U.S.C. 136; 29 U.S.C. 791, 792, 793, and 795; DoD Directive 1440.1; and E.O. 12106.

**PRINCIPAL PURPOSE(S):** To establish case records and document the counseling, investigation, and adjudication of complaints of employment discrimination brought by applicants and current and former DoD employees against the DoD.

**ROUTINE USE(S):** Records may be provided to EEO officials, hearing examiners, investigators and arbitrators, or by representatives of the Equal Employment Opportunity Commission and the courts concerning the complaint and appeal. The Blanket Routine Uses found at http://dpclo.defense.gov/privacy/SORNs/blanket_routine_uses.html apply to these records. The specific routine uses found at http://dpclo.defense.gov/privacy/SORNs/govt/EEOCGOVT-1.html also apply to these records.

**DISCLOSURE:** Voluntary. However, if the individual does not furnish the information requested, processing the complaint may be delayed or impaired.

**READ INSTRUCTIONS CAREFULLY**

This form should be used only if you, as an applicant for Federal employment or a Federal employee, think you have been discriminated against due to race, color, religion, sex, national origin, age, pregnancy, genetic information, disability, or reprisal by a Federal agency and have presented the matter for informal resolution to an Equal Employment Opportunity Counselor within 45 calendar days of the date the incident occurred or, if a personnel action, within 45 calendar days of its effective date.

Your complaint must be filed within 15 calendar days of the date of your final interview with the Equal Employment Opportunity Counselor. If the matter has not been resolved to your satisfaction within 30 calendar days of your first interview with the Equal Employment Opportunity Counselor and the final counseling interview has not been completed within that time, you have the right to file a complaint at any time thereafter up to 15 days after the final interview.

These time limits may be extended if you show that you were not notified of the time limits and were not otherwise aware of them, or that you were prevented by circumstances beyond your control from submitting the matter within the time limits, or for other reasons considered sufficient by the agency.

If you need help in the preparation of your complaint, you may contact the Equal Employment Opportunity Counselor who provided you with your initial counseling, or you may secure help from a representative of your choice.

For complaints filed against the Immediate Office of the Secretary of Defense, the Joint Staff and all activities receiving administrative support from Washington Headquarters Services, the individuals designated to receive complaints are the Equal Employment Opportunity Officer or the Director, EEO, Office of the Secretary of Defense. Complaints generated within agencies outside the above designated activities must be filed with that agency's individual designated to receive complaints of discrimination, i.e., the Chief EEO Counselor.

You may have a representative of your own choosing at all stages of the processing of your complaints.

You will have an opportunity to talk with an investigator and present all the facts which you believe show discrimination. The investigator will not be under the jurisdiction of the head of that part of the agency in which the alleged discrimination took place.

After the investigation of your complaint has been completed, you will be furnished a copy of the Report of Investigation. You will be given an opportunity to request a hearing, which will be conducted by an Administrative Judge assigned by the Equal Employment Opportunity Commission (EEOC). The hearing will be held at a convenient time and place. At the hearing, you may present witnesses and other evidence on your behalf.

The final decision (in writing) will be made by the head of the agency or his or her designee. If a hearing is held on your complaint, the head of the agency or the designee will review the decision recommended by the Administrative Judge before making a final decision, and will furnish you with a transcript of the hearing, a copy of the findings, analysis, and recommended action of the Administrative Judge, along with the agency's final decision letter.

If you are not satisfied with the final agency decision, you have the right to appeal that decision within 30 calendar days after receipt to the Equal Employment Opportunity Commission, Office of Federal Operations, P.O. Box 77960, Washington, DC 20013.

If your complaint is based on race, color, religion, sex, national origin, pregnancy, genetic information, disability, or reprisal, you may file a civil action in an appropriate U.S. District Court within 90 days of receipt of the agency's decision or, if you elect to file an appeal with the Commission, you may still file a civil action in a Federal District Court within 90 days of the Commission's decision if you are dissatisfied with the decision.

If your complaint is based on race, color, religion, sex, national origin, pregnancy, genetic information, disability, or reprisal, you may file a civil action in an appropriate U.S. District Court if you have not received a final agency decision within 180 days of filing your complaint with the agency or if you have not received a final Commission decision within 180 days of filing your appeal with the Commission's Office of Federal Operations.