# Exhibit 34



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Stan Laber, a/k/a
Kory V.,[1]
Complainant,

v.

James N. Mattis,
Secretary,
Department of Defense
(National Geospatial-Intelligence Agency),
Agency.

Appeal No. 0120180946

Agency No. NGAE-14-003

<u>DECISION</u>

On October 19, 2017, Complainant filed an appeal with the Equal Employment Opportunity Commission (EEOC or Commission), pursuant to 29 C.F.R. § 1614.403(a), from the Agency's September 11, 2017 final decision concerning an equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., and Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq.

<u>BACKGROUND</u>

During the relevant time, Complainant worked as a Contract Specialist, Pay Band 4, in the Agency's Office of Contract Services (OCS), at the OCS Policy Branch facility in Springfield, Virginia.

Complainant applied for a Contract Specialist, Pay Band 5 position. On September 6, 2013, Complainant learned that he was not chosen for an interview and was not selected for the position. Complainant believed that he was discriminated against in the screening process, when management officials used subjective scoring to eliminate him from interview contention. Consequently, on March 10, 2014, Complainant filed the instant formal complaint based on sex (male), religion (Jewish), disability, age, and reprisal.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                    0120180946

After an investigation, the Agency provided Complainant with a copy of the report of investigation and notice of his right to request a hearing before an Equal Employment Opportunity Commission Administrative Judge (AJ). Pursuant to Complainant's request, on November 21, 2014, the Agency issued a final decision pursuant to 29 C.F.R. § 1614.110(b), finding no discrimination.

According to the Agency, "the vacant position had been delineated as one of the most senior within the office of contracting and the need was for a candidate with considerable contract experiences within multiple buying divisions of [the Agency]." The evaluation team members, comprised of individuals with experience supervising Complainant, "expressed reservation as to Complainant's lack of supervisory experience, especially in an operational contracting role." Further, the evaluation team found that Complainant had not managed across organizational lines or been involved in implementing strategic visions. The evaluation team acknowledged that Complainant had "decent contracting experience." However, the evaluation team found that this experience was not to the "depth or breadth of those candidates selected for interview."

Complainant appealed the Agency's final decision to the Commission. On appeal, Complainant argued that the Report of Investigation was inadequate, because it did not contain the ratings issued and did not contain the articulated reasons for how the ratings were reached. The panel members stated they rated Complainant's resume as a "5," which was below the "natural" cut-off score of "7." Complainant asserts, however, that the Agency refused to produce the rating sheets, applications and similar records. Complainant asserts that such evidence would have provided him an opportunity to meet his burden of proving his lower score were pretext for discrimination.

In the prior decision, the Commission found that "the record contains inadequate documentary evidence to allow us to determine if the Agency's legitimate, non-discriminatory reason is pretextual." The Commission vacated the Agency's final decision and remanded the matter to the Agency for a supplemental investigation. Specifically, the Commission ordered the Agency to "conduct and complete a supplemental investigation which includes, but is not limited to, the following:

1.  Application materials submitted by all applicants selected for an interview for AON 20130928.
2.  Demographic information, including sex, religion, age, disability, and prior protected activity, for all applicants selected for an interview for AON 20130928.
3.  Opportunity afforded to Complainant to submit a rebuttal affidavit and documentary evidence to prove pretext.
4.  Issuance of a new decision . . . ."

3                                                          0120180946

<u>Complainant v. Department of Defense</u>, EEOC Appeal No. 012015 0981 (April 4, 2017)

Pursuant to the Commission's Order, on September 11, 2017, the Agency issued the instant final decision. The Agency again concluded that its decision not to interview Complainant was not discriminatory.

Complainant filed the instant appeal.

ANALYSIS AND FINDINGS

*Standard of Review*

As this is an appeal from a decision issued without a hearing, pursuant to 29 C.F.R. § 1614.110(b), the Agency's decision is subject to de novo review by the Commission. 29 C.F.R. § 1614.405(a).  See Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614, at Chapter 9, § VI.A. (Aug. 5, 2015) (explaining that the de novo standard of review "requires that the Commission examine the record without regard to the factual and legal determinations of the previous decision maker," and that EEOC "review the documents, statements, and testimony of record, including any timely and relevant submissions of the parties, and . . . issue its decision based on the Commission's own assessment of the record and its interpretation of the law").

As an initial matter, we observe that September 11, 2017 decision reflects that the Agency merely added a few paragraphs to its earlier November 21, 2014 decision.  Specifically, the Agency added one paragraph to the procedural history portion of the decision and three paragraphs to its analysis.

In its analysis, the Agency concluded that a "review of the resumes submitted" during the supplemental investigation showed that "all interviewees showed actual supervisory experience beyond an informal, team lead/supervisory assistant role." Within the same paragraph, however, the Agency acknowledged that "[t]he few interviewees that did *not show supervisory experience* did possess experience related to an operational contracting assignment or area of extensive operation responsibility, consistent with the panel's screening criteria" (emphasis added).

The Agency's final decision, however, does not include an individualized assessment of the applicants and how they compare to Complainant. The Agency's few sentences, referencing the interviewees generally, is an insufficient analysis of the additional evidence it was ordered to gather during the supplemental investigation.  Moreover, while acknowledging that our order only specifically required "application materials" provided by those chosen for interviews, the Commission also noted that the investigation was "not limited to" such evidence.  In a case where individuals who were ranked with scores of 7 and above were granted interviews, Complainant was ranked with a 5, and Complainant specifically alleges that the scoring and ranking was discriminatory.

A proper supplemental investigation would have included the ranking criteria and worksheets. Further, Complainant legitimately argues that the Agency's new, additional reason for granting interviews to some who, it now admits, lacked supervisory experience could be indicative of pretext. [2]

The Agency's supplemental investigative report is sparse, comprised of merely six resumes and a demographic spreadsheet. The corresponding analysis of this additional evidence is equally wanting. Unfortunately, we are again unable to properly determine whether the Agency's proffered legitimate, non-discriminatory reason is pretext to mask discriminatory animus. The case must be remanded to the Agency to develop a proper evidentiary record to support its decision that it did not discriminate against Complainant as alleged and provide Complainant with the opportunity to demonstrate pretext.

CONCLUSION

Based on a thorough review of the record and the contentions on appeal, we **REVERSE** the Agency's final decision and **REMAND** the matter for further processing in accordance with this decision and the **ORDER** below.

ORDER

Within thirty (30) calendar days of the date this decision becomes final, the Agency shall conduct and complete a supplemental investigation which includes, but is not limited to, the following:

(1) Any and all documents used and created by panel members in determining those applicants selected for an interview for AON 20130928. Such documents shall identify the ranking criteria used, the scores assigned to each successful candidate by each panel member, and any additional notes regarding the scoring of Complainant and the individuals offered an interview.

(2) Supplemental affidavits, if necessary, to provide explanation and clarity regarding the scoring system and rankings issued in the documents referenced in (1).

(3) Issuance of a new final decision, with a detailed analysis of the additional evidence comparing the successful candidates with Complainant. The decision shall include appropriate appeal rights.

---

[2] In the prior decision we noted that the inadequate record prevented the Commission from determining whether the six candidates chosen for an interview "also lacked supervisory experience in an operation contracting role" (i.e. the reason given for not granting Complainant an interview). See EEOC Appeal No. 0120150981 (April 4, 2017).

The Agency is further directed to submit a report of compliance, as provided in the statement below.

IMPLEMENTATION OF THE COMMISSION'S DECISION (K0618)

Under 29 C.F.R. § 1614.405(c) and §1614.502, compliance with the Commission's corrective action is mandatory. Within seven (7) calendar days of the completion of each ordered corrective action, the Agency shall submit via the Federal Sector EEO Portal (FedSEP) supporting documents in the digital format required by the Commission, referencing the compliance docket number under which compliance was being monitored. Once all compliance is complete, the Agency shall submit via FedSEP a final compliance report in the digital format required by the Commission. See 29 C.F.R. § 1614.403(g). The Agency's final report must contain supporting documentation when previously not uploaded, and the Agency must send a copy of all submissions to the Complainant and his/her representative.

If the Agency does not comply with the Commission's order, the Complainant may petition the Commission for enforcement of the order. 29 C.F.R. § 1614.503(a). The Complainant also has the right to file a civil action to enforce compliance with the Commission's order prior to or following an administrative petition for enforcement. See 29 C.F.R. §§ 1614.407, 1614.408, and 29 C.F.R. § 1614.503(g). Alternatively, the Complainant has the right to file a civil action on the underlying complaint in accordance with the paragraph below entitled "Right to File a Civil Action." 29 C.F.R. §§ 1614.407 and 1614.408. A civil action for enforcement or a civil action on the underlying complaint is subject to the deadline stated in 42 U.S.C. 2000e-16(c) (1994 & Supp. IV 1999). **If the Complainant files a civil action, the administrative processing of the complaint, including any petition for enforcement, will be terminated.** See 29 C.F.R. § 1614.409.

STATEMENT OF RIGHTS - ON APPEAL<br>RECONSIDERATION (M0617)

The Commission may, in its discretion, reconsider the decision in this case if the Complainant or the Agency submits a written request containing arguments or evidence which tend to establish that:

1.   The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.   The appellate decision will have a substantial impact on the policies, practices, or operations of the Agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision. A party shall have **twenty (20) calendar days** of receipt of another party's timely request for reconsideration in which to submit a brief or statement in opposition.

6                                                                          0120180946

See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015).  All requests and arguments must be submitted to the Director, Office of Federal Operations, Equal Employment Opportunity Commission.  Complainant's request may be submitted via regular mail to P.O. Box 77960, Washington, DC 20013, or by certified mail to 131 M Street, NE, Washington, DC 20507.  In the absence of a legible postmark, the request to reconsider shall be deemed timely filed if it is received by mail within five days of the expiration of the applicable filing period.  See 29 C.F.R. § 1614.604.  The agency's request must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP).  See 29 C.F.R. § 1614.403(g).  The request or opposition must also include proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request.  Any supporting documentation must be submitted with your request for reconsideration.  The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances.  See 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (R0610)

This is a decision requiring the Agency to continue its administrative processing of your complaint.  However, if you wish to file a civil action, you have the right to file such action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.  In the alternative, you may file a civil action **after one hundred and eighty (180) calendar days** of the date you filed your complaint with the Agency, or filed your appeal with the Commission.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court.  "Agency" or "department" means the national organization, and not the local office, facility or department in which you work.  **Filing a civil action will terminate the administrative processing of your complaint.**

### RIGHT TO REQUEST COUNSEL (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs.  Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you.  **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission. The**

7                                              0120180946

court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:


Carlton M. Hadden, Director
Office of Federal Operations


June 25, 2019
Date

# Exhibit 35



**NATIONAL GEOSPATIAL-INTELLIGENCE AGENCY**

7500 GEOINT Drive
Springfield, Virginia 22150

U-882-19/ODE

<u>**CERTIFIED MAIL**</u>
7018 1830 0000 2612 4016

Office of Diversity, Inclusion, and
Equal Employment Opportunity[1]

September 5, 2019

Mr. Stan Laber
321 S. Maine Ave.
Albany, New York 12209

Final Agency Decision in the
Complaint of <u>Stan Laber</u> v.
<u>Mark Esper,</u> Secretary of Defense,
National Geospatial-Intelligence Agency
Agency Case No. NGAE-14-003

Dear Mr. Laber:

This is to inform you of the National Geospatial-Intelligence Agency (NGA), Department of Defense's (hereinafter referred to as the "Agency") final agency decision (FAD), regarding the Equal Employment Opportunity (EEO) discrimination complaint you, Mr. Stan Laber, (hereinafter, referred to as "you" or "the Complainant") filed on March 10, 2014.

This FAD is again revised and reissued in continuing compliance with the Decision of the US Equal Employment Opportunity Commission (EEOC), Appeal Number 0120180946, and dated June 25, 2019.  The FAD, as directed, addresses supplementation of the evidentiary record, with explanation; it further addresses analysis considerations identified by the Commission, with assessment and reasoning focused on comparator information, adherence to Agency policy and practices, and demographics, to the extent that specifics were available for collection.

<u>**Claim**</u>

You assert that you were subjected to discrimination on the basis of age (over 40), religion (Jewish), sex (male), disability (undesignated), and reprisal (protected EEO activity), when on September 6, 2013, you were not selected to be interviewed for, nor subsequently, selected for the position of Contract Specialist, Pay Band 05, (AON 20130928).

---

[1] The Office of Diversity, Inclusion, and Equal Employment Opportunity was formerly known as the Office of Diversity Management and Equal Employment Opportunity (ODE).  During the course of the complaint's processing and the case's appellate review, the former nomenclature was in effect; the change in title became effective on January 1, 2019.

**UNCLASSIFIED**

UNCLASSIFIED

## Finding

You have not established a factual basis from which to conclude that you were subjected to discrimination based on any of the claimed protected bases, as further explained below.

## Case Summary

*Procedural History*

You filed a formal complaint of discrimination dated March 10, 2014, and a Notice of Receipt of the Complaint was mailed to you on March 13, 2014.  On April 2, 2014, NGA issued a Notice of Partial Acceptance of the Discrimination Complaint, specifically dismissing the claim of discrimination based on disability for failure to state a claim pursuant to statute, and dismissal of the claim of discrimination based on reprisal for failure to allege any adverse action that was taken against you based upon prohibited activity covered by applicable statutes.  You were advised to contact the EEO office if you believed the claims had not been correctly identified and that any failure to do so within five calendar days would be treated as a concurrence as to the accuracy of the accepted claims.  Notwithstanding the notice that the dismissed claims would not be investigated, the investigator did inquire as to all claims made by Complainant in the formal complaint (See Investigative File (IF), p 292, for Investigator's explanation).

The complaint was investigated from July 3, 2014 through August 8, 2014.  You were mailed the Report of Investigation (ROI) on August 27, 2014 by overnight FedEx.  A copy of a notice defining your right within 30 days, to request either: (1) a hearing before an EEO administrative judge, or (2) an immediate FAD, without a hearing, in accordance with 29 C.F.R. 1614.110, was also forwarded to you with the ROI.

You requested a FAD on September 22, 2014 via an email to the EEO counselor.  The Agency issued a FAD on November 21, 2014 finding that you had failed to establish a factual basis evidencing you were subjected to discrimination.  On December 22, 2014, you filed with the EEOC Office of Federal Operations (OFO), and hereinafter referenced as "the Commission", an appeal of the FAD.  You did not specify any issues for appellate review in your original notice.  On February 2, 2015, the Commission acknowledged in writing a receipt of your appeal.  Though you submitted an untimely appellate brief, the Commission exercised its discretion to consider your contentions.  After a thorough review of the record, on April 4, 2017, the Commission vacated the Agency's original FAD dated November 21, 2014, and ordered further proceedings in accordance with enumerated requirements.  The decision was received by the Agency on or about April 13, 2017, and neither party lodged an exception or requested reconsideration.  The Agency was also directed to prepare a report of compliance addressing additional investigative documentation required by the Commission's Order.  Prior to issuance of the report, the Agency mailed a letter to you on June 14, 2017, notifying you of your right to provide additional rebuttal information or supplemental documentation.  You were also given copies of the materials the Commission directed the Agency to collect and to be provided to you.  On June 16, 2017, the Agency issued the required report to the Commission detailing the supplemental documentation provided to you, and highlighting that you were afforded an additional opportunity to submit further records or rebuttal information.  The

UNCLASSIFIED

**UNCLASSIFIED**

Agency then issued a FAD to render a final decision on your complaint, and a Compliance Letter to complete the record consistent with the Commission's Decision.

On June 25, 2019, the Commission again vacated the Agency's FAD and remanded the matter for supplemental investigation and a new FAD. From July 2, 2019 through August 2, 2019, the Agency conducted a supplemental investigation aimed at securing any record of the selection process relative to your claim that had not been included in the initial investigation or prior supplementation of the record. In an effort to ensure that the record detailed selection criteria utilized by the panel, along with the rating profile employed in assessing the criteria, supplemental declarations were collected from the panel members.

On July 23, 2019, the Agency sought an extension of time for compliance with the Commission's order to ensure a comprehensive record and to afford you an opportunity to respond and/or rebut the supplemental materials. You telephonically communicated your objection to the requested extension on July 25th and your objection was noted within the written request to the Commission. On July 31, 2019, a Compliance official with the Commission replied via email that the request could not be officially granted but the Agency would have to decide how to proceed in respect to strict adherence to the Commission's order. On August 1, 2019, the Agency opted to ensure a revised FAD included any additional input from you.

The supplemental record was mailed for your review on August 6, 2019, and you were offered the opportunity to submit any additional information, documentation, witness testimonies, or rebuttal to any aspect of the Agency's case, for consideration as to the issue presented in your complaint. As of August 22, 2019, you had not responded, nor submitted any evidence for Agency assessment.

Before deciding this claim, supplemental evidence was critically reviewed for any indicia of discrimination or inconsistency in application or evaluation of the selection criteria. In light of the language in the EEOC's order, the review focused on screening the entire record for evidence of any pre-text underlying the Agency's proffered explanation of the legitimacy of its action, the reasoning or rationale behind its selection, and the selection process itself.

*Background Synopsis*

The Complainant was employed with the NGA having commenced his assignment with the Agency in November 2006 (IF p 54). During the period of service which gave rise to the complaint, he served as a Contract Specialist-DAWIA, IA-1102-04, in the Office of Contract Services (OCS) Policy Branch (OCSP) (IF p 54). His first line supervisor was Howard Pierce; his second line supervisor was Daniel Hinchberger (IF p 54). At some point in time, three of the four named officials served in a supervisory role as to Complainant (IF pp 54, 55). The remainder of Complainant's chain of command consisted of Susan Pollmann, his third level supervisor, and Tonya Crawford, Director of OCS, and approving official of the selected applicant screened by the selection panel (IF p 117).

The vacancy announcement for Contract Specialist-DAWIA, IA-1102-05, opened on June 24, 2013; closed on July 5, 2013 (IF pp 166-169). He learned in September 2013, that he

3

**UNCLASSIFIED**

**UNCLASSIFIED**

was not selected for an interview. Complainant alleges that he was discriminated against in the screening process of the applications by the relevant managing officials, when they likely used subjective scoring to eliminate him from interview contention (IF pp 2, 7). Though the EEO Office did not accept the allegations of discrimination on the basis of reprisal for EEO activity and disability status, the ROI includes the investigator's factual inquiry into all allegations of discrimination in the complaint (IF p 292). No other specific example or allegation of discrimination appears from the ROI.

In conducting the investigation, documentary evidence and declarations were compiled. In addition to the Complainant, the investigator interviewed Mr. Daniel Hinchberger, Mr. Richard Unis, Ms. Tammy Verdon, Ms. Johnetta Williams, and Ms. Tonya Crawford, collectively, the management officials alleged to have discriminated against Complainant. The advising Human Development Specialist, Ms. Natasha Grant, also furnished a declaration.

Declarations were obtained from: Complainant (IF pp 53-64); Mr. Daniel Hinchberger, Group Chief, (IF pp 66-78; job title @ p 67); Mr. Richard Unis, Contract Division Chief, (IF pp 81-90; job title @ p 82); Ms. Tamara Verdon, Supervisory Contract Specialist, (IF pp 92-103; job title @ p 93); Ms. Johnetta Williams, Supervisory Contract Specialist, (IF pp 105-114; job title @ p 106); Ms. Tonya Crawford, Director of Contracting, SES (III), OCS (IF pp 116-125; title @ p 117); and Ms. Natasha Grant, Human Resource Specialist, Recruitment, Human Resource Pilot Management Division (IF pp 127-131; job title @ p 128). No other witnesses appear to have been requested by either the Agency's representative or the Complainant.

In addition to the testimonies through declarations, the ROI contained documentary evidence consisting of the formal complaint (IF pp 2-3); the EEO counselor's report with attachments (IF pp 6-13); associated procedural documents involved in the processing of the current complaint (IF pp 34-49); organizational charts/workplace profile (IF pp 140-150); resumes of the selectee and of the Complainant (IF pp 172-179); and additional exhibits related to the position description, application processes and procedures, and relevant NGA policy and guidance (IF pp 153-278). Complainant's electronic mail transmissions (IF pp 137-138) and tables reflective of interviewee demographic data delineated by basis of discriminatory claim (IF pp 280-290), are also included. Finally, the ROI contains the "NGA Instruction for Filling Civilian Positions Including Promotions" and the Agency's "Policy Notice: Selection Panel Membership", the Agency's response to additional requests for information from the investigator, and documentation related to the investigator's processing of this investigation (See Index, ROI, @ p ii).

As a consequence of the Commission's Decision, the ROI was first supplemented by: the application materials of those applicants selected for interview for the specified position, and, demographic information of the interviewees to the extent that it was either collected in the application process (i.e. - religious preference is not collected by NGA) or provided by the interviewee. Though provided an opportunity for further rebuttal, no additional materials came from the Complainant.

4

**UNCLASSIFIED**

Pursuant to the directive of the Commission, the investigation was further supplemented by a comprehensive request and review of any and all documentation maintained by the Human Development Directorate (HD) pertaining to the subject recruitment, and, supplemental declarations of the responsible management officials.  The additional material was mailed to the Complainant for review and rebuttal on August 6, 2019, accompanied by a request for any additional evidence or documentation he wanted incorporated into the record and used in consideration of the Agency's decision on his complaint.  The Agency had moved the Commission on July 23, 2019, for a brief extension to the Commission's compliance order so as to allow Complainant time to respond and to afford the Agency time to assess any submission from the Complainant.  The Commission did not decide the issue of extension; an Interim Compliance Letter noting the completion of the directive for a supplemental investigation was promulgated on August 22, 2019 as nothing further had been received from Complainant by that date and the investigation was deemed complete; and, the FAD and Full Compliance Declaration were issued as of this date, as directed by the Commission's order.

## Summary of the Evidence

*Complainant's Case*

**Testimony of Mr. Stan Laber** - Complainant was a supervisory contract specialist, IA-1102-04, in the OCSP, OCS, NGA, at the time of his application for a vacant position as a Pay Band 05 supervisory contract specialist (IF pp 53, 54).  His second line supervisor was Daniel Hinchberger and the two interacted once every few months (IF p 54).  Complainant had no organizational relationship with Mr. Unis but did speak infrequently with him on business subjects.  Complainant had been supervised in the past for some period of time by Ms. Verdon, having daily contact then, but their contact was much less frequent after she stopped serving as his supervisor (IF p 54).  Ms. Williams had also been a former supervisor of Complainant dating back to approximately three years prior to the complaint; while in a supervisory relationship their contact was daily, thereafter, the contact was much less frequent (IF p 55).  Complainant alleges that Mr. Hinchberger, Mr. Unis, Ms. Verdon, Ms. Williams, and Ms. Crawford were responsible for discriminating against him as either panel members or as the approving official of the panel's recommendation (IF p 53).

He claims that he was discriminated against on the bases of age, religion, sex, and in reprisal for his filing EEO complaints with other agencies and because of his FOIA and IG requests (IF p 53).[2]  He notes that he had a history of filing EEO complaints before coming to NGA in 2006, though this particular complaint is the first filed since his employment with NGA (IF p 55).  Complainant believes that during the selection process, NGA officials were aware of his EEO activity, as well as his request to serve as an EEO counselor at NGA (IF p 55).  He does not recall who his supervisor was at the time but it was someone in OCS. He states that he was ultimately approved to be a counselor, but whether someone who files EEO complaints should serve as an EEO counselor had been an issue.  Though he did not think it to be an issue, the agency did because while he was attending the class the instructor told him that the instructor was well-aware of his history and that it had been

[2] Complainant does not specifically identify a disabling condition as a basis for discrimination in his declaration, but a comment alludes to his disability impacting the selection process.

**UNCLASSIFIED**

discussed at NGA; the instructor reported to Complainant that he had been consulted by another agency in regard to the complaints previously filed against that agency (IF p 55). When he asked to serve a second year, Complainant was informed that his services were not needed (IF p 55). He is clear that he is not claiming reprisal for the filing of this complaint but, instead, for the EEO activity from 1979-2006, prior to his NGA employment, that the managing officials could have learned of and then used to deny him an interview (IF p 55). Generally, the past complaints involved non-selections, promotions, and training, most were based upon religion, with many evolving into court cases discoverable on the internet (IF p 55). Complainant maintains his EEO cases' presence on the internet demonstrates that the agency must have had knowledge of how litigious he has been (IF p 55). He believes that everyone including Mr. Hinchberger was aware of the EEO activity, though he does not know how or when Mr. Hinchberger learned of it (IF p 56). Mr. Unis must have known as well but Complainant does not know how he had gained knowledge of the EEO activity. Nobody ever acknowledged learning of his EEO activity but he is nonetheless convinced that everyone knew, including Ms. Verdon, Ms. Williams, and Ms. Crawford (IF p 56, 57).

Complainant specifically alleges that NGA officials believe his EEO complaints from prior employment to be frivolous; and in regard to his non-selection, the officials acted on their belief that he was a frequent-filer of frivolous complaints, and to avoid a non-selection complaint, purposely scored him so as to not be selected for an interview (IF p 57). He claims that they think his EEO history would preclude him from being an effective supervisor and would project a negative managerial style and ability (IF p 57). Complainant believes his qualifications for the position to be prominent and that the resume listing of his experience does not really provide a "succinct argument of my qualifications" (IF p 58). He is sure that he is better qualified than the selectee because he was certain to have had more experience even if he did not know the details of the selectee's experience (IF p 58). Because he is the oldest person who applied for the vacancy and has over 30 years of experience, he does not believe there could be anybody more qualified (IF p 58). In short, his claim is that he has more experience, training, and knowledge than anyone who was selected for an interview even though he does not know who applied for the position; he asserts that such makes him superior to the other candidates (IF p 58). He admits that he does not know for a fact, but believes, he is more qualified than others and cites to his education, training, and certifications (IF p 58), also detailing his acquisition assignments (IF p 59).

Complainant explains what the selection panel officials did to discriminate. The officials did not interview him or select him. He "…imagines that they did not objectively score…" him so as to avoid having to interview and select him for the position (IF p 59). Though he cannot cite to "overt comments" by the officials related to his age, religion, or sex, he does know that this particular group of officials act with impunity (IF p 59). He is confident that the officials knocked the scores down so that he fell below the cutoff line for interviews because they had a negative view of him. Their view arose from his complaints, religion, dress and appearance, and his not meeting their idealized view of what a supervisor is to be (IF p 59). There is no other explanation for his being excluded from an interview (IF p 59). The scoring data and the communication between panel members trying to reconcile

6

**UNCLASSIFIED**

**UNCLASSIFIED**

the scoring will reveal the lack of objectivity (IF p 60). Complainant presumed that there was lobbying among the panel to push him farther down the list (IF p 60).

Complainant asserts that he was treated differently in the selection process because of his age, believing all other applicants selected to be interviewed to be younger than he (IF p 60). He maintains that the agency has a record of promoting younger employees as opposed to older and moving older employees into dead end positions or jobs that are less qualifying for future promotions (IF p 61). He further asserts that he was treated differently because of his religion. Though he does not know the religion of other applicants, he presumes that no one that might have applied exhibits the religious dress and behaviors of Complainant (IF p 61). Based upon his religion he states that he was treated negatively (IF p 61).

Complainant also believes he was treated differently because of his sex based upon his contention that most selectees in OCS are female; he believes that a female was selected for the position (IF p 62, 63). He indicates that Ms. Crawford probably did not want Complainant interviewed so she gave instructions to the panel and told the team lead of the panel which applicant should be selected (IF p 62).

Finally, Complainant declares that he was subject to reprisal in not being interviewed and selected for the position because of the negative attitude officials had as to his being a "complainer, particularly EEO" (IF p 63). Though the officials did not "taunt me about being a frequent-flier", he is convinced it played a "decisive role in the non-selection" (IF p 63). He adds that he has a disabling condition which also served as a basis for officials discriminating against him but he will not disclose information about it for privacy reasons (IF p 63). He does not believe anyone within the agency was aware of the disability but states "…that does not mean that the condition did not affect the selection action." (IF p 63); he adds that because he cannot disclose the details of the disability, he is unable to explain how or why he was discriminated against based upon the disability, except to state that he thinks they perceived some part of his behavior as being a disability (IF p 63).

*Complainant's Witnesses*

None.

*Agency's Case*

*-Responsible Management Official(s)*

**Testimony of Daniel Hinchberger** (Male, Over 40, Religious Affiliation-No Preference, No Disability, No Evidence of Prior EEO Activity (IF p 66) - Mr. Hinchberger was serving as the Group Chief within the Compliance and Operations Group, OCS, NGA, during the time giving rise to this complaint. Mr. Hinchberger is a male over 40 years of age, does not identify with a specific religion, and is without a disabling condition (IF pp 66, 67). He does not know the Complainant's age but guesses him to be a male in his early sixties (IF pp 66, 67, 73). Mr. Hinchberger believes Complainant to be Jewish because the Complainant wears a skull cap and the two had spoken in the past about Complainant's religion (IF p 66). He knew nothing of any disabling condition of Complainant and has never regarded

7

**UNCLASSIFIED**

**UNCLASSIFIED**

Complainant as being unable to do something because of a mental or physical impairment (IF p 68). He does not specifically recall knowing of prior EEO activity by Complainant and states that if Complainant had mentioned it before, he does not recall any details (IF p 68, 72-73).

Age, religion, sex, and prior EEO activity were not factors in the decision to not offer Complainant an opportunity to interview (IF pp 73, 74). Similarly, Complainant's physical or mental condition did not factor into the decision as Mr. Hinchberger was unaware of Complainant having any kind of a disability (IF p 74). In response to Complainant's allegation that the panel retaliated against him for his EEO activity, Mr. Hinchberger denies knowing of Complainant's FOIA or IG complaints; admits to some vague recollection of something EEO related but not presenting as an issue or creating a negative impression in his mind; and affirmatively asserts that the panel did not discuss anything related to EEO activity (IF p 75). He disputes any of the characterizations by the Complainant that the panel acted unfairly, held any age or religious bias, acted with impunity or viewed the Complainant negatively (IF p 75, 76). Instead, Mr. Hinchberger contends that the panel acted in good faith to find the best candidate and without influence from Ms. Crawford (IF p 77). He maintains that he was not directed or persuaded to recommend, or not to recommend, a particular candidate (IF p 73). He denies any knowledge of Complainant's past refusals to sign documents based upon religion or moral obligation (IF p 77).

He served as the panel chair and ensured that the diversity requirements mandated by the agency for the composition of the panel were followed. The panel was comprised of one female, one male, and one minority (African-American); all were division chiefs of the OCS operational groups and knew the work would not entail staff-oriented functions (IF p 69). Panel members received the referral certificate with 16 applicants deemed qualified by HR. The certificate contained no information as to applicants' age, religion, sex, disabling conditions, or EEO activity (IF p 70). Each panel member independently rated and ranked the applicants' resumes and the scores were then considered by the panel for any splits (difference by more than two points on the individual panel member scores) (IF p 69). The resumes were evaluated and scored based on criteria contained in the vacancy announcement (IF p 69)[3]. Splits are discussed and reconciled; all four panel members rated Complainant a "5" so he was not discussed (IF pp 69, 70). The panel then looked for a logical break point for candidates to be interviewed and decided to interview only those candidates with a score of "7" or above (IF p 69). At the conclusion of the interview process the panel had a consensus discussion as to a recommendation for a selection. The recommendation was subsequently approved by Ms. Crawford (IF pp 69, 70).

Mr. Hinchberger's biggest concern as to Complainant's qualifications centered on the Complainant's apparent lack of supervisory experience; Complainant had no or limited supervisory experience in an operational contracting role (IF p 70). Complainant had decent contracting experience but not to the depth or breadth of other candidates (IF p 71).

---

[3] Vacancy announcement (IF p 166-168) details the assignment description, mandatory and desirable criteria; Work role description (IF p 164) identifies competencies, knowledge, and skills for the position.

8

**UNCLASSIFIED**

Complainant's not being selected for an interview was not a personal decision against him but was based upon his mid-range score (IF p 71). To Complainant's claim that he should have been selected as the best qualified applicant for the position because of his 30 years of experience and multiple DAWIA certifications and training courses, Mr. Hinchberger contends the person with the most working experience is not necessarily the best manager (IF p 73). He states that the selectee had a greater degree of demonstrated success and at a slightly higher level than Complainant (IF p 73).

*Supplemental Declaration*

The original AON was an open, competitive announcement limited for application to NGA government employees. The selection criteria utilized were developed for the AON and denoted in two categories as mandatory and desirable. Though Mr. Hinchberger could no longer recall the specific criteria, the panelists used them as each had a copy of the AON. The only distinct difference in importance of the criteria would have been between the mandatory ones as compared to those listed as desirable. He used the 1-9 rating scale in his assessments of each candidate. His rating of the eventual selectee was based in part on her demonstrated ability to lead contracting professionals and manage a broad array of acquisition efforts. The alternate selectee had an ability to lead a large acquisition team and manage the IFSP acquisition from start to finish. His rating of the Complainant was based in part on the level of his demonstrated leadership, i.e. - the rating given reflected a demonstrated leadership but not to the level of those earning an interview. Mr. Hinchberger did not recall having any knowledge of the religion of any of the employees selected for interview, in particular, he did not know if any of those selected for interview were of Complainant's faith.

**Testimony of Richard Unis** (Male, Over 40, Religious Affiliation-Lutheran, No Disability, No Evidence of Prior EEO Activity (IF p 81) - Mr. Unis was a member of the selection panel (IF p 83). He is over 40, male, Lutheran, and not disabled (IF p 81). At the time of his service on the panel he was the Contracts Division Chief for OCSR, a division within OCS (IF p 82). He is aware of Complainant's religion as the Complainant had mentioned it to him (IF pp 81, 86), but was unaware of any disabling condition of the Complainant (IF pp 83, 86) or any prior EEO activity of the Complainant (IF pp 82, 86, 88).

Notwithstanding knowing Complainant, Mr. Unis did not know his exact age but believed him to be near 60 (IF pp 85, 81); he did know of Complainant's sex (IF p 86). Neither age, nor religion, nor sex were factors in the decision as to whether to interview Complainant (IF p 86). Mr. Unis was not directed or persuaded to recommend, or to exclude, a particular candidate for consideration (IF p 86).

Mr. Unis denies having a negative view of Complainant or acting with impunity (IF p 88). He claims to harbor no objections to Complainant's religion or dress but scored the resume solely against the selection criteria (IF p 88). There was no lobbying by panel members to move the Complainant down the list of qualified candidates. Complainant was not interviewed because there were better qualified candidates than he (IF pp 88, 89). As to

age, Mr. Unis specifies the selectee was not a "younger, fresher leader"[4] , but the best qualified candidate based on experience (IF pp 89, 85). He further explains his belief that OCS promotes the best candidates based on the pool of applicants for the position with recent selections for Pay Band 5 vacancies coming from applicants aged in their upper 40's and 50's (IF p 89). His observation of selectees for Pay Band 5 positions over the last 6 to 7 years appear to be essentially equally split between the sexes (IF p 89). Mr. Unis is not aware of any contracting officer being pressured to sign a document or contract action which the contracting officer does not support; referring it up to a supervisor is the prescribed resolution within OCS (IF p 90).

A large pool of referred candidates potentially meeting the selection criteria was provided to Mr. Unis for scoring (IF p 83). He reviewed the resumes on his own by using the requirements of the position in the AON vacancy announcement against the experience listed in the resume. He then ranked the candidates by how well they met the criteria assigning a score to each resume (IF p 83). Complainant's resume was scored as a "5" because of the lack of broad experience across NGA contracting. The position had been delineated as one of the most senior within the office of contracting and the need was for a candidate with considerable contract experience within multiple buying divisions of NGA (IF p 83).

After individually rating candidates, the panel came together to discuss differences of more than two rating points per candidate but Mr. Unis does not recall any contentiousness (IF p 84). The panel then determined which candidates to interview based upon a natural cut point and Complainant was not among the group rated as a top applicant (IF p 84). Interviews were then conducted and the eventual selectee had supervisory contract experience across four different buying divisions within NGA contracts. She was then serving in a deputy role, had source selection experience, and had a good understanding of various customers across the agency. Complainant did not have the experience level working in buying divisions at NGA (IF p 85).

The panel passed the recommendation for the selectee to Mr. Hinchberger and the selectee was ultimately hired (IF p 85).

*Supplemental Declaration*

An internal NGA vacancy announcement was used to recruit candidates for the open position of Supervisory Contract Specialist. The vacancy announcement contained the mandatory criteria used by the panel to evaluate each applicant. The position would require the successful applicant to have extensive hands-on contracting experience with major systems, base operations, or complex programs, and strong supervisory skills to provide creative leadership. In addition to the mandatory criteria, the job also required providing business advice, contractual guidance, and supervisory oversight. Supervisory responsibilities included leading, mentoring, and ensuring all acquisitions were legally and ethically concluded. The applicant also had to possess the minimum educational

[4] Mr. Unis includes the language used by Complainant in his testimonial response to the investigator.

requirements of a Bachelor's degree with at least 24 hours of business-related coursework unless the applicant qualified for a statutory exception.

The mandatory selection criteria evaluated included experience in applying the Federal Acquisition Regulation (FAR) and DOD Federal Acquisition Regulation Supplement (DFARS); contracting for major systems and complex programs; managing contract actions and source selection procedures; advising on the acceptability of contract terms; and negotiating contracts.  The criteria were expressly listed in the vacancy announcement and evaluated using the standard 1-9 rating scale by each panelist.  Mr. Unis stated that he rated at least nine candidates as having significantly more relevant contracting experience and because the position was a senior level supervisory position, the higher scoring candidates had significantly more depth at that level.

He believed Ms. Dyah Goodman, an applicant selected for interview was Jewish as he knew from her past comments to him that her family background was Israeli.

**Testimony of Tammy Verdon** (Female, Over 40, Religious Affiliation-Catholic, No Disability, No Prior EEO Activity (IF p 94) - Supervisory contract specialist Ms. Verdon was a panel member involved in the evaluation of Complainant's application for the position (IF p 94).  She is over 40, a non-practicing Catholic, female, without a disabling condition or evidence of any prior EEO activity (IF pp 93-94).  She believes Complainant is a bit older than she; is Jewish based upon conversations about his religion and her sexual orientation (IF p 92); and that he is male (IF p 93).  She knew nothing of Complainant's disabling condition or any prior EEO activity by Complainant (IF pp 93, 94).  She maintains that she is still unaware of any impairment or disability of Complainant (IF p 94).

Her service on selection panels is common and as an OCS supervisor she is frequently asked to be on panels (IF p 94).  The process is for HD to announce the vacancy and then to compile the applications, look at resumes and compile those meeting the position description requirements (IF p 94).  Panel members are then given the resumes to rate and score against the job description and the panel scored the applicants individually, meeting as a team to compile the scores and rank order the resumes.  The panel then interviewed only the most highly rated resumes (IF pp 94, 95).

Ms. Verdon did not rate Complainant high because of weakness in leadership and strategic involvement.  He had strong contracting knowledge but no experience in leading medium or large teams.  His resume did not clearly reflect strategic thinking/ agility, nor did he have demonstrated experience in setting up a larger operation and implementing it. Complainant had not managed across organizational lines or been involved in resolving or implementing strategic visions (IF p 95).  These deficits were not weaknesses of the eventual selectee in that the selectee had leadership experience in her previous supervisory roles and worked with multiple major systems customers (IF pp 95, 96).  Some of the applicants scored in the low range of 1 through 3 having missed the mark.  Some scored in the solid range of 7 through 9, but the bulk of the applicants were in the mid-range of 4-6 (IF p 96).

UNCLASSIFIED

The panel decided that it would interview the strong, competitive group of applicants and a cut line for interviews was established based upon the resume ranking (IF p 96). A logical cut point yielded a group of 7 or 8 interview candidates (if p 96). Of the group interviewed, she did not know the interviewees' religion, disability status, prior EEO activity, nor exact age (IF p 96). As to Complainant specifically, Ms. Verdon did not know his age (although she did have an assumption), any prior EEO activity, or any claimed or perceived disabling condition (IF p 98). She did know his religion and sex (IF p 98), but maintains that none of those factors were considered or of consequence in the decision as to whom to interview (IF p 98). She was not directed or influenced to recommend a particular candidate, nor directed or persuaded not to recommend a particular candidate (IF p 98).

Ms. Verdon rejects Complainant's claims of bias by the panel, members acting with impunity, the panel's negative view of Complainant or preference for younger candidates, individual members' favoritism for female and veteran applicants, and intent to discriminate against those of a specified religious practice or belief (IF pp 99-102). She acknowledges the evaluation of resumes does involve subjectivity, but recognizes Complainant's resume as reflecting subject matter expertise as a contracting officer. She maintains that his experience does not demonstrate leadership proficiencies with medium to large contracting teams, and she states that Complainant's resume did not reveal strength in supervision, resource management, personnel development, and strategic leadership (IF p 99).

*Supplemental Declaration*

The Supervisory Contract Specialist competitive promotion opportunity was announced through NGA's PeopleSoft process and open to all of NGA. The announcement identified key characteristics and requirements of the position along with mandatory and desirable criteria. The stated requirements of the position included demonstrated experience, training and education, judgement and business acumen necessary to be delegated DOD signatory authority, strong leadership skills, meeting applicable DAWIA certification requirements, and a professional knowledge of contract law and policy. The minimum mandatory qualifications in support of the above included experience in applying the FAR and DFARs, contracting for a variety of products and services, managing contract actions, advising on the acceptability of contract terms, and the ability to negotiate contracts while applying contract principles. Desirable qualifications included coaching and project management skills, experience in organizational representation, demonstration of strategic and transformational thinking, leadership, and problem identification and resolution.

The panel members used the selection criteria as stated in the announcement and a weighting scheme was not utilized. A 1-9 scale was the standard used by the panelists and the sample provided for review appeared to be consistent with the one used.

The "5" rating Ms. Verdon gave to Complainant indicated that he met all of the skills and competencies and exhibited about the same performance based potential as most employees. It recognized Complainant's strong contracting knowledge, but the score also reflected his lack of depth and demonstration of key characteristics and qualifications such as leadership experience, strategic thinking, management of multiple people, and

UNCLASSIFIED

capability to implement strategic vision. The final ratings of the top rated candidates were deeper in leadership, managing people, and strategic involvement than Complainant's.

Ms. Verdon did not, nor did the panel, consider factors such as age, sex, religion, disability, or prior EEO protected activities in evaluating and rating candidates. The panel did not seek information relative to any candidate's religion, or any other EEO protected class, at any point in the selection process, and such were not factors in selecting the candidates to be interviewed.

**Testimony of Johnetta Williams** (Female, Over 40, Religious Affiliation-Catholic, No Disability, No Prior EEO Activity (IF pp 105-109) - Ms. Williams is over 40, Catholic, female, does not consider herself disabled, and has no knowledge of any EEO activity pursued by Complainant (IF pp 105,106, 109). During the period giving rise to the complaint, she was employed with NGA as a supervisory contract specialist, IA-1102-05, serving as the division chief of OCSJ in OCS (IF p 106). She knew the Complainant from a period of time when she had been his direct supervisor (IF p 105) and she continued to periodically see him in the hallways (IF p 106). She believed Complainant to be in his mid-sixties, Jewish (because he talked of his family traditions and wore a yarmulke) (IF pp 105, 106, 109), and male (IF p 106).

On September 6, 2013, Ms. Williams was serving as the female representative to the selection panel (IF p 107). She remembered the selection process as entailing an individual review of resumes based upon key experiences, strengths, knowledge, skills, and abilities; a determination as to whether the candidate met the position criteria; and a scoring and rank ordering of the resumes prior to convening as a panel (IF p 107). The panel chair was Mr. Hinchberger and she had turned her scores over to him. Because of the number of applicants, a cutoff was set but she could not recall how that was determined (IF p 107). With the cutoff established, the panel met to assess which candidates would be interviewed. Each interviewee was scored separately by the panel members and after concluding all interviews, the scores were then shared with the entire panel. A consensus was reached as to the selectee, Ms. Karen Eichelberger, and the recommendation went forward to Ms. Crawford (IF p 107).

The panel did not interview Complainant. He was not interviewed based solely upon his not meeting the cutoff, and not because of any conversation among the panel involving Complainant personally (IF p 108). Although his qualifications were not lacking, they were not at the level of those selected to be interviewed (IF p 109). Ms. Williams was not directed or influenced to recommend, or not recommend, any particular candidate (IF p 109); and Complainant's age, religion, and sex were not factors in her decision as to Complainant's overall qualifications (IF pp 109, 110). She disclaims any knowledge of prior EEO activity involving the Complainant, and states that she was not aware of any disabling condition of his such that they could have been factors in her decision as to whether Complainant was to be selected for an interview (IF pp 109, 110). As to specific allegations by Complainant of the panel's behavior, thought processes, conduct in execution of the selection procedure, religious intolerance, sex and veteran status favoritism, and negative views of Complainant, Ms. Williams disputes what Complainant

13

alleges (IF pp 111-114). The panel had a responsibility to select the best qualified applicant and other candidates were rated, interviewed, and found to be better qualified than Complainant (IF p 112).

*Supplemental Declaration*

Ms. Williams recalled that the vacancy for Supervisory Contract Specialist was an open, competitive announcement. The selection criteria used by the panel were the mandatory and desirable qualifications stated in the job announcement. An applicant needed to show knowledge and experience in leadership, strategic thinking, and organizational representation, to name a few, and the AON informed applicants and panelists of these selection criteria. The 1-9 rating scale was the standard provided by HD for the panelists to use in evaluation of an applicant's credentials.

*-Additional witness testimonies*

**Testimony of Tonya Crawford** (Female, Over 40, Religion-Christian, No Disability, No Evidence of Prior EEO Activity (IF pp 116, 117) - Ms. Crawford is also over 40, Christian, female, does not consider herself disabled, and has no knowledge of any of Complainant's prior EEO activity, nor of any disabling condition experienced by Complainant (IF pp 116-118, 119-120). Ms. Crawford was involved in the selection process as an approving official, seeing all application packets and a summary of the panel's process and interviews conducted (IF p 118). She looked at the results to see whether the panel complied with agency rules and to verify that the panel conducted a resume review as a precursor to selecting prospective interviewees (IF p 118). After determining that the panel had complied with guidelines and established a cutoff based upon criteria, she reviewed the panel's scoring of the interviewees based upon objective criteria (IF p 118). She concurred with the way the process was run in this case (IF p 119).

Her recollection of Complainant's resume, as compared to the ultimate selectee's, led her to conclude that Complainant, although an excellent performer, was not as strong a candidate as the selectee; Complainant did not have the extensive leadership or collaborative networks (IF p 119). Notwithstanding Complainant's wealth of technical experience, the panel was to be considering breadth of leadership experience and evidence of collaboration as well (IF p 121).

Ms. Crawford had no personal knowledge of any of Complainant's EEO activity, nor how the panel would have even been able to find out such information. In response to Complainant's statements regarding the panel's scoring bias, acting with impunity, and negative views of Complainant because of his religion, Ms. Crawford denied each claim (IF p 122). She related that vacancy announcements increasingly required higher levels of demonstrated leadership for supervisory positions (IF p 122). She noted that her organization looked at all applicants and endeavored to pick the right leader based upon the resume and interview; age and religion have nothing to do with the decision (IF p 123).

**UNCLASSIFIED**

*Supplemental Declaration*

The objective criteria Ms. Crawford used to review the panel's scoring were the mandatory and desirable qualifications listed in the AON.

**Testimony of Natasha Grant** (Female, Under 40, Religious Affiliation-Unknown, No Disability, No Evidence of Prior EEO Activity (IF pp 127, 128) - As an HR Specialist assigned to Recruitment, Human Resource Pilot Management Division, HD, Ms. Grant did not know the age, religion, disability status, or record of any prior EEO activity of the Complainant (IF pp 128, 129).  She presumed, but did not know for sure, that Complainant was male because of the name on the application (IF p 128).  In short, she did not know him (IF p 128).

She served as the recruiter for the job announcement, receiving all applications and resumes; then creating a referral certificate of those screened who meet the mandatory hiring criteria set by the hiring manager (IF p 129).  The panel has to rate and rank resumes from the referral list, subsequently meeting to establish a cutoff point for those candidates to be interviewed (IF p 130).  If there is a clear break among the scores, then there is no reason to interview low scoring applicants (IF p 130).  Once a selection is made, the recruiter reviews the procedure followed to ensure that the selection process was properly conducted (IF p 129).  Panel members and selection officials are not provided any demographic data as to the applicants' age, race, sex, disability or prior EEO activity, but do see the name of each applicant (IF pp 130, 131).  The rules and regulations were followed in this selection (IF p 131).

*Complainant's Rebuttal*

**Rebuttal of Mr. Stan Laber** - Complainant did not provide any rebuttal or additional explanatory response to the Investigator.  As noted above, Complainant also did not provide any rebuttal, after being afforded the opportunity, pursuant to the Commission's decision on appeal.

As of the writing of this revised FAD, Complainant had not furnished any additional evidentiary documentation or submitted rebuttal to the supplemented record.

*Documentary evidence*

The AON was a recruitment action for a Supervisory Contract Specialist-DAWIA vacancy. Applicants had to be able to verify they met applicable DAWIA certification requirements for the GS-1102 series, per directives of the Office of Personnel Management.  The AON listed mandatory (1-5) and desirable (1-4) qualification criteria.  Mandatory criteria involved contracting experience with Federal Acquisition Regulations, acquisition experience for a variety of products and services across major systems or complex programs, and managing contracts from conception to implementation.  Desirable qualifications included knowledge and experience related to supervision/leadership, organizational representation, strategic and transformational thinking.  Educational requirements included either a Bachelor's Degree in any field that includes at least 24 semester hours of business related coursework, or an educational exception pursuant to 10 USC 1724.  The statute

provides for an exception to the educational requirement for contracting officer positions for OPM designated GS-1102 series positions entailing an exemption from the requirement for anyone who served on or before September 30, 2000, in a GS-1102 series position.

The NGA Instruction on Filling Civilian Positions or for Promotions detailed procedures for the conduct of a recruitment action and selection process.  Per Appendix 10, Documentation required to be maintained by HD as the official repository, includes individual rating (scoring) sheets for each applicant from each panel member for any vacancy involving a promotion or lateral reassignment (IF p 278).  Individual rating sheets for those applicants not rated as a "best qualified" candidate were not provided by HD for inclusion in the ROI.

Resumes of those rated as "best qualified" reflected extensive leadership experience and contracting expertise involving complex contract administration, management, or implementation.

A NGA Policy Notice established panel composition to reflect diversity and mandated diversity education.

*Supplemental Documentary Evidence*

The panel members scored the candidate packages against the detailed mandatory and desirable qualification criteria using the Agency's standard 1-9 point rating scale (generic promotion profile) as required by the Instruction.

Email correspondence related to production of applicant resumes for the vacant position for which Complainant applied confirmed that everything maintained within the file record had been provided to ODE for disclosure.

Examples of certification and related recruitment forms provided by HD to selection panels, as used by the selection panel in the case of Complainant's non-selection, evidenced a defined process for documenting a selection.  Accompanying copies evidenced the panel followed the guidelines.

According to the Certificate of Eligibles for the Supervisory Contract Specialist position, sixteen people were preliminarily deemed by HD as meeting the education and experience eligibility qualifications.  Comparator data showed of those employees, seven were male and nine were female; seven were Black, one was Hispanic, and eight were Caucasian. Nineteen employees had self-nominated themselves for consideration of which ten were males and nine were females; two were Asian, seven were Black, one was Hispanic, and nine were Caucasian; ten were over forty years of age.

Email correspondence from a HD employment relations specialist confirmed that religious data is not maintained in the NGA HD database.

HD represented that all file material that had been maintained had been provided for the Supplemental Investigation; missing materials may have been retained by the selection

official.  The selection officer represented that he had not retained any materials involving the selection process other than those which had been previously provided.

Email correspondence from a HD recruitment specialist related that a selectee for a vacant position must provide evidence of educational qualifications set as a requirement of the position prior to finalizing the selection and processing the Personnel Action.

Additional email advised that the HD recruitment specialist had erred in the initial referral of Complainant's resume as a minimally educationally qualified applicant.  According to HD, Complainant's resume did not evidence the educational requirement for business related courses, nor appear from the work experience delineated to meet the statutory deadline for the exemption.  Complainant should not have been referred as even a minimally qualified candidate for this position.


**Finding of Facts**

1.  There was no evidence indicating that a selection panel member or the approving official had actual knowledge of, or considered Complainant's prior engagement in protected EEO activity, in the evaluation of his qualifications for the position.

2.  There was no evidence of a selection panel member or the approving official's knowledge of Complainant having a disability or disabling condition.  There was nothing contained in the record which would reasonably lead a panel member or the approving official to conclude or suspect that Complainant had a disability.

3.  Panel members knew or could have reasonably concluded Complainant's sex; they knew or had concluded that Complainant was over the age of 40.  No panelist knew Complainant's exact age, with most approximating his age as late fifties to mid-sixties.  No panelist described Complainant as appearing to be much older than the applicant pool in general.

4.  Religious affiliation was not information made known to the selection panel by HD or conveyed through the individual promotion packets.  Complainant had made known his religious affiliation through conversation or apparel; each panel member attested to religion not being a factor in the rating of an applicant or in the selection of interviewees.  One panel member believed that a member of Complainant's faith had been selected for interview based upon her commentary as to her family's heritage.

5.  Resumes of other self-nominated applicants who were not selected for interview reflected competitive candidates with similar experiential levels as Complainant.

6.  While NGA failed to comply with its own instruction regarding the retention of individual panel member notes from the initial ratings of applicants' resumes, each panel member's scores were recorded on a collective score sheet.

**UNCLASSIFIED**

7.  Each panelist described the same process used to evaluate and recommend candidates for promotion, and the process mirrored the NGA Instruction.  The panel was given and followed specific guidance to consider only what was written in the package.  All panelists signed an accountability statement affirming that packages would be considered without prejudice or partiality, that each panel member had taken the mandatory diversity and unconscious bias trainings, that the panel was itself of diverse composition.

8.  Complainant's score was not comparable to those selected for interview. Complainant's package was evaluated using the same criteria from the AON as was used to evaluate all comparators.  There was no evidence that Complainant was treated differently because of his: Sex (male), as one of the applicant/comparators selected for interview was a male; Disability (not specified), as no panel member was aware of, or made aware of, or perceived, any disability of the Complainant, Complainant refused to identify a disability to the case investigator, and Complainant merely asserted his disabling condition was "known"; Age (DOB: February 1945), as the majority of applicants were over 40 years of age, 7 of the 8 applicants selected for interview were over 40 (4 in their forties, 3 in their fifties), and the selectee was 48 years in age; Religion (Jewish), because, though no religious affiliation was a demographic provided to the panel, at least one of the panelists believed one of the applicants selected for interview was of Complainant's faith; or, in Reprisal (prior EEO activity), as no panel member knew of Complainant's engagement in protected activity.

9.  The mandatory and desirable qualifications listed in the AON were utilized by the panel as rating criteria.  The panel recognized Complainant's strong contracting knowledge, but the score also reflected his lack of depth and demonstration of key characteristics and qualifications specific as desirable qualifications, inclusive of leadership experience, strategic thinking, management of multiple people, and capability to implement strategic vision.  The final ratings of the top rated candidates showed them to be stronger in leadership experience, managing people, and strategic involvement than Complainant.

10.  There was no evidence of any information from outside of Complainant's application package having been considered by anyone on the panel.  There was no evidence of the panel conducting themselves, or the affairs of the panel, contrary to the terms of the Instruction, and the panel was comprised in accordance with the Instruction's requirements.

11.  Each panelist was part of the decision to set a cut off score at 7 for determining the best qualified applicants worthy of interview based on a natural break in all applicants' scores.  The cut off score was not an arbitrary decision or one made as a pre-text for precluding the Complainant's application from further consideration.  His application, as well as other comparators' packages, were not competitive based on the factors the panel applied to all candidates.

**UNCLASSIFIED**

UNCLASSIFIED

## Applicable Law and Precedent

*Disparate Treatment Theory*

Generally, and in the absence of direct evidence of discrimination, the adjudication of complaints of discrimination alleging disparate treatment follows a three-step evidentiary analysis. To prevail in a disparate treatment claim, a complainant must satisfy the evidentiary scheme fashioned by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). The initial burden is on a Complainant to establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24 (1978); *Furnco Construction Corporation v. Waters*, 438 U.S. 567 (1978). This means that the complaining employee must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur. *Teamsters v. U.S.*, 431 U.S. 324 (1977). A complainant must initially establish a prima facie case by demonstrating that s/he was a member of a protected class and was treated differently (less favorably) than non-members of that protected class *under circumstances that would support an inference of discrimination (emphasis added)*. *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 576, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978). Proof of a prima facie case will vary depending on the facts of the particular case. *McDonnell Douglas*, 411 U.S. at 804 n.14.

If a complainant meets this burden, the burden going forward shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981). This burden is not a burden of proving that there was no discriminatory motive, but is simply one of production. *Burdine*, at 254-56. Once the agency articulates a legitimate, non-discriminatory reason for the challenged action, the *prima facie* case disappears. St. Mary's Honor Center v. *Hicks*, 509 U.S. 502 (1993); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).

The complainant then has the burden to prove by preponderant evidence that the agency's proffered reasons are merely a pretext for discrimination and that discrimination was the motivating factor. *Burdine*, at 256; see also, *St. Mary's Honor Center, supra; Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). At all times, a complainant has the burden of proof. *St. Mary's Honor Center, supra.* To ultimately prevail, the complainant must prove, by a preponderance of the evidence, that the agency's explanation is a pretext for discrimination, that is, the agency's proffered reasons are merely a pretext for discrimination and that discrimination was the motivating factor. *Burdine*, at 256; see also, *St. Mary's Honor Center, supra; Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). At all times, the complainant has the burden of proof. *St. Mary's Honor Center, supra.*

*-Age (Born February 1945)*

One aspect of the complaint arises under the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq. (hereinafter the ADEA) which prohibits employers, including the Federal government, from discriminating against employees or applicants for employment age 40 and older in hiring, discharge or conditions of employment. The ADEA also prohibits reprisal or retaliation against participation in the

UNCLASSIFIED

EEO process or for opposing any unlawful employment practices covered by the ADEA. 29 U.S.C. § 623(d).  The ADEA requires complainants to demonstrate that employment decisions were made "because of age".  Complainant's ultimate burden, therefore, is to establish that age was a determinative factor in the Agency's decisions of which he is complaining.  *Loeb v. Textron, Inc.*, 600 F. 2d 1003 (1st Cir. 1979) and *Johnson v. USPS*, EEOC Request No. 05910560 (September 17, 1991).

In order to prevail in an age discrimination claim under the ADEA, complainant must generally show membership in the group of persons protected under the ADEA (i.e., persons age 40 or over); that complainant was subjected to an adverse employment action; and that complainant was disadvantaged in favor of a younger person similarly situated to complainant.  *Simpson v. Midland-Ross Corp.*, 823 F. 2d 937, 44 FEP Cases 418 (6th Cir. 1987); *Polstorff v. Fletcher*, 452 F. 2d 17, 17 FEP Cases 123 (D. Ala. 1978) (citing *Marshall v. Goodyear Tire & Rubber Co.*, 554 F. 2d 730, 15 FEP Cases 139 (5th Cir. 1977).  Further, in identifying members of complainant's protected group, the Supreme Court has held that comparative employees do not have to be outside of complainant's protected group (i.e., younger than 40 years of age).  There simply has to be a sufficient disparity in age to suggest that an employee younger than complainant received favored treatment. *O'Connor v.  Consolidated Caterers*, 517 U.S. 308 (1996).

*-Disability (Unstated Physical or Mental)*

To establish a *prima facie* case of disability discrimination under the Rehabilitation Act, complainant must demonstrate that: (1) he is a person with a disability, (2) he is qualified for and can perform the position at issue, and (3) he received an adverse employment action as a result of his disability.  *Maxwell v. Department of Veterans Affairs*, EEOC Appeal No. 01960916, 1998 WL 321127 (June 5, 1998).  The Rehabilitation Act (29 C.F.R. s 1614.405(a)) decrees that it is unlawful to discriminate on the basis of a disability against a qualified person with a disability.  To be a qualified individual with a disability, complainant must establish that he has: (1) an impairment that substantially limits one or more major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. *Ocon v. Department of Transportation*, EEOC Appeal No. 01A35397, 2006 WL 1209735 (April 27, 2006).

An agency official must have knowledge of the complainant's disability or perceive the complainant to have a disability for a lack of knowledge of a disabling condition severs a causal connection between the complainant's disability and any personnel action.  *Ahmad v. Postmaster General*, EEOC No. 01871714 (1987).

*-Retaliation (Protected EEO Activity)*

To state a prima facie case of retaliation the complainant must allege that: (1) he is engaged in a protected activity, (2) the employer subjected him to an adverse employment action, and (3) there is a causal connection between the protected activity and the adverse action. *Weston v. Pennsylvania*, 251 F. 3d 420, 430 (ed. Cir. 2001); see also *Agular v. Morgan Corp.*, 27 F. App 110, 112 (e3d Cir. 2002); *Glenn v. Horgan Bros., Inc.* No. Civ. A. 03-6578, 2005 WL 1503428 (E.D. Pa. June 24, 2005).  Knowledge by the employer of the employee's engagement in protected activity is crucial to establishing the causal link.

**UNCLASSIFIED**

The first step in the process is for the complainant to present evidence sufficient to establish an inference of retaliation. Testimony grounded on speculation is not enough to create a genuine issue of material fact. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496 (7th Cir. 2004). Essentially, complainant has to show knowledge by the retaliating party of the protected activity in which the aggrieved claims a basis for reprisal. *Petersen v. Utah Department of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002); *Sitar v. Ind. Department of Transportation*, 344 F.3d 720, 727(7th Cir. 2003). The inference of retaliation is negated in the absence of any evidence that the decision-maker was aware of the protected activity, even if others that were not involved in any adverse determination may have had some knowledge of the protected activity.

A second critical element that must be established by the complainant for creating the inference of retaliation is a demonstration of temporal proximity between the adverse action and the protected activity, and the time frame needs to be proximate. *Clark County School District v. Breeden*, 532 U.S. 268 (2001). Generally, the more of a lapse in time between the employee's engagement in the activity and the imposition of an adverse action, the less import is afforded to the inference.

*-Religion (Jewish) and Sex (Male) Claims*

Section 717 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., prohibits discriminatory practices in employment with the federal government, based on religion and sex. In the absence of direct evidence of discrimination, the three-part analysis detailed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 @ 802 (1973), encompasses claims of religious or sex discrimination alleging disparate treatment. The complainant is required to establish a *prima facie* case by presenting facts reasonably giving rise to an inference of discrimination when otherwise not explained. The burden is on complainant to establish his case of unlawful discrimination by a preponderance of the evidence. *McDonnell Douglas Corp.*; *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24 (1978); *Furnco Construction Corporation v. Waters*, 438 U.S. 567 (1978). This means that complainant must present a body of evidence such that, were it not rebutted, the trier of fact could conclude that unlawful discrimination did occur. *Teamsters v. U.S.*, 431 U.S. 324 (1977).

If complainant meets this burden, the burden of production shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). This burden is not a burden of proving that there was no discriminatory motive, but is simply one of production. *Burdine*, at 254-56. Once the agency articulates a legitimate, non-discriminatory reason for the challenged action, the *prima facie* case disappears. *St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). The complainant then has the burden to prove by preponderant evidence that the agency's proffered reasons are merely a pretext for discrimination and that discrimination was the motivating factor. *Burdine*, at 256; see also, *St. Mary's Honor Center, supra*; *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). At all times, complainant has the burden of proof. *St. Mary's Honor Center, supra*.

21

**UNCLASSIFIED**

The essence of the *prima facie* case is that complainant presents direct or circumstantial evidence sufficient to generate a reasonable inference by the fact-finder that a prohibited consideration, such as sex or religion, was a factor in the adverse employment action. *Furnco Construction Co. v. Waters*, 438 U.S. 567 (1978); *McNeil v. Department of Defense*, EEOC Appeal No. 01980212 (June 13, 2001).

Complainant must also establish that a managing official knew of complainant's sex or religion for intentional discrimination based upon either.  If the responsible agency official was unaware of the religion or sex of the Complainant, then there is no basis for intentional discrimination.  *Ahmad v. Postmaster General*, EEOC 01871714 (1987).

## LEGAL ANALYSIS

*Rationale for a FAD*

Complainant opted for a FAD on September 22, 2014, in lieu of an administrative hearing before an EEOC administrative law judge.  As such, it is incumbent upon the Agency, and procedurally proper, to issue this FAD in compliance with the EEOC's Management Directive 110, and to decide if Complainant was discriminated against as he has alleged.

*Elements of a Prima Facie of Discrimination*

Complainant contends that he was discriminated against based on his age, sex, religion, disabling condition, and in reprisal for his prior EEO activity, when on September 6, 2013, he was not interviewed or selected for a vacant supervisory Pay Band 5 position within the OCS.  On appeal, Complainant claimed the record was deficient because it did not contain the applications for the candidates selected for an interview, precluding the Agency from being able to carry its burden to assert a nondiscriminatory, rational reason for its action.  Those materials and additional declarations have subsequently been included in the record.

*Person with a Disability*

This aspect of Complainant's claim was dismissed by the Agency EEO official for failure to state a claim (IF pp 45, 292) yet nonetheless was included in the investigation.  During the investigation, Complainant refused to identify the nature of his claimed disability and to state whether it was mental or physical (IF p 292).  There is no evidence of his ever disclosing his alleged disability to any of the responsible managing officials.  Each of the witnesses denies any knowledge of Complainant's disability or a perception that he was disabled in any manner.  Because he does not want to disclose information about his condition for privacy reasons (IF p 63), *does not believe anyone within the agency was aware of the disability* (IF p 63), and is unable to explain how or why he was discriminated against based upon the disability, except to state that he thinks "they" perceived some part of his behavior as being a disability (IF p 63), Complainant has failed to state an evidentiary basis for a claim or to establish a causal connection between the disabling condition and the adverse  personnel action.

Further, the EEOC has determined that an individual is not a person with a disability unless the impairment prevents the person from working across a range of jobs or engaging in a major life activity to the same extent as an average person (or they are perceived as such). Because Complainant has not alleged or established a disability as impacting any of his major life activities such as to substantially limit them when compared to an average person, and because he has no record of impairment, nor evidence of being regarded as impaired, he has not established himself as an individual with a disability.

*Retaliation for EEO Protected Activity*

This allegation by Complainant was also investigated despite being dismissed by the EEO office as detailed in the Notice of Partial Acceptance of Discrimination Complaint (IF pp 45-49). Essentially, Complainant asserts that he was not interviewed or selected for a position as a Pay Band 5 supervisory contract specialist because managerial officials knew of his prior EEO history and construed the evaluation of his application so as to preclude him an opportunity to interview. The EEO official upon review of his allegation concluded that Complainant failed to illustrate how he was treated differently than other applicants denied an interview.

The Complainant alleged that he was engaged in protected EEO activity at his prior (non-NGA) employment location(s) between 1979 and 2006, and because of it, in 2013 his then-current managing officials subjected him to an adverse employment action, the non-selection for an interview resulting in his not being selected for the position. Showing knowledge by the employer of the employee's engagement in protected activity is part of Complainant's case. Knowledge by the retaliating party of the protected activity in which the aggrieved claims a basis for reprisal is a critical first step. *Petersen v. Utah Department of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002); *Sitar v. Ind. Department of Transportation*, 344 F.3d 720, 727(7th Cir. 2003). The inference of retaliation is negated in the absence of any evidence that the decision-maker was aware of the protected activity, even if others that were not involved in any adverse determination may have had some knowledge of the protected activity.

Complainant maintains his EEO cases' presence on the internet demonstrates that the agency must have had knowledge of how litigious he has been (IF p 55). He believes that everyone including Mr. Hinchberger was aware of the EEO activity, though he does not know how or when Mr. Hinchberger would have learned of it (IF p 56). Mr. Unis must have known as well, but Complainant does not know how he had gained knowledge of the EEO activity. Nobody ever said to him that they had heard of his EEO activity but he is nonetheless convinced that everyone knew, including Ms. Verdon, Ms. Williams, and Ms. Crawford (IF pp 56, 57).

To the contrary, every managing official other than Mr. Hinchberger denied any knowledge of Complainant's past EEO activity. Each denied any consideration of Complainant's earlier EEO activity in the evaluation process. Mr. Hinchberger alluded to only a vague recollection of the Complainant possibly mentioning something about past EEO activity, denying any recollection of specifics and clearly stating that Complainant's EEO activity was not a factor in any part of the selection process.

A second critical element to be established by the Complainant for creating the inference of retaliation is a demonstration of temporal proximity between the adverse action and the protected activity, and that time frame needs to be very close indeed.  By Complainant's own testimony, there had been no EEO activity since his employment with NGA. Complainant does make clear that he is not claiming reprisal for the filing of this complaint but for the EEO activity prior to his NGA employment, a time period from 1979-2006 (IF p 55), and over six years prior to the date of the alleged reprisal.  A period of more than six years would be insufficient to establish temporal proximity; over six years in addition to the protected activity occurring outside the Agency's purview is unsupportable as evidence of a retaliatory animus.

Testimony grounded in speculation is not enough to create a genuine issue of material fact.  *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496 (7th Cir. 2004).  Complainant has not produced any evidence from which to validly impute or attribute knowledge of his prior EEO activity to the managing officials, or any evidence that the non-selection was in retaliation for the EEO activity.  His speculation and conclusions based upon conjecture does not constitute evidence.

*Age*

The ADEA requires a Complainant to demonstrate that employment decisions were made "because of age".  Complainant's burden is to establish that age was a determinative factor in the Agency's decision of which he is complaining.

In order to prevail in an age discrimination claim under the ADEA, Complainant must generally show membership in the group of persons protected under the ADEA (i.e., persons age 40 or over); that Complainant was subjected to an adverse employment action; and that Complainant was disadvantaged in favor of a younger person similarly situated to Complainant.

It is clear from the demographics within the ROI that Complainant is in the protected group, as was all but one of the candidates selected for interview.  Though it may be that Complainant was the oldest of the candidates referred, there is not such a disparity between his age and those of 50% of the interviewees as to create a distinct age bracket within those applicants over 40.

More importantly, none of the panel members indicated that age was a factor in their decision as to the best qualified candidate.  Moreover, several expressed that the type and extent of leadership experience thought as critical for the position would most likely be disadvantageous for a candidate without years of experience.  All managing officials dispute Complainant's contention that they were looking for younger employees to promote.

There is no evidence other than Complainant's assertions that the managing officials weighed Complainant's age of over 40 as a determinative factor in his non-selection for an interview.  His contention that as the oldest person applying for the position there could be

nobody else more qualified is a subjective belief.  His assertion that the agency has a record of promoting younger employees as opposed to older, and moving older employees into positions from which they become less qualified for future promotions, is not borne out by any factual basis presented or incorporated within the record, and is inconsistent with the attestations of each of the panel members' testimonies of their promoting or selecting applicants without regard to age.

There is no evidence supportive of Complainant's assertions that management weighed Complainant' s age of over 40 as a determinative factor in his non-selection for an interview.

*Religion and Sex*

The Complainant is required to present facts reasonably giving rise to an inference of discrimination that otherwise are not explained.  The burden is to establish his case of unlawful discrimination by a preponderance of the evidence.  *McDonnell Douglas Corp.*; *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24 (1978); *Furnco Construction Corporation v. Waters,* 438 U.S. 567 (1978).  This means that Complainant must present evidence to the degree that if it were not rebutted, the trier of fact could conclude that unlawful discrimination did occur. *Teamsters v. U.S.,* 431 U.S. 324 (1977).

Complainant maintains that he was denied an opportunity to interview because of his religion.  He offers as facts giving rise to a reasonable inference of discrimination that he was the best qualified person for the position based upon his training and experience. Notwithstanding, he was not selected for an interview and it must be because management officials noted his religious dress, appearance, and associated behaviors. He presumes that no one that might have applied exhibits a similar religious dress, practice, and manner.

Management officials on the panel acknowledge that they knew of Complainant's religion either by Complainant's telling them in past discussions or by concluding that Complainant was Jewish through associating his dress and appearance with the Jewish faith.  Each management official denied any consideration of his faith or faith-based practice in evaluation of his resume.  All attest that the subject was never discussed or referenced by innuendo.  Complainant presents only his conclusion that his faith was a factor in the selection process.  Management's articulation of Complainant's qualifications for the position vis-à-vis the qualifications within the resumes of those selected for interview – particularly in regard to the desirable qualifications of breadth and depth of demonstrated leadership or supervisory experience- stand as reasonable explanations for excluding Complainant from the interview process, negating Complainant's inference of discrimination.  Three of the four evaluators served in a supervisory role over Complainant at some point in time prior to their service on the selection panel.  Complainant suggests nothing indicative of any bias as to his religious faith exhibited by these management officials toward him prior to their scoring his resume.  For religion to have been a factor, each evaluator while evaluating Complainant's resume in a private setting, would have had to have discriminated against Complainant for his cumulative score to have been so

impacted.  Panel members deny any lobbying to move the Complainant down the list of qualified candidates.  The belief by one panel member that a comparator was of the same faith as Complainant and was selected to be interviewed, would lend further credence to the panel's claim that religion was not a factor in the evaluation assessment.

Sex is similarly claimed as a discriminatory basis.  Complainant alleges that management desired a female for the position, and because he was a male, he was not selected to be interviewed, precluding his chance at being offered the position.  A female was selected as best qualified from those selected for interview.  Because the selectee for the position could only come from those qualifying for interview pursuant to the policy, because both males and females were selected to be interviewed, he was not disadvantaged or distinguished from the qualifying group on the basis of his sex.

*Agency's Legitimate, Non-Discriminatory Reasons*

Once the agency articulates a legitimate, non-discriminatory reason for the challenged action, the *prima facie* case disappears.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993); <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133 (2000).  The Complainant then has the burden to prove by preponderant evidence that the agency's proffered reason(s) are merely a pretext for discrimination and that discrimination was the motivating factor for the personnel action.  If Complainant meets this burden, the burden of production shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions.  <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).  This burden is not a burden of proving that there was no discriminatory motive, but is simply one of production.  <u>Burdine</u>, at 254-56.

Assuming arguendo that Complainant did present a *prima facie* case as to any one or combination of age, religion, or sex discrimination, management officials have articulated a legitimate reason for their action.  All members of the evaluation team attest that they endeavored to follow NGA hiring policies and practices, had participated in many hiring panels before, acted in good faith, and aimed to accomplish their mission to hire the best qualified candidate.  In this case, the vacant position had been delineated as one of the most senior within the office of contracting and the need was for a candidate with considerable contract and leadership experience within multiple buying divisions of NGA.

Panel members expressed reservation as to Complainant's lack of supervisory experience, *especially*[5] in an operational contracting role.  Specifically, Complainant did not have the experience level working in buying divisions at NGA; was viewed as having a weakness in leadership and strategic involvement; had strong contracting knowledge but no experience in leading medium or large teams; and his resume did not clearly reflect strategic thinking/

---

[5] The Commission's Order of June 25, 2019, at footnote 2, page 4, noted that in its first appellate decision of April 4, 2017, related to the Agency's FAD of November 21, 2014, the record prevented the Commission from determining whether the interviewees demonstrated supervisory experience in an operational contracting role.  The emphasis in the first FAD, as clarified in the second FAD, and emphasized again in this FAD, was that broad supervisory experience, especially if the supervisory experience was gained in an operational contracting role, was an important consideration for the panel, as the vacant position was for a supervisory contracting specialist at the GS-15 equivalent level.

agility, or demonstrate experience in setting up and implementing large operations. Further, Complainant had not managed across organizational lines or been involved in resolving or implementing strategic visions. His resume did not reveal strength in supervision, resource management, personnel development, and strategic leadership. These deficits were not weaknesses of the eventual selectee. Though Complainant had decent contracting experience it was not to the depth or breadth of those candidates selected for interview.

In review of the resumes submitted as a result of Complainant's appeal and the Commission's decision, all interviewees showed actual supervisory experience beyond an informal, team lead/supervisory assistant role. The interviewees led significant contracting efforts, supervised organizational contracting teams, and/or possessed broad leadership experience. Most of the resumes reveal multiple or lengthy supervisory assignments. The few interviewees that did not show *multiple or lengthy*[6] supervisory experience, did possess experience related to an operational contracting assignment or area of extensive operational responsibility; consistent with the panel's screening criteria.

Though resumes do not normally provide a great deal of context, these resumes were sufficiently detailed for a knowledgeable panel to be able to differentiate various degrees of supervisory from near-supervisory experience. Because senior officials believe vacancy announcements for supervisory positions should require higher degrees of demonstrated leadership, the distinction is with merit and was a legitimate measure for distinguishing those with the requisite skills from those remaining applicants. If a panel member knew of an applicant's religious preference, it was information learned outside of the application process, and was not information that could be, or, from the testimonies, was considered in the assessment/evaluation of a candidate.

*Pre-textual Rationale*

Once an agency articulates legitimate, nondiscriminatory reasons for its actions, the burden shifts back to Complainant to prove, by a preponderance of the evidence, that the agency's reasoning was a pretext for discrimination.

A Complainant can raise an inference of pretext by showing weakness, implausibility, inconsistency, incoherency, or contradiction in the reasons offered for the agency's actions- *Opare-Addo v. USPS*, EEOC Appeal No. 0120060802 (Nov 20, 2007). He might also provide evidence of deviation from norm, irrationality, or unreasonableness of an agency's basis for its conduct, such that a reasonable fact finder might find the explanation unworthy of credence. Other indices of pretext include: documentary statements; or past personal treatment attributable to those responsible for the personnel action that led to the

---

[6] The FAD of August 17, 2017, erroneously omitted the qualifier "multiple or lengthy". Without the qualifier, the sentence is incongruous with the preceding characterization that, "… *all* interviewees showed actual supervisory experience, beyond an informal, team lead/supervisory assistant role." The resumes of each interviewee, as noted by the selection panel's testimonies, reflected that most interviewees had lengthy or multiple supervisory assignments. The few that did not show multiple or lengthy supervisory roles, possessed strength in other detailed desirable evaluation criteria rated as exceeding the qualifications of the Complainant, i.e.-supervisory experience in an operational contracting environment.

filing of the complaint; comparative or statistical data revealing differences in treatment across various protected groups; unequal application of agency policy; or deviation from standard operating procedures without justification or explanation. _Mellisa F. v. USPS_, EEOC Appeal No.0120141697 (November 12, 2015).

Complainant first raised on appeal that the Report of Investigation was inadequate for not including the ratings issued, and the articulated reasons for how the ratings were reached. The Complainant also argued that the Agency refused to produce the rating sheets and related records, and such would have afforded him the ability to establish pre-text for discrimination.  The Commission found the record to be inadequate to enable a determination as to the legitimacy of the Agency's decision, and the Agency was required to supplement the record with application materials of those chosen for interview.

But unlike the case of _Ashlea P. v. Kevin McAleenan, Acting Secretary, Department of Homeland Security (Customs and Border Protection)_, Agency, EEOC Appeal No. 0120182299, May 29, 2019, wherein the EEOC held that the Department had failed to meet its burden of production by merely describing its adherence to a selection process as the legitimate reason for its action, the record in Complainant's case here reveals that the panelists determined the Complainant to have insufficient supervisory experience to be considered a best qualified candidate as reflected in his having little or no supervisory experience in an operational contracting environment.  The Agency did more than explain the general mechanics of how the selection process was conducted, by specifically noting the weakness of Complainant's resume in terms of the mandatory and desirable qualifications, as compared to those selected for interview.

However, in as much as the prior review and discussion did not contrast Complainant's resume as to each and every comparator, and to each of the desirable qualifications, the Agency reconsidered the resumes and notes of the evaluators for a detailed comparison.

The Agency still finds that Complainant's resume did not show Complainant as having experience with, or occupying higher level leadership positions or involving strategic involvement.  Panelists also scored Complainant as weak in experience leading medium or large contract teams or larger operational efforts.  While at NGA, Complainant had served as a team lead, and generally, a team lead is not charged with supervisory responsibilities. His resume did not reveal the contracts he oversaw as involving a high degree of complexity or operational impact.  Though his years of government contracting experience dated to October 2000, his contracting experience at NGA commenced in October 2006, and appeared focused on primarily managing the Contractor Officer Representative programs.  The panel concluded he had not managed across organizational lines or been involved in resolution or the implementation of strategic visions.  His rating of a "5" from each panel member's independent review of his applicant package did reflect a credit for limited leadership, but not to the level of those interviewed, and certainly not to the degree of the selectee's demonstrated ability to lead contracting professionals and manage a broad array of acquisition efforts across differing buying divisions.  Since the position entailed senior supervising capabilities, Complainant's lack of broad experience across the NGA contracting continuum, as reflected in his resume, contributed to his lower rating.

UNCLASSIFIED

According to the NGA Selection Profile Score (1-9 rating scale) (Exhibit 2, Supplemental Investigation), a "5" described a candidate that met all of the desired skills and competencies and exhibited about the same performance-based potential as most employees.

The selectee, Ms. Eichelberger, had been serving at the time of the candidate screening as a deputy director.  She had at least three years of senior supervisory contracting experience over teams ranging in size from eight to twenty-two contracting specialists. She oversaw imagery (operational) contracting worth nearly 9 billion dollars, and oversaw military support task orders of nearly 250 million dollars.  Her prior titles included deputy chief of several directorate divisions.  She earned a score of "9" from the panel at the conclusion of their independent resume review.  According to the Profile Score, a "9" meant that an applicant greatly exceeded the desired skills and competencies and exhibited greater performance-based potential than all but a few employees.  The alternate selectee was Ms. Ladson and her resume showed that she had served as a lead contracting officer for over twelve years and had been the chief of the OCS plans and policy branch for nearly two years.  Panel notes reflected Ms. Ladson's leadership experience in a variety of assignments through her military service in the Maryland National Guard, with a broad background in strategic program management and examples of collaboration.  Ms. Ladson earned a score of "8".  The score is indicative of an applicant whose package does not reflect a capability to the level of greatly exceeds, but does demonstrate a greater potential than one who exceeds the desired skills and competencies and exhibits more performance-based potential than most employees, the description of a score of "7".

A review and comparison of the resumes of the remainder of those selected for interview further illustrates the import the panel ascribed to evaluating the applicants in terms of the specified mandatory and desirable criteria related to contracting leadership.  Remembering those criteria to include leadership experience, strategic thinking, management of multiple people, and the demonstrated capability to implement strategic vision, the final ratings of the top rated candidates showed them to be stronger in each element as compared to Complainant.

The five other candidates interviewed (scoring at or above the cutoff number) included Ms. Goodman (7), Ms. Michael (8), Mr. Larman (7), Ms. Smith (8), and Ms. Hill (7).

    a.  Ms. Goodman's resume detailed her supervisory contract experience as a team chief and responsibility for oversight of a five billion dollar, complex IT/IS contract.  She also was responsible as the sole contracting officer for the complicated CASi contract.

    b.  Ms. Michael's resume detailed supervisory duties totaling over three years as a contracting officer and an additional year as a contracting specialist for the performance cycle.  She also served as a supervising contract specialist with performance appraisal responsibilities as a team lead over a four person team.  Panel notes did not appear to rate Ms. Michael's supervisory skills as exceptionally notable, but her leadership abilities were the subject of comment, as was her capability to administer several multi-million dollar

UNCLASSIFIED

contracting efforts across programs, and to independently manage a source selection effort.

c. Mr. Larman supervised a five member team and mentored numerous Agency employees not under his direct supervision. His contracting experience included management of a number of contractor programs totaling up to one billion dollars. He also cited to his experience with acquisition strategy planning.

d. Ms. Smith's experience included extensive education in Business Administration far beyond the mandatory Bachelor's degree, coupled with a demonstrated ability in complex contract implementation and management, and supervisory contracting experience both at NGA and in her years of service with the US Army Acquisition Support Center.

e. Ms. Hill was viewed by the panel as having good supervisory contract experience gained in the course of her service overseeing the team of five contracting professionals in support of the HD and in administering the complex IT contract and contracting team in support of that effort. Her leadership ability was also reflected in her past experience as a Senior Program Manager and Contracting Officer with a sister US Intelligence Agency.

After addressing the Commission's concerns of inadequacy of the initial evidentiary record and the lack of a person-by-person comparative analysis between the interviewees and the Complainant, the Agency re-screened the record for other indicia of pre-text. There was no evidence of inconsistency, incoherency, or contradiction in the testimonies of the selection panel witnesses as to the mandatory and desirable qualification criteria utilized as the basis for determining the best qualified candidates. The selection criteria manifested the specifications, duties, and responsibilities of the recruited position, and though more than five years passed since the evaluation of applicants, there was nothing in the supplemental declarations suggestive of artifice, conjecture, discordance or bias. There were not conflicting statements, nor documentary exhibits reflective of divergence from established norms or expected processes in the conduct of the selection panel. Nothing in the record, or information presented by Complainant evidenced animosity toward, or past antagonistic or discriminatory personal treatment of, the Complainant by any member of the selection panel, which might have been the basis for a perception of pre-text.

Notwithstanding there being no evidence of any departure from expected practice by the selection panel, the Agency did discover an apparent deviation from the Agency's guidance, as specified in its Instruction, for the retention of all panelists' notes (IF p 278 (Appendix 10, NGA Instruction on Filling Civilian Positions). The materials maintained by HD as to this particular selection did not include the scoring/screening notes of the panel members as to those applicants not earning a score of at least a "7". The request for the materials made during the course of the Supplemental Investigation resulted only in representations that all of the scoring sheets should have been maintained by HD but that it was not unheard of that in the past, selecting officials might not have been asked for the materials to be forwarded for retention by HD.

The inconsistent application of the prescribed practice does not appear to be unique to this hiring action, and although a factor which could give rise to an inference of pre-text, when viewed with all of the evidence within this record, most especially the lack of a clearly demonstrated comparator as to each and every protected category claimed by Complainant, is not sufficient evidence to establish Complainant's burden.  The Agency stated in its earlier decision.

The Commission has noted that indicators of pretext include discriminatory statements, deviations from standard process without any proffered justification, statistical data showing different treatment, unequal enforcement or application of Agency policy, or inconsistencies without explanation in the evidentiary record.  In the present case, the resumes evaluated by each selection panel member were scored according to established practice and consistent with applicant selection panel procedures directed by the Agency's HD.  The testimonies support that each panel member saw in the resumes of those selected for interview sufficient indications of the position requirement to have expertise in both contracting and leadership.  All evaluators deny having held a negative view of Complainant and emphasize that they scored the resumes only against the selection criteria.  None were directed or persuaded to recommend, or not to recommend, a particular candidate.  Complainant's non-selection for an interview was not a personal decision against him but attributable to his mid-range resume score.

After considered further review, the evidence confirms the basis for that finding.  The Agency also argued in its prior decision:

Though resumes do not normally provide a great deal of context, these resumes were sufficiently detailed for a knowledgeable panel to be able to differentiate various degrees of supervisory from near-supervisory experience.  Because senior officials believe vacancy announcements for supervisory positions should require higher degrees of demonstrated leadership, the distinction is with merit and was a legitimate measure for distinguishing those with the requisite skills from those remaining applicants.

Complainant's argument that he was better qualified than those selected for interview and that had he been selected for interview, he would have been selected for the position, lacks any evidence of his better qualifications.  Indeed, it appears that his inclusion for consideration at all was the result of a mistake as to his satisfaction of the educational requirements; this beneficial error notwithstanding, the panel still viewed the Complainant as a mid-level candidate.  If an Agency's selection process is to be afforded any deference, it cannot be the subject of reassessment of every personnel decision made by the knowledgeable professional.  The Commission recognizes that absent evidence of unlawful motivation, promotion and personnel matters should not be second-guessed. *Vanek v. Department of the Treasury*, EEOC Request No. 05940906 (January 16, 1997).  Complainant's contention that the panel erred in its assessment of his qualifications versus the qualifications of those selected for interview is without merit.  Despite the investigator's explanation that Complainant's answers to questions would be used to elicit information from other witnesses, and that the Complainant would be afforded the opportunity for rebuttal as a means for him to address expressed Agency motive, or the Agency's

**UNCLASSIFIED**

pronounced legitimate basis for its actions (IF pp 6, 292), Complainant proffered as evidence only what he believed, or maintained others knew or should have known, as justification for his contention on appeal, that the Agency's excuse for its personnel selection was simply a pre-text for discrimination.

## DECISION

Accordingly, based on the record, as recently supplemented and as previously amended, per the direction and prior direction of the EEOC, it remains the decision of the Agency, that Stan Laber, as Complainant, failed to prove a claim of discrimination based on disability, reprisal, religion, sex, and age with respect to the issue accepted for investigation. The entire record has been reviewed and considered. The Agency concludes that there is no evidence of unlawful discrimination, and therefore, it is the final decision of the Agency that the Complainant was not discriminated against, as alleged.

Complainant submitted no supplemental records or rebuttal evidencing or clarifying a basis for pre-text, there not appearing any clear evidence of pre-text from within the existing record, and, the Complainant having failed to present a factual case of pre-text sufficient to meet his burden of proof, the Agency finds the claim of disparate treatment discrimination to be unsubstantiated.

*Statement of Relief*

The Complainant initially sought as relief a Pay Band 5 Supervisory Contract Specialist position, pecuniary and no-pecuniary damages (IF pp 7, 247). His formal EEO complaint sought in relief those measures that would make him whole in every permitted (sic) under Title VII, as amended (IF p 3).

There being no finding of discrimination, the Complainant is not entitled to any relief, and none is awarded or appropriate.

If you are dissatisfied with this decision, you have the following rights:

## NOTICE OF EEOC APPEAL RIGHTS

If you are dissatisfied with this decision, you (you, on behalf of your client) may file an appeal in accordance with 29 C.F.R. 1614.402 and 29 C.F.R. 1614.403 within thirty (30) calendar days of receipt of this correspondence. You may submit the appeal in writing by mailing it to:

> Equal Employment Opportunity Commission
> Office of Federal Operations
> PO BOX 77960
> Washington, D.C.  20013

Or, you may send a facsimile of the appeal to:

> (202) 663-7022

32

**UNCLASSIFIED**

The thirty day period for filing an appeal begins on the date of **receipt** of this decision. The appeal must be timely or it may be dismissed.  An appeal shall be deemed timely if it is delivered in person or postmarked before the expiration of the filing period, or in the absence of a legible postmark, the appeal is received by the Commission by mail within five (5) days after the expiration of the filing period.

A copy of EEOC Form 573, "Notice of Appeal/Petition" (enclosed), should be included with the appeal to indicate what is being appealed.  In or attached to the appeal sent to the commission, you must certify the date and method by which service was made on the agency.

Any statement or brief filed in support of the appeal must be submitted to the Director of the EEOC Office of Federal Operations (OFO) at the address given previously within thirty (30) calendar days of the filing of the appeal.  A copy of any statement or brief filed in support of the appeal must also be mailed to:

> National Geospatial-Intelligence Agency/ODE
> Attn: Patsy A. Coleman/Mail Stop L-11
> 3838 Vogel Road
> Arnold, Mo 63010

Following the receipt of the appeal and any brief or statement in support of the appeal, the Director, OFO, will request a copy of the complaint file from this agency.  NGA must submit the file and any statement or brief in opposition to the appeal to the OFO Director within thirty (30) days of receipt of the request for the complaint file.  A copy of the NGA statement or brief must be served on the Complainant at the same time.  You are also asked to submit a copy of the appeal to the agency representative at:

> National Geospatial-Intelligence Agency
> Office of General Counsel
> Attn:  Ms. Heather Herbert/Mail Stop S71OGCA
> 7500 GEOINT Drive – Mail Stop: S71-OGC
> Springfield, Virginia 22150

## NOTICE OF RIGHT TO FILE A CIVIL ACTION

29 C.F.R. Section 1614.408 provides that a Complainant may file a civil action in an appropriate US District Court.  A civil action may be filed:

- Within ninety (90) calendar days of receipt of this decision if no appeal has been filed;
- Within ninety (90) calendar days after receipt of the EEOC's final decision or action on appeal; or
- After 180 calendar days from the date of filing an appeal with the EEOC if there has been no final decision by the Commission.

29 C.F.R. Section 1614.409 states that if a Complainant alleges a violation of the Equal Pay Act, s/he is authorized under the Fair Labor Standards Act (29 U.S.C. 216(b)) to file a civil action in a court of competent jurisdiction within two years, or, if the violation is willful, three years of the date of the alleged violation regardless of whether s/he pursued any

complaint processing.  Recovery of back wages is limited to two years prior to the date of filing suit, or to three years if the violation is deemed willful; liquidated damages in an equal amount may also be awarded.  The filing of a complaint or appeal in that instance does not toll the time for filing a civil action.

The official agency head or department head must be named as the defendant.  The terms, "agency" or "department" include the national organization, and not just the local office, facility, or department in which the Complainant works.  Do not name just the agency or department.  In this instance, **Mark Esper, Secretary, US Department of Defense**, is the proper defendant.  Failure to provide the name or official title of the agency head or department head may result in dismissal of the case.

If you decide to file a civil action and if you do not have or cannot afford the services of an attorney, you may request that the Court appoint an attorney for you.  You may also ask the court to grant permission to file the action, without fees, costs or other security.  The granting or denial of an attorney does not extend the time in which to file a civil action.  Both the request and the civil action must be filed within ninety (90) calendar days of the date after the Commission's decision has been received.

## Docket Number

The Agency Case Number, **NGAE-14-003**, should be used on all correspondence concerning this complaint and decision.

Sincerely,

BETH C. FLANAGAN
Director, Office of Diversity, Inclusion
and Equal Employment Opportunity

Date: 5 Sep 2019

Enclosure:
EEOC Form 573

cc:
NGA Office of General Counsel
Attn:  Ms. Heather Herbert/Mail Stop S71OGCA
7500 GEOINT Drive – Mail Stop: S71-OGC
Springfield, Virginia 22150

# Exhibit 36



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Office of Federal Operations**
**P.O. Box 77960**
**Washington, DC 20013**

Stan Laber, a/k/a
James T.,[1]
Complainant,

v.

Lloyd J. Austin III,
Secretary,
Department of Defense
(National Geospatial-Intelligence Agency),
Agency.

Appeal No. 2020000304

Agency No. NGAE-14-003

## DECISION

On October 15, 2019, Complainant filed an appeal with the Equal Employment Opportunity Commission (EEOC or Commission), pursuant to 29 C.F.R. § 1614.403(a), from the Agency's September 5, 2019 final decision concerning his equal employment opportunity (EEO) complaint alleging employment discrimination in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq., Section 501 of the Rehabilitation Act of 1973 (Rehabilitation Act), as amended, 29 U.S.C. § 791 et seq., and the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq.

## BACKGROUND

At the time of events giving rise to this complaint, Complainant worked as a Supervisory Contract Specialist, IA-1102-04, at the Agency's Office of Contract Services in Springfield, Virginia.

On March 10, 2014, Complainant filed an EEO complaint alleging that the Agency discriminated against him on the bases of sex (male), religion (Jewish), disability, age, and reprisal for prior protected EEO activity (request for information covered under the Freedom of Information Act and Privacy Act) when, on September 6, 2013, he was not interviewed or selected for the position of Contract Specialist, Pay Band 5, AON 20130968.

---

[1] This case has been randomly assigned a pseudonym which will replace Complainant's name when the decision is published to non-parties and the Commission's website.

2                                                                2020000304

The Agency dismissed Complainant's alleged basis of reprisal pursuant to 29 C.F.R. § 1614.107(a)(1), finding that he failed to allege an adverse action that was taken against him based on prohibited protected activity that would be covered by applicable statutes. It also dismissed Complainant's alleged basis of disability, pursuant to 29 C.F.R. § 1614.107(a)(1), for failure to state a claim, noting that Complainant refused to disclose the nature of his disability to the EEO Counselor.[2]

The Agency investigated the claims and, after receiving the report of investigation (ROI), Complainant requested a final agency decision (FAD). The Agency issued its FAD on November 21, 2014, finding Complainant failed to establish his claim. Complainant appealed to the Commission and, on April 4, 2017, the Commission vacated the FAD and remanded the matter to the Agency. The Agency issued another FAD which the Commission vacated on June 25, 2019. The Commission remanded the matter for a supplemental investigation and a new FAD.

The Agency investigations produced the following pertinent facts.

Regarding his alleged basis of reprisal, Complainant attested that he filed between 50 and 100 EEO complaints between 1979 and 2006, but the instant case was the first filed against the Agency. Complainant alleged that the responsible management officials (RMOs) were aware of his prior EEO activity during the selection process for the position at issue and believes the Agency did not select him because of it. He also alleged the RMOs held negative opinions of him and made sure he would not be interviewed.

Regarding his alleged basis of disability, Complainant refused to disclose the nature of his disability and attested that he did not believe anyone at the Agency had knowledge of his disability. However, he attested that he still believed his disability may have been a factor in that Agency employees may have perceived that his behavior was driven by a disability.

The Group Chief, Division Chief and two Supervisory Contract Specialists (Supervisor1 and Supervisor2), who were members of the selection panel, as well as the Director of Contracts, who was the approving official, attested that they did not recall knowing of Complainant's prior EEO activity or disability, prior to learning of the instant complaint.

Complainant attested that he believed the Agency discriminated against him by not interviewing and not selecting him for the position at issue. Complainant attested that he believed that he should have been interviewed and selected for the position because he had more experience, training, and knowledge than anyone inside or outside of government service. He asserted that he was the oldest applicant, although he acknowledged not knowing any of the other candidates or seeing their application materials. He generally asserted that he did not believe it was possible that there was a better candidate in light of his experience, education, training, and certifications.

---

[2] The Agency indicated that the disability and reprisal claims would not be investigated, but the reports of investigation include questioning as to these bases.

3                                    2020000304

Complainant attested that he believed the Agency RMOs scored him unfairly and inaccurately in the selection process for the position at issue. He acknowledged that he had no proof or witnesses to his allegation that he was discriminated against based on his age, religion, sex, disability, or EEO activity. However, he asserted that he believed Agency leadership prefers younger employees and leaders and has a history of placing older employees in dead-end positions and not promoting them. He asserted that he assumed that no one else applied who had his religious characteristics and that he was viewed as uncooperative when he refused to do something based on his religion. He attested that he alleged sex as a basis so that he would not miss any allegations, as he believed that most selectees were women with military experience.

The Group Chief attested that the referral certificate for the position at issue contained no information about each applicant's age, religion, sex, disabilities, or EEO activity. He explained that each member of the selection panel rated and ranked the applicants' resumes and, if two or more panel members were to rate an applicant more than one point apart, the panel convened to discuss their ratings. He explained that, after the resume scores were consolidated and averaged, the panel met to identify a logical break point in the overall numeric rankings, to decide who would be interviewed.

The Group Chief explained that they decided to interview 7 of the 16 referred candidates, with the breakpoint for interviews being a score of 7 or higher. He attested that all four panel members independently rated Complainant's resume as a "5." He attested that the eventual selectee received an overall score of 9, which was the highest of the applicants.

The Group Chief attested that Complainant's rating reflected the fact that he had very limited or no supervisory experience in an operational contracting role. The Group Chief attested that, in the one operational position where Complainant appeared to have a leadership role, he was a Team Lead, which is typically an informal, quasi-supervisory position and, to the extent Complainant had any supervisory experience, it was at the first-line level. He attested that his biggest concern was his apparent lack of supervisory experience. He attested that, by contrast, the selectee had supervised larger teams and at the division level. He also attested that Complainant did not have the same depth or breadth of experience as other candidates. He attested that Complainant was a good solid performer but not necessarily outstanding. He attested that, regarding Complainant's 30 years' experience, that the person with the most on-the-ground working experience does not necessarily make the best manager.

The Group Chief attested that the panel conducted interviews prior to selection, and they interviewed 7 candidates – those having an average score of 7 or above on their resumes. He attested that the panel felt they were the strongest candidates. He attested that Complainant did not get an interview because he had an average score of 5. He attested that the panel recommended the selectee, who had an average score of 9, which was the highest, and they recommended an alternate, who was 1 of 3 candidates who received an average score of 8. Their recommendations went to the Director of Contracts.

4                                                              2020000304

The Division Chief attested that Complainant was in the middle portion of her ranking list, with a resume score of 5. She attested that Complainant lacked broad experience across the Agency's contracting organization and the position at issue was one of the most senior within the office of contracts. She explained that Complainant had a lot of experience, duties, and assignments outside the normal buying realm, but she was looking for someone with significant breadth and depth of contract experience, particularly within multiple buying divisions of the Agency. She attested that there was a natural cut point in the average scores at 7, as there was clearly a group toward the top and a group at the bottom. She attested that Complainant was in the lower group. She attested that they decided to interview the top 8 candidates because there were so many candidates and there was a natural break in qualifications from the scoring. She attested that after the interviews, the panel ranked the final candidates, combining resume and interview, and the selectee was the panel's top candidate.

The Division Chief explained that her assessment of the selectee was that she had supervisor contract experience across four different buying divisions within the Agency's contracts organization, with 13 years' experience in those divisions. She attested that the selectee was currently serving in the Deputy role and essentially was already performing Band 05 work. She attested that the selectee had source selection experience and a lot of depth and breadth in working various contracts, whereas Complainant had a lot of experience outside of the Agency and not a lot of experience working in buying divisions at the Agency. She explained that the position was one of the senior positions within the contracting organization and they needed someone who had a good understanding of various customers across the Agency and their requirements.

Supervisor1 attested that she also rated Complainant's resume a 5. She attested that his resume demonstrated strong contracting knowledge, but his resume was weakest with respect to demonstrated leadership experience, leading medium to large teams. She attested that, although he had some supervisory experience, to her knowledge, he only supervised one person at a time and, most recently, it was not in contracting. She attested that his weakest area was leadership and strategic involvement, as he had no experience leading medium or large teams. She attested that strategic thinking/agility and managing multiple people were not clear on his resume. She attested that he did not have the experience of setting up a larger operation and implementing it. She attested that he had not managed across organizational lines and had not been involved in resolving or implementing strategic visions. She attested that she gave the selectee a 9, noting that she had been in a leadership position at least as far back as 2002-2003 when she was the Deputy of one of the contracting divisions. She attested that, in that role, the selectee had about 10 direct subordinates and shared responsibility for about 20. She attested that the selectee has been in supervisory roles ever since then, in different divisions and levels.

Supervisor2 attested that she could not recall the details or her rating and ranking the resumes. However, she attested that Complainant's qualifications were not at the same level as those who were interviewed, noting he had never been in an Acting Deputy Division Chief position and never led a large team.

5                                          2020000304

The Director of Contracts attested that, as the approving official, she received a selection package that shows everyone who applied, who was on the selection panel, and a summary of who was interviewed. Se attested that she checked to see whether the panel complied with the Agency's rules on diversity, which the panel did, and verified that the panel conducted a resume review before deciding who they would interview. She attested that the panel applied criteria to establish a ranking, they ranked the candidates and selected the highly competitive resumes. She attested that she verified that they did not interview someone who was way down on the scoring scale. She attested that there was a line drawn based on the criteria and the most highly rated candidates were interviewed. She attested that, once she verified that the interviews were decided based on consistently applied criteria, she looked at how the panel scored all of the individuals who were interviewed, making sure that the panel selected someone from the most highly qualified candidates, that they used objective criteria, and that they applied the criteria consistently. She attested that she made sure that the job was given to the most qualified candidate and signed off on the selection. She attested that she did not see any red flags or need to provide course corrections to the subordinate Agency officials running the selection.

A Human Resources Specialist (HR) attested that, as a recruiter, it was her role to receive all applications and resumes. She attested that she took the job announcement and read through the resumes to determine whether the candidates were qualified for the position; then, she made a recommendation to the hiring manager about whether the candidates were referred. She explained that the referral certificate was sent to the hiring manager and they make their pick from the list. She attested that, in this case, the panel received 16 referred applicants and they decided to interview the top 7 candidates, all of whom scored 7, 8, or 9. She attested that anyone who fell below the cutoff point, which was a score of 7, was not interviewed. She attested that, they interviewed just about 50% of the list and this was a good number of interviews. She attested that panel members or selecting officials do not receive any information regarding the applicants' age, race, sex, disability, or prior EEO activity.

The supplemental ROI indicates that management provided a list of the qualifications for the position. It also includes the Selection Profile Score form completed for each applicant, the certification package, including the certificate of eligibles, assignment opportunity certification, rating and ranking sheets, panel notes/individual rating forms, and panel composition accountability statement. It also includes the applicants' resumes and demographic information for the applicants who were interviewed.

At the conclusion of the investigation, the Agency provided Complainant with a copy of the report of investigation and notice of his right to request a hearing before an Equal Employment Opportunity Commission Administrative Judge (AJ). In accordance with Complainant's request, the Agency issued a final decision pursuant to 29 C.F.R. § 1614.110(b). The decision concluded that Complainant failed to prove that the Agency subjected him to discrimination as alleged.

The instant appeal followed. On appeal, Complainant argues that the Agency's investigation was insufficient, and the Agency's FAD lacked analysis.

6                                                                           2020000304

<u>ANALYSIS AND FINDINGS</u>

As this is an appeal from a decision issued without a hearing, pursuant to 29 C.F.R. § 1614.110(b), the Agency's decision is subject to *de novo* review by the Commission. 29 C.F.R. § 1614.405(a).  See <u>Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614</u>, at Chapter 9, § VI.A. (Aug. 5, 2015) (explaining that the *de novo* standard of review "requires that the Commission examine the record without regard to the factual and legal determinations of the previous decision maker," and that EEOC "review the documents, statements, and testimony of record, including any timely and relevant submissions of the parties, and . . . issue its decision based on the Commission's own assessment of the record and its interpretation of the law").

A claim of disparate treatment is examined under the three-part analysis first enunciated in <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)</u>. For a complainant to prevail, he must first establish a *prima facie* case of discrimination by presenting facts that, if unexplained, reasonably give rise to an inference of discrimination, *i.e.*, that a prohibited consideration was a factor in the adverse employment action. <u>McDonnell Douglas, 411 U.S. at 802, n. 13</u>; <u>Furnco Constr. Corp. v. Waters, 438 U.S. 567 (1978)</u>. The burden then shifts to the agency to articulate a legitimate, nondiscriminatory reason for its actions. <u>Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)</u>. Once the agency has met its burden, the complainant bears the ultimate responsibility to persuade the fact finder by a preponderance of the evidence that the agency acted on the basis of a prohibited reason. <u>St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)</u>.

Here, Complainant alleged that the Agency treated him disparately in not selecting him for an interview, and ultimately, a Pay Band 5 level Contract Specialist position. Even assuming *arguendo* that he established a *prima facie* case for each of the bases of discrimination alleged, we find the responsible Agency officials articulated legitimate, nondiscriminatory reasons for its actions. The officials directly involved in the selection process explained that Complainant did not advance to the interview stage because his resume showed little supervisory experience in an operational contracting role and lacked the depth or breadth of experience exhibited by other candidates. The witnesses explained that Complainant's resume was also relatively lacking in demonstrating leadership and strategic involvement, as he had no experience leading medium or large teams. They also  explained that Complainant lacked broad experience across the Agency's contracting organization and the position at issue was one of the most senior positions within the organization. For these reasons, Complainant's resume was not as competitive as other candidates and his resume was rated an average score of 5 out of 9. Only candidates whose resumes received an average score of 7 or higher advanced to the interview stage of the selection process. Because Complainant's average score was in the bottom half of the average scores, he was not interviewed and, ultimately, was not selected. Although Complainant alleged that the Agency acted discriminately and/or in reprisal, we find the record does not establish by a preponderance of the evidence that the Agency acted on the basis of Complainant's sex, religion, or disability or that there was a nexus between the Agency's actions and his prior EEO activity. Therefore, we find he has failed to establish a claim of disparate treatment.

7                                                                                          2020000304

CONCLUSION

Based on a thorough review of the record and the contentions on appeal, including those not specifically addressed herein, we AFFIRM the Agency's final decision.

STATEMENT OF RIGHTS - ON APPEAL

RECONSIDERATION (M0920)

The Commission may, in its discretion, reconsider this appellate decision if Complainant or the Agency submits a written request that contains arguments or evidence that tend to establish that:

1.  The appellate decision involved a clearly erroneous interpretation of material fact or law; or

2.  The appellate decision will have a substantial impact on the policies, practices, or operations of the agency.

Requests for reconsideration must be filed with EEOC's Office of Federal Operations (OFO) **within thirty (30) calendar days** of receipt of this decision.  If the party requesting reconsideration elects to file a statement or brief in support of the request, **that statement or brief must be filed together with the request for reconsideration**.  A party shall have **twenty (20) calendar days** from receipt of another party's request for reconsideration within which to submit a brief or statement in opposition.  See 29 C.F.R. § 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614 (EEO MD-110), at Chap. 9 § VII.B (Aug. 5, 2015).

Complainant should submit his or her request for reconsideration, and any statement or brief in support of his or her request, via the EEOC Public Portal, which can be found at https://publicportal.eeoc.gov/Portal/Login.aspx

Alternatively, Complainant can submit his or her request and arguments to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, via regular mail addressed to P.O. Box 77960, Washington, DC 20013, or by certified mail addressed to 131 M Street, NE, Washington, DC 20507.  In the absence of a legible postmark, a complainant's request to reconsider shall be deemed timely filed if OFO receives it by mail within five days of the expiration of the applicable filing period.  See 29 C.F.R. § 1614.604.

An agency's request for reconsideration must be submitted in digital format via the EEOC's Federal Sector EEO Portal (FedSEP).  See 29 C.F.R. § 1614.403(g).  Either party's request and/or statement or brief in opposition must also include proof of service on the other party, unless Complainant files his or her request via the EEOC Public Portal, in which case no proof of service is required.

8                                             2020000304

Failure to file within the 30-day time period will result in dismissal of the party's request for reconsideration as untimely, unless extenuating circumstances prevented the timely filing of the request.  **Any supporting documentation must be submitted together with the request for reconsideration.**  The Commission will consider requests for reconsideration filed after the deadline only in very limited circumstances.  See 29 C.F.R. § 1614.604(c).

<u>COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION</u> (S0610)

You have the right to file a civil action in an appropriate United States District Court **within ninety (90) calendar days** from the date that you receive this decision.  If you file a civil action, you must name as the defendant in the complaint the person who is the official Agency head or department head, identifying that person by his or her full name and official title.  Failure to do so may result in the dismissal of your case in court.  "Agency" or "department" means the national organization, and not the local office, facility or department in which you work. If you file a request to reconsider and also file a civil action, **filing a civil action will terminate the administrative processing of your complaint**.

<u>RIGHT TO REQUEST COUNSEL</u> (Z0815)

If you want to file a civil action but cannot pay the fees, costs, or security to do so, you may request permission from the court to proceed with the civil action without paying these fees or costs. Similarly, if you cannot afford an attorney to represent you in the civil action, you may request the court to appoint an attorney for you. **You must submit the requests for waiver of court costs or appointment of an attorney directly to the court, not the Commission.** The court has the sole discretion to grant or deny these types of requests. Such requests do not alter the time limits for filing a civil action (please read the paragraph titled Complainant's Right to File a Civil Action for the specific time limits).

FOR THE COMMISSION:


Carlton M. Hadden, Director
Office of Federal Operations


<u>August 16, 2021</u>
Date

# Exhibit 37



| Name | DeptID | PP | Grd | Title | Sex | DOB | Age | Race |
|------|--------|----|----|-------|-----|-----|-----|------|
| Employee 1 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 49 | Black or African American |
| Employee 2 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 45 | White |
| Employee 3 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 35 | Black or African American |
| Employee 4 | OCSS | IA | 03 | Contract Specialist-DAWIA | F | | 51 | Hispanic/Latino |
| Employee 5 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | | 44 | Black or African American |
| Employee 6 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | F | | 33 | Black or African American |
| Employee 7 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 40 | Black or African American |
| Employee 8 | OCSJ | IA | 04 | Contract Specialist-DAWIA | M | | 55 | White |
| Employee 9 | OCS | IP | 01 | Senior Advisor, Agile Acquisition Strategic Initiati | M | | 50 | White |
| Employee 10 | OCSP | IA | 04 | Supv Contract Specialist-DAWIA | F | | 51 | Black or African American |
| Employee 11 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 46 | Black or African American |
| Employee 12 | OCSSS | IA | 04 | Contract Specialist-DAWIA | F | | 51 | Black or African American |
| Employee 13 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 59 | Black or African American |
| Employee 14 | OCSR | IA | 04 | Contract Specialist-DAWIA | F | | 38 | Black or African American |
| Employee 15 | OCSSM | IA | 04 | Contract Specialist-DAWIA | F | | 52 | Black or African American |
| Employee 16 | OCSS | IA | 04 | Supv Procurement Analyst-DAWIA | F | | 51 | White |
| Employee 17 | OCSU | IA | 04 | Supv Contract Specialist-DAWIA | F | | 52 | White |
| Employee 18 | OCSB | IA | 05 | Supv Procurement Analyst-DAWIA | F | | 53 | Black or African American |
| Employee 19 | OCSSS | IA | 04 | Supv Contract Specialist-DAWIA | F | | 54 | White |
| Employee 20 | OCSF | IA | 01 | Temporary Hire Student | F | | 20 | White |
| Employee 21 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | | 24 | White |
| Employee 22 | OCS | IA | 03 | Staff Officer | F | | 54 | White |
| Employee 23 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 53 | Black or African American |
| Employee 24 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | F | | 57 | Black or African American |
| Employee 25 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 46 | Black or African American |
| Employee 26 | OCSSS | IA | 04 | Contract Specialist-DAWIA | F | | 55 | White |
| Employee 27 | OCS | IE | 02 | Deputy Director, Office of Contract Services | F | | 52 | Two or More Races |
| Employee 28 | OCSP | IA | 03 | Purchasing Agent | F | | 65 | Black or African American |
| Employee 29 | OCS | IE | 03 | Director, Office of Contract Services | F | | 42 | Black or African American |

**152**

000164

| Employee 30 | OCSN | IA | 04 | Contract Specialist-DAWIA | F | 37 | White |
| Employee 31 | OCS | IA | 03 | Staff Officer | F | 43 | Black or African American |
| Employee 32 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | 53 | White |
| Employee 33 | OCSU | IA | 02 | Purchasing Agent | M | 56 | Black or African American |
| Employee 34 | OCS | IA | 04 | Supv Contract Specialist-DAWIA | F | 33 | White |
| Employee 35 | OCSF | IA | 03 | Contract Specialist-DAWIA | M | 27 | White |
| Employee 36 | OCS | IA | 04 | Staff Officer | F | 53 | Black or African American |
| Employee 37 | OCSR | IA | 05 | Supv Contract Specialist-DAWIA | F | 49 | White |
| Employee 38 | OCSJ | IA | 03 | Contract Specialist-DAWIA | F | 30 | Black or African American |
| Employee 39 | OCSN | IA | 04 | Supv Staff Officer | F | 57 | Black or African American |
| Employee 40 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | 33 | Black or African American |
| Employee 41 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | 52 | White |
| Employee 42 | OCSU | IA | 03 | Contract Specialist-DAWIA | F | 52 | Black or African American |
| Employee 43 | OCSJ | IA | 04 | Contract Specialist-DAWIA | M | 52 | Black or African American |
| Employee 44 | OCSN | IA | 05 | Supv Staff Officer | F | 56 | Hispanic/Latino |
| Employee 45 | OCSF | IA | 04 | Contract Specialist-DAWIA | F | 54 | White |
| Employee 46 | OCSJ | IA | 02 | Purchasing Agent | F | 54 | Black or African American |
| Employee 47 | OCSF | IA | 04 | Contract Specialist-DAWIA | F | 47 | White |
| Employee 48 | OCSB | IA | 04 | Supv Staff Officer | F | 54 | Black or African American |
| Employee 49 | OCSU | IA | 03 | Purchasing Agent | F | 55 | White |
| Employee 50 | OCSP | IA | 04 | Contract Specialist-DAWIA | M | 36 | White |
| Employee 51 | OCSP | IA | 04 | Supv Program Management Execution Officer-D/ | M | 41 | White |
| Employee 52 | OCSF | IA | 04 | Supv Contract Specialist-DAWIA | F | 41 | White |
| Employee 53 | OCSSS | IA | 03 | Contract Specialist-DAWIA | M | 32 | White |
| Employee 54 | OCSA | GS | 11 | Contract Specialist-DAWIA | F | 41 | Two or More Races |
| Employee 55 | OCSS | IA | 03 | Staff Officer | F | 53 | Black or African American |
| Employee 56 | OCSA | IA | 04 | Supv Contract Specialist-DAWIA | M | 42 | Black or African American |
| Employee 57 | OCSF | IA | 03 | Contract Specialist-DAWIA | M | 27 | White |
| Employee 58 | OCSJ | IA | 03 | Contract Specialist-DAWIA | F | 35 | Black or African American |
| Employee 59 | OCSS | IA | 03 | Staff Officer | F | 46 | Black or African American |
| Employee 60 | OCSR | IA | 04 | Contract Specialist-DAWIA | F | 54 | White |

**153**

| Name | DeptID | PP | Grd | Title | Sex | DOB | Age | Race |
|------|--------|----|----|-------|-----|-----|-----|------|
| Employee 1 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 49 | Black or African American |
| Employee 2 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 45 | White |
| Employee 3 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 35 | Black or African American |
| Employee 4 | OCSS | IA | 03 | Contract Specialist-DAWIA | F | | 51 | Hispanic/Latino |
| Employee 5 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | | 44 | Black or African American |
| Employee 6 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | F | | 33 | Black or African American |
| Employee 7 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 40 | Black or African American |
| Employee 8 | OCSJ | IA | 04 | Contract Specialist-DAWIA | M | | 55 | White |
| Employee 9 | OCS | IP | 01 | Senior Advisor, Agile Acquisition Strategic Initiativ | M | | 50 | White |
| Employee 10 | OCSP | IA | 04 | Supv Contract Specialist-DAWIA | F | | 51 | Black or African American |
| Employee 11 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 46 | Black or African American |
| Employee 12 | OCSSS | IA | 04 | Contract Specialist-DAWIA | F | | 51 | Black or African American |
| Employee 13 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 59 | Black or African American |
| Employee 14 | OCSR | IA | 04 | Contract Specialist-DAWIA | F | | 38 | Black or African American |
| Employee 15 | OCSSM | IA | 04 | Contract Specialist-DAWIA | F | | 52 | Black or African American |
| Employee 16 | OCSS | IA | 04 | Supv Procurement Analyst-DAWIA | F | | 51 | White |
| Employee 17 | OCSU | IA | 04 | Supv Contract Specialist-DAWIA | F | | 52 | White |
| Employee 18 | OCSB | IA | 05 | Supv Procurement Analyst-DAWIA | F | | 53 | Black or African American |
| Employee 19 | OCSSS | IA | 04 | Supv Contract Specialist-DAWIA | F | | 54 | White |
| Employee 20 | OCSF | IA | 01 | Temporary Hire Student | F | | 20 | White |
| Employee 21 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | | 24 | White |
| Employee 22 | OCS | IA | 03 | Staff Officer | F | | 54 | White |
| Employee 23 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 53 | Black or African American |
| Employee 24 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | F | | 57 | Black or African American |
| Employee 25 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | | 46 | Black or African American |
| Employee 26 | OCSSS | IA | 04 | Contract Specialist-DAWIA | F | | 55 | White |
| Employee 27 | OCS | IE | 02 | Deputy Director, Office of Contract Services | F | | 52 | Two or More Races |
| Employee 28 | OCSP | IA | 03 | Purchasing Agent | F | | 65 | Black or African American |
| Employee 29 | OCS | IE | 03 | Director, Office of Contract Services | F | | 42 | Black or African American |

**154**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Employee 30 | OCSN | IA | 04 | Contract Specialist-DAWIA | F | | 37 | White |
| Employee 31 | OCS | IA | 03 | Staff Officer | F | | 43 | Black or African American |
| Employee 32 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | | 53 | White |
| Employee 33 | OCSU | IA | 02 | Purchasing Agent | M | | 56 | Black or African American |
| Employee 34 | OCS | IA | 04 | Supv Contract Specialist-DAWIA | F | | 33 | White |
| Employee 35 | OCSF | IA | 03 | Contract Specialist-DAWIA | M | | 27 | White |
| Employee 36 | OCS | IA | 04 | Staff Officer | F | | 53 | Black or African American |
| Employee 37 | OCSR | IA | 05 | Supv Contract Specialist-DAWIA | F | | 49 | White |
| Employee 38 | OCSJ | IA | 03 | Contract Specialist-DAWIA | F | | 30 | Black or African American |
| Employee 39 | OCSN | IA | 04 | Supv Staff Officer | F | | 57 | Black or African American |
| Employee 40 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 33 | Black or African American |
| Employee 41 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | | 52 | White |
| Employee 42 | OCSU | IA | 03 | Contract Specialist-DAWIA | F | | 52 | Black or African American |
| Employee 43 | OCSJ | IA | 04 | Contract Specialist-DAWIA | M | | 52 | Black or African American |
| Employee 44 | OCSN | IA | 05 | Supv Staff Officer | F | | 56 | Hispanic/Latino |
| Employee 45 | OCSF | IA | 04 | Contract Specialist-DAWIA | F | | 54 | White |
| Employee 46 | OCSJ | IA | 02 | Purchasing Agent | F | | 54 | Black or African American |
| Employee 47 | OCSF | IA | 04 | Contract Specialist-DAWIA | F | | 47 | White |
| Employee 48 | OCSB | IA | 04 | Supv Staff Officer | F | | 54 | Black or African American |
| Employee 49 | OCSU | IA | 03 | Purchasing Agent | F | | 55 | White |
| Employee 50 | OCSP | IA | 04 | Contract Specialist-DAWIA | M | | 36 | White |
| Employee 51 | OCSP | IA | 04 | Supv Program Management Execution Officer-DA | M | | 41 | White |
| Employee 52 | OCSF | IA | 04 | Supv Contract Specialist-DAWIA | F | | 41 | White |
| Employee 53 | OCSSS | IA | 03 | Contract Specialist-DAWIA | M | | 32 | White |
| Employee 54 | OCSA | GS | 11 | Contract Specialist-DAWIA | F | | 41 | Two or More Races |
| Employee 55 | OCSS | IA | 03 | Staff Officer | F | | 53 | Black or African American |
| Employee 56 | OCSA | IA | 04 | Supv Contract Specialist-DAWIA | M | | 42 | Black or African American |
| Employee 57 | OCSF | IA | 03 | Contract Specialist-DAWIA | M | | 27 | White |
| Employee 58 | OCSJ | IA | 03 | Contract Specialist-DAWIA | F | | 35 | Black or African American |
| Employee 59 | OCSS | IA | 03 | Staff Officer | F | | 46 | Black or African American |
| Employee 60 | OCSR | IA | 04 | Contract Specialist-DAWIA | F | | 54 | White |

**155**

| Employee 61 | OCSP | IA | 05 | Supv Contract Specialist-DAWIA | F | | 66 | Asian |
|---|---|---|---|---|---|---|---|---|
| Employee 62 | OCSA | IA | 03 | Contract Specialist-DAWIA | M | | 60 | White |
| Employee 63 | OCSA | IA | 05 | Supv Contract Specialist-DAWIA | F | | 57 | White |
| Employee 64 | OCSN | IA | 04 | Contract Specialist-DAWIA | M | | 30 | Hispanic/Latino |
| Employee 65 | OCSU | IA | 03 | Contract Specialist-DAWIA | F | | 29 | Hispanic/Latino |
| Employee 66 | OCSSS | IA | 02 | Contract Specialist-DAWIA | M | | 23 | White |
| Employee 67 | OCSR | IA | 03 | Contract Specialist-DAWIA | M | | 40 | Black or African American |
| Employee 68 | OCSU | IA | 04 | Supv Contract Specialist-DAWIA | F | | 45 | Black or African American |
| Employee 69 | OCSU | IA | 04 | Contract Specialist-DAWIA | M | | 51 | White |
| Employee 70 | OCS | IP | 01 | Group Chief | M | | 49 | White |
| Employee 71 | OCSF | IA | 04 | Contract Specialist-DAWIA | M | | 52 | Black or African American |
| Employee 72 | OCSSM | IA | 05 | Supv Contract Specialist-DAWIA | F | | 60 | Black or African American |
| Employee 73 | OCSP | IA | 03 | Contract Specialist-DAWIA | F | | 64 | Black or African American |
| Employee 74 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 42 | Black or African American |
| Employee 75 | OCSR | IA | 04 | Contract Specialist-DAWIA | M | | 58 | White |
| Employee 76 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | | 25 | White |
| Employee 77 | OCSJ | IA | 01 | Temporary Hire Student | F | | 24 | White |
| Employee 78 | OCSN | IA | 05 | Supv Procurement Analyst-DAWIA | F | | 54 | White |
| Laber, Stan P | OCSP | IA | 04 | Supv Contract Specialist-DAWIA | M | | 68 | White |
| Employee 80 | OCSR | IA | 04 | Supv Contract Specialist-DAWIA | F | | 49 | White |
| Employee 81 | OCSA | IA | 04 | Supv Contract Specialist-DAWIA | M | | 57 | Black or African American |
| Employee 82 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 66 | White |
| Employee 83 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | M | | 35 | White |
| Employee 84 | OCSU | IA | 02 | Purchasing Agent | M | | 52 | Black or African American |
| Employee 85 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | | 54 | White |
| Employee 86 | OCSSM | IA | 03 | Contract Specialist-DAWIA | F | | 28 | Black or African American |
| Employee 87 | OCSF | IA | 02 | Contract Specialist-DAWIA | M | | 23 | Black or African American |
| Employee 88 | OCSR | IA | 04 | Contract Specialist-DAWIA | M | | 59 | White |
| Employee 89 | OCSJ | IA | 03 | Contract Specialist-DAWIA | M | | 38 | Black or African American |
| Employee 90 | OCSR | IA | 04 | Contract Specialist-DAWIA | M | | 47 | Hispanic/Latino |
| Employee 91 | OCSA | IA | 05 | Supv Contract Specialist-DAWIA | F | | 53 | White |

000168

| Employee 92 | OCSF | IA | 05 | Supv Contract Specialist-DAWIA | M | 47 | White |
|---|---|---|---|---|---|---|---|
| Employee 93 | OCSU | IA | 03 | Contract Specialist-DAWIA | M | 35 | White |
| Employee 94 | OCSP | IA | 04 | Contract Specialist-DAWIA | M | 39 | White |
| Employee 95 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | 45 | White |
| Employee 96 | OCSU | IA | 02 | Contract Specialist-DAWIA | F | 52 | Black or African American |
| Employee 97 | OCS | IP | 01 | Group Chief | F | 46 | White |
| Employee 98 | OCSF | IA | 04 | Contract Specialist-DAWIA | F | 53 | Black or African American |
| Employee 99 | OCSP | IA | 05 | Contract Specialist-DAWIA | F | 52 | Black or African American |
| Employee 100 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | 50 | Black or African American |
| Employee 101 | OCS | | O5 | Deputy Chief | M | 33 | Unspecified |
| Employee 102 | OCSF | IA | 03 | Contract Specialist-DAWIA | F | 33 | White |
| Employee 103 | OCSS | IA | 03 | Contract Specialist-DAWIA | F | 50 | Black or African American |
| Employee 104 | OCSA | IA | 05 | Supv Contract Specialist-DAWIA | M | 33 | White |
| Employee 105 | OCSP | IA | 04 | Procurement Analyst-DAWIA | F | 32 | Black or African American |
| Employee 106 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | 26 | White |
| Employee 107 | OCSU | IA | 03 | Contract Specialist-DAWIA | M | 57 | Black or African American |
| Employee 108 | OCSU | IA | 02 | Contract Specialist-DAWIA | M | 30 | White |
| Employee 109 | OCSP | IA | 03 | Contract Specialist-DAWIA | M | 50 | Black or African American |
| Employee 110 | OCS | IA | 04 | Contract Specialist-DAWIA | F | 36 | Asian |
| Employee 111 | OCS | IA | 05 | Supv Contract Specialist-DAWIA | F | 56 | White |
| Employee 112 | OCSU | IA | 05 | Supv Contract Specialist-DAWIA | M | 43 | White |
| Employee 113 | OCSP | IA | 05 | Supv Contract Specialist-DAWIA | M | 46 | White |
| Employee 114 | OCSSS | IA | 04 | Supv Contract Specialist-DAWIA | F | 49 | Black or African American |
| Employee 115 | OCSS | IA | 01 | Temporary Hire Student | F | 20 | White |
| Employee 116 | OCSA | IA | 04 | Contract Specialist-DAWIA | F | 58 | White |
| Employee 117 | OCSP | IA | 05 | Supv Contract Specialist-DAWIA | M | 53 | Black or African American |
| Employee 118 | OCSF | IA | 03 | Contract Specialist-DAWIA | F | 26 | White |
| Employee 119 | OCSSS | IA | 05 | Supv Contract Specialist-DAWIA | F | 55 | Black or African American |
| Employee 120 | OCS | IA | 01 | Temporary Hire Student | M | 21 | White |
| Employee 121 | OCSF | IA | 05 | Supv Contract Specialist-DAWIA | M | 56 | White |
| Employee 122 | OCSU | IA | 04 | Contract Specialist-DAWIA | F | 63 | White |

000169

| Employee 123 | OCSN | IA | 03 | Staff Officer | F | | 38 | Hispanic/Latino |
| Employee 124 | OCSA | IA | 04 | Contract Specialist-DAWIA | M | | 31 | White |
| Employee 125 | OCSSM | IA | 02 | Contract Specialist-DAWIA | M | | 25 | White |
| Employee 126 | OCSN | IA | 04 | Staff Officer | F | | 56 | White |
| Employee 127 | OCSU | IA | 02 | Contract Specialist-DAWIA | F | | 58 | Black or African American |
| Employee 128 | OCSU | IA | 03 | Contract Specialist-DAWIA | F | | 50 | Black or African American |
| Employee 129 | OCSA | GS | 13 | Supv Contract Specialist-DAWIA | F | | 39 | Black or African American |
| Employee 130 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 57 | White |
| Employee 131 | OCSR | IA | 03 | Contract Specialist-DAWIA | F | | 34 | Hispanic/Latino |
| Employee 132 | OCSU | IA | 04 | Contract Specialist-DAWIA | F | | 48 | Black or African American |
| Employee 133 | OCSB | IA | 04 | Contract Specialist-DAWIA | F | | 48 | Black or African American |
| Employee 134 | OCSS | IA | 03 | Contract Specialist-DAWIA | F | | 57 | White |
| Employee 135 | OCSSM | IA | 04 | Contract Specialist-DAWIA | F | | 50 | Black or African American |
| Employee 136 | OCSJ | IA | 03 | Contract Specialist-DAWIA | M | | 51 | White |
| Employee 137 | OCSSS | IA | 03 | Contract Specialist-DAWIA | M | | 46 | Black or African American |
| Employee 138 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 49 | White |
| Employee 139 | OCSSS | IA | 03 | Contract Specialist-DAWIA | F | | 30 | White |
| Employee 140 | OCSSM | IA | 03 | Contract Specialist-DAWIA | F | | 58 | White |
| Employee 141 | OCSU | IA | 04 | Contract Specialist-DAWIA | F | | 43 | Black or African American |
| Employee 142 | OCSR | IA | 01 | Temporary Hire Student | M | | 28 | White |
| Employee 143 | OCS | IA | 04 | Contract Specialist-DAWIA | F | | 46 | Hispanic/Latino |
| Employee 144 | OCSJ | IA | 04 | Supv Contract Specialist-DAWIA | M | | 29 | White |
| Employee 145 | OCSA | IA | 03 | Contract Specialist-DAWIA | M | | 67 | White |
| Employee 146 | OCSF | IA | 05 | Supv Contract Specialist-DAWIA | M | | 34 | White |
| Employee 147 | OCSJ | IA | 04 | Contract Specialist-DAWIA | F | | 54 | Black or African American |
| Employee 148 | OCSA | IA | 04 | Contract Specialist-DAWIA | M | | 51 | White |
| Employee 149 | OCSU | IA | 03 | Contract Specialist-DAWIA | M | | 52 | Black or African American |
| Employee 150 | OCSF | | O3 | Contracting Ofcr | F | | 40 | Unspecified |
| Employee 151 | OCSF | IA | 04 | Supv Contract Specialist-DAWIA | F | | 32 | Black or African American |
| Employee 152 | OCSU | IA | 03 | Contract Specialist-DAWIA | M | | 43 | White |
| Employee 153 | OCSSS | IA | 03 | Contract Specialist-DAWIA | M | | 31 | White |

000170

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Employee 154 | OCSA | IA | 05 | Supv Contract Specialist-DAWIA | M | | 57 | Asian |
| Employee 155 | OCSA | IA | 01 | Temporary Hire Student | F | | 21 | Asian |
| Employee 156 | OCSR | IA | 05 | Supv Contract Specialist-DAWIA | M | | 51 | White |
| Employee 157 | OCS | | O3 | Contracting Ofcr | M | | 30 | Unspecified |
| Employee 158 | OCSU | IA | 05 | Supv Contract Specialist-DAWIA | F | | 53 | White |
| Employee 159 | OCSSS | IA | 04 | Contract Specialist-DAWIA | M | | 48 | White |
| Employee 160 | OCSA | IA | 03 | Contract Specialist-DAWIA | F | | 28 | White |
| Employee 161 | OCSSM | IA | 04 | Supv Contract Specialist-DAWIA | F | | 52 | White |
| Employee 162 | OCSSS | IA | 04 | Contract Specialist-DAWIA | F | | 53 | Black or African American |
| Employee 163 | OCS | IA | 05 | Supv Contract Specialist-DAWIA | F | | 52 | Black or African American |
| Employee 164 | OCSA | IA | 05 | Supv Contract Specialist-DAWIA | F | | 56 | White |
| Employee 165 | OCSA | IA | 03 | Purchasing Agent | F | | 43 | Black or African American |
| Employee 166 | OCSJ | IA | 05 | Supv Contract Specialist-DAWIA | F | | 54 | Black or African American |
| Employee 167 | OCSJ | IA | 04 | Contract Specialist-DAWIA | M | | 62 | White |
| Employee 168 | OCSA | GS | 15 | Supv Cost Estimator | F | | 44 | Black or African American |
| Employee 169 | OCSU | IA | 01 | Temporary Hire Student | F | | 31 | White |
| Employee 170 | OCSA | GS | 12 | Auditor | M | | 59 | White |
| Employee 171 | OCSA | | O3 | Contracting Ofcr | F | | 30 | Unspecified |

**159**

000171

# Exhibit 38

**#1 & #5**

| Applicants | Sex | Birthdate | Religion | Disability | EEO |
|---|---|---|---|---|---|
| Employee 1 | F | ▮-64 | Not Listed | None | None |
| Employee 2 | F | ▮-72 | Not Listed | None | None |
| Employee 3 | F | ▮-68 | Not Listed | None | None |
| Employee 4 | F | ▮-64 | Not Listed | None | None |
| Employee 5 | M | ▮-56 | Not Listed | None | None |
| Employee 6 | M | ▮-78 | Not Listed | None | None |
| Employee 7 | F | ▮-60 | Not Listed | None | None |
| Employee 8 | F | ▮-70 | Not Listed | None | None |

**290**